<pre>
 1                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
 2     _____

 3     UNITED STATES OF AMERICA,          CRIMINAL NUMBER:

 4               vs.                       2:24-cr-99-MEF

 5     RAHEEL NAVIWALA,                    JURY TRIAL

 6               Defendant.                VOL X, PGS. 2175 - 2412

 7     _____

 8          Frank R. Lautenberg Post Office and U.S. Courthouse
            Two Federal Square
 9          Newark, New Jersey  07101
            February 24, 2025
10

11
       B E F O R E:              THE HONORABLE MICHAEL E. FARBIARZ,
12                               UNITED STATES DISTRICT COURT JUDGE,
                                 AND A JURY.
13

14
       A P P E A R A N C E S:
15
            OFFICE OF THE UNITED STATES ATTORNEY, BY:
16          MATTHEW SPECHT, ASST. UNITED STATES ATTORNEY
            ELAINE K. LOU, ASST. UNITED STATES ATTORNEY
17          AARON LOUIS WEBMAN, ASST. UNITED STATES ATTORNEY
            970 Broad Street
18          Newark, New Jersey  07102

19               appeared on behalf of the Government;

20


21               Lisa A. Larsen, RPR, RMR, CRR, FCRR
22                     Official Court Reporter
                    Lisa_Larsen@njd.uscourts.gov
23                         (973)776-7741

24


25          Proceedings recorded by mechanical stenography.
          Transcript produced by computer-aided transcription.
</pre>

*UNITED STATES DISTRICT COURT*
*Newark, New Jersey*

1  **A P P E A R A N C E S**: (Cont'd.)

2      FORD O'BRIEN LANDY, LLP, BY:
       JAMIE HOXIE SOLANO, ESQ.
3      BRYAN W. McCRACKEN, ESQ.
       IFEDAPO BENJAMIN, ESQ.
4      AMY C. BROWN, ESQ.
       275 Madison Avenue
5      Floor 24
       New York, New York  10016
6
           appeared on behalf of the Defendant;
7
**A L S O   P R E S E N T**:
8
       Kimberly Dorismond, Paralegal, Ford O'Brien
9      Landy, LLP; and
       Raheel Naviwala, Defendant.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>**I N D E X**</u>

2

3   <u>**WITNESSES**</u>**:**          <u>DX</u>   <u>CX</u>    <u>RDX</u>  <u>RCX</u>  <u>FDX</u>   <u>FCX</u>

4

    RAHEEL NAVIWALA              2265  2295 2300

5

6

7                    <u>**E X H I B I T S**</u>

8
                                      <u>MKD/ID</u>    <u>RECEIVED</u>
9
    Government's Exhibit No:
10
        4801                                        2267
11

12

13                                    <u>PAGE</u>

14  <u>**CLOSING ARGUMENT**</u>**:**

15      By Mr. Specht                 2392

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*

```
 1              (PROCEEDINGS held in open court before the
 2              HONORABLE MICHAEL E. FARBIARZ, United States
 3              District Court Judge, on February 24, 2025.)
 4         THE DEPUTY CLERK:  All rise.
 5         THE COURT:  We are here for U.S. vs. Raheel Naviwala.
 6    The assistant United States attorneys are present as is the
 7    defendant, along with each of his defense lawyers.
 8         Mr. Naviwala, you're still there for a reason?
 9         THE DEFENDANT:  They exiled me.
10         MS. SOLANO:  He's taking your admonishment seriously
11    that he not communicate with us.
12         THE COURT:  The record can reflect that Mr. Naviwala is
13    seated in a different place and, indeed, further away from his
14    lawyers than he has been throughout the proceedings.
15         Ms. Solano, thank you for that explanation.
16         Good letters, everyone.  Good work.  I greatly
17    appreciate it all.
18         Mr. Webman, I was true to what I said.  I looked at
19    everything from 801, so fear not.  No moss was gathered and I
20    barely noticed that your filing came in just after
21    eight o'clock, so don't worry about it.
22         MR. WEBMAN:  Your Honor, I believe it was due at 9:00.
23         THE COURT:  At 9:00.
24         MR. WEBMAN:  It was.
25         THE COURT:  That's funny.  We've all revealed something
```

United States District Court
District of New Jersey

```
1    about ourselves.
2          Let's go through it.  Good work, everyone, and much
3    appreciated.
4          First of all, the papers are very good.  I don't think
5    there's any need for kind of real argumentation given how good
6    they are uniformly from everybody.
7          The first thing I just want to understand before we get
8    to the question of the right instruction to give to the jury
9    with respect to testimony that, in the United States' telling,
10   should be Mr. Quindoza's testimony and, in the defendant's
11   telling, should be something broader.
12         There was a representation made Friday by the
13   United States that the United States would not be coming back
14   to argue in summation, and I assume also in rebuttal, about
15   violations of the rules of either a so-called face-to-face
16   rule -- I'm making up that term -- or a telemedicine rule.
17         I assume that remains the United States'
18   representation.
19         MR. WEBMAN:  Yes, Your Honor.  We have a jury
20   instruction that says that.
21         THE COURT:  I just want to make sure, because it's
22   relevant to how I think about things that that's still where
23   we're at.
24         So here is where I see things:  I have gone through --
25         Do you need to be heard, Ms. Solano?
```

1        MS. SOLANO:  Your Honor, maybe I'm not understanding

2    the position because what was in writing to me was that they

3    are going to argue about violations of the rules.

4        Is this a different issue?

5        MR. WEBMAN:  We're not talking about violations of the

6    rules as violations of the criminal statute.  I think we're on

7    common ground there.

8        THE COURT:  So let me just tell you how I understand it

9    and then you'll correct, Mr. Webman, and Ms. Solano will get

10   clarity based on that.

11       No one, neither Mr. Specht nor Ms. Lou, are going to

12   stand up in closing and say part of how you know that the

13   submitted claims were not medically necessary was that they

14   violated Medicare's face-to-face rules; or neither Mr. Specht

15   nor Ms. Lou will argue that part of how you know the claims

16   were not medically necessary is that they violated Medicare's

17   telehealth rules.

18       I assume that's right.

19       Do I have that right?

20       MR. WEBMAN:  Your Honor, there's -- in consulting over

21   the weekend with my fraud section colleagues, I think there's

22   just one refinement that comes from --

23       THE COURT:  So all of that is right, subject to what

24   you're about to say?

25       MR. WEBMAN:  Yes, Your Honor.

1            THE COURT:  Say what you're going to say, then.

2            MR. WEBMAN:  I think there are two points I wanted to

3    make in response to the defendant's letter --

4            THE COURT:  No, no.  I want to just understand what's

5    gonna be said in summation and rebuttal.

6            MR. WEBMAN:  So this goes from my response to the

7    letter.  I think that there is -- in the regulation, we have

8    been very focused on one portion of the regulation, which is

9    410.38(g)(2)(i), which is the line that brings in that list of

10   codes that are covered as specified covered items in the reg.

11           There is then a 410.38(g)(2)(ii), which says that the

12   list of specified items includes, among other things, in (b)

13   under that section, any item of durable medical equipment that

14   appears on the DME POS fee schedule with a price ceiling at or

15   greater than $1,000.

16           I couldn't print out the fee schedule to bring in this

17   morning, Your Honor, because it's a big Excel file.  But if

18   you look at the Medicare data in evidence, we can see that the

19   two main braces in this case -- the back brace, 0650, and the

20   knee brace, 1851 -- are both routinely reimbursed for over a

21   thousand dollars, meaning that this ceiling in the fee

22   schedule is a thousand dollars or above.

23           So based on that and based on that reading of the reg,

24   which is already in evidence, and based on other material

25   that's already in evidence, I think there's a fair inference

```
 1   that the full panoply of requirements --
 2          THE COURT:  I'm not quite following that, just because
 3   it's the first time I'm hearing of it.
 4          MR. WEBMAN:  Sorry.
 5          THE COURT:  So, is there an affirmative indication from
 6   a regulation that is in evidence that braces above a certain
 7   cost during this the relevant period required -- an
 8   affirmative requirement -- that those required a face-to-face
 9   visit?
10          MR. WEBMAN:  Yes, it requires the full panoply of
11   requirements that are in subsection (g).
12          THE COURT:  But what's the answer to my question?
13          MR. WEBMAN:  Yes, that includes face-to-face,
14   Your Honor.
15          THE COURT:  Okay.  So the United States' position is
16   now that face-to-face visits were required for much of the
17   DME?
18          MR. WEBMAN:  For these two brace types, this is
19   something, again, I learned overnight, Your Honor --
20          THE COURT:  Mr. Webman, this is -- among the many other
21   things that might be said, it's a little tricky in terms of
22   basic fairness to decide this overnight and now expect that
23   you can close on it today.
24          I mean, this is the kind of thing that -- I appreciate
25   that you don't have a discovery obligation as to the law and,
```

1    indeed, we're talking about the substance in the defense

2    exhibit.

3        But I thought that your position, the United States'

4    position, was much more sympathetic, the way I understood it,

5    based on the letter of yesterday, which is -- and based on the

6    representation of Friday, which is that we, the United States,

7    are not going to argue in closing and in rebuttal that

8    something was not medically necessary because it violated

9    Medicare rules or regs, period, full stop.

10       The effort this morning to walk back the Friday reg and

11   what was described Friday morning is, at a minimum, awfully

12   complicating.

13       MR. WEBMAN:  I understand, Your Honor.

14       I think there is a distinction, though.  We still are

15   not planning to argue -- the representation I made on Friday,

16   I think still holds, which is we are not going to argue -- and

17   we agreed to a jury instruction that says this: that the

18   violation of the face-to-face requirement is a violation of

19   the law.  The argument --

20       THE COURT:  Hang on.

21       That's not what the jury instruction says.  It does not

22   say the violation of face-to-face --

23       MR. WEBMAN:  The violation of any particular

24   regulation --

25       THE COURT:  Is not.

1        MR. WEBMAN:  -- is not in and of itself a violation of

2   the law.

3        THE COURT:  You left out the word "not."  Keep going.

4        MR. WEBMAN:  Sorry.  We're not planning to argue the

5   fact that a face-to-face interaction didn't happen for a knee

6   brace, for example, this goes to the knee laxity issue.  We're

7   not going to say that the failure to do --

8        THE COURT:  Ms. Solano, have a seat.

9        MR. WEBMAN:  -- the failure to do a face-to-face visit

10  for a knee before prescribing this brace that is over a

11  thousand dollars, we're not gonna argue that the failure to do

12  that thing was in and of itself --

13       THE COURT:  I guess what I don't understand is, why

14  are you mentioning this to me?  What is the -- I'm asking you

15  whether the United States will argue, whether because there

16  was an alleged violation of a Medicare rule or reg or there

17  was a violation of the criminal law.

18       What you told me was, no, we will not argue that.  You

19  also wrote me a letter that said:  We have not argued that.

20  You're now creating space for something else.

21       What is the something else you're creating space for?

22       MR. WEBMAN:  Your Honor, the purpose of bringing this

23  up is that I think the curative instruction that we proposed

24  is a little bit too broad and --

25       THE COURT:  But that doesn't matter to me.  We're not

1    there yet.  We're talking about something else, and the

2    something else we're talking about is what the United States

3    is gonna argue in closing and summation because, as your

4    letter yesterday suggests, it's important to the curative

5    instruction I might give to understand what you might argue.

6          MR. WEBMAN:  Yes, Judge.

7          THE COURT:  So I am trying only to find out what the

8    United States is going to argue.

9          MR. WEBMAN:  So what the United States is going to

10   argue, I believe, and Mr. Specht, who is going to give the

11   summation, will correct me if I have this a little bit wrong,

12   but what the United States is going to argue is that the whole

13   scheme was designed to produce doctors' orders without regard

14   to medical necessity, that didn't make the effort to figure

15   out whether patients actually needed the brace.

16         THE COURT:  Stop right there.  I've understood that

17   from the moment this case began and, candidly, the record

18   doesn't suggest anything different.

19         What I don't understand is what, Mr. Webman, you are

20   standing up to do now is to say, and also, by the way,

21   Mr. Specht and/or Ms. Lou will say that, and there needed to

22   be a face-to-face consultation for the expensive braces, and

23   that is part of what the jury should consider in evaluating

24   the argument.

25         MR. WEBMAN:  We're not going to say that, Your Honor.

```
 1          THE COURT:  So then that's it.  That's the only -- I
 2   appreciate you're helping me understand.
 3          Ms. Solano, sit, sit.  I'm talking to someone else.
 4          I appreciate you telling me about the full body of what
 5   you discovered overnight with respect to the reg.  I got it,
 6   appreciate it.  It's helpful.
 7          But the key point that I took from Friday's
 8   representation from the United States, and the letter from the
 9   United States yesterday, was that there will not be an
10   argument from the United States that violation -- there will
11   not be an argument from the United States, in closing or
12   summation, that violation of a particular rule or reg is part
13   of the way the jury can infer that claims submitted were not
14   indeed medically necessary.
15          I understand you to be saying now that that is how the
16   United States will close and rebut.
17          MR. WEBMAN:  That's right, Your Honor.  We will talk
18   only about the co-conspirators' and, perhaps the defendant's,
19   understanding and belief how that informs -- but not that the
20   violation was itself a violation of the law, but that they
21   understood that they lived in a world where these things were
22   required and that the failure to do them shows that they
23   weren't taking care to make sure that there was medical
24   necessity.
25          I believe those things are different and that it's
```

1    consistent with our representation on Friday.

2          THE COURT:  Okay.  Ms. Solano.

3          MS. SOLANO:  Yes, Your Honor.  Thank you.

4          I have two points in response.

5          On 9:51 p.m., I received a representation in writing

6    from the Government that said:  The Government --

7          THE COURT:  What day is this?

8          MS. SOLANO:  I'm sorry, Your Honor, on February 22nd,

9    so on Saturday night, I received a representation from the

10   Government in writing that said:

11          (Reading:)

12          The Government is likely to argue that the

13          defendant and his co-conspirators' attempts to

14          obtain prescriptions for knee braces that they

15          believe required an in-person consultation with a

16          doctor are indicia of the defendant and his

17          co-conspirators' intent to defraud, as well as

18          their complete or reckless disregard for medical

19          necessity, leading to their participation in a

20          fraudulent Medicare billing scheme that did not

21          account for medical necessity at all.

22          The Government may further argue that the jury

23          can conclude that, as a result, Medicare claims

24          submitted for orthotic braces as part of the

25          scheme were not medically necessary.

1        What I understand from the representations here is that

2   they still intend to argue this and they still intend to argue

3   about the co-conspirators' understanding of the laws and the

4   regs.

5        They put on wrong testimony about those laws and the

6   regs, and so under those circumstances, they cannot then

7   suggest to the jury that they should rely on that completely

8   inappropriate testimony in determining any of the issues in

9   this case.

10       So that is point 1.

11       THE COURT:  Let's stay on point 1 for a second.

12       What I understand from that, maybe I'm wrong, is that

13  what the United States is gonna get up and say is, duh, it's

14  really strange to prescribe a brace that kinda makes sense

15  only if you moved around on somebody, if you haven't moved

16  around on somebody.  And they're gonna make that argument --

17  it's how I understand it, at least, they're gonna make that

18  argument without citing any rule or reg or anyone's

19  understanding of the rule or reg.

20       Do I have that right?

21       MR. WEBMAN:  Yes, Your Honor.  Sorry, Your Honor.  I

22  think the understanding of what Medicare required generally,

23  not anybody's specific interpretation of the regulation.

24       THE COURT:  You have to just be very clear here.

25  Everyone understands that this case is about medical

1   necessity.  We all understand, you don't have to carve out

2   room for that.

3        Both sides are gonna get up and discuss medical

4   necessity as they have throughout the trial.  The point is,

5   are you gonna cite someone's -- are you gonna cite a

6   regulation or a rule or are you gonna cite someone's

7   understanding of a rule or regulation?  Answer each of those

8   questions separately.

9        MR. WEBMAN:  We are not gonna cite any regulation or a

10   rule.  We will cite the co-conspirators' understanding of what

11   the rule --

12        THE COURT:  Are you really sure you want to go down

13   that road?  I mean, the import of that -- given the record

14   that's been created here, there is a little bit of a fine

15   line, as I'm sure everyone understands between these things.

16   This is a hill you're trying to die on and I candidly don't

17   get it.  I mean, you're preserving something very small and --

18   whose -- what conspirator testimony are you trying to save

19   here?

20        Mr. Specht wrote this closing argument last week.

21        Mr. Specht, what co-conspirator's understanding of the

22   rules do you need to cite here or are you planning to cite?

23   "Need" is your question.  "Plan" is mine.

24        MR. SPECHT:  Your Honor, there are communications about

25   knee laxity in which members of the conspiracy talk about

1  trying to convince RediDoc to write prescriptions for knee

2  laxity, and then RediDoc doesn't do that and then members of

3  the conspiracy say:  We really need to push to get someone to

4  write tests for knee laxity.

5          THE COURT:  Right.

6          MR. SPECHT:  I think that's the boundary and I think it

7  speaks to a few facts.  I think it speaks --

8          THE COURT:  Hang on for a second.

9          Is that the only instance in your closing where there's

10  going to be a reference to rules or regs?

11          MR. SPECHT:  If I could have a moment.

12          THE COURT:  Yeah, sure.

13          (Brief pause.)

14          MR. SPECHT:  Your Honor, I think it is, and I think

15  this point is largely --

16          THE COURT:  Mr. Specht, hang on.

17          Ms. Lou, this applies to the rebuttal as you kind of

18  understand it roughly now.  You can't know for sure.

19          MS. LOU:  Obviously it depends on what is said in

20  counsel's summation but largely it's the same thing.

21          If Ms. Solano, for example, gets up and says the reg

22  doesn't require X, Y, Z, we intend to then respond by saying

23  again -- and I believe Your Honor's curative instruction about

24  how the testimony came in as to the regs and that it should

25  only be used for the purpose of the co-conspirators'

1  understanding of what the regs were is in line with us --

2       THE COURT:  Ms. Solano, I need you to sit down.

3       MS. LOU:  In line with this --

4       THE COURT:  Hang on a sec.

5       It's just, we don't wait in line.  This is like being

6  in a school where kids go like this raising their hand.  Don't

7  do that.  It's just, I don't want them to stand while I'm

8  talking to you because I respect you.  I'm listening to you.

9  Don't do that to them.

10       Do you understand?

11       MS. SOLANO:  Yes, Your Honor.

12       MS. LOU:  Again, it's not that whether or not the

13  actual reg required it or not.  It's that everybody shared

14  understanding that that was required and then their blatant

15  disregard for it and then not implementing any change -- they

16  did try to push but then still continued to bill knee braces

17  even after they didn't get the joint laxity test.  Right?  The

18  evidence has showed that.

19       THE COURT:  Let's go back to what Mr. Specht was

20  saying, then.

21       Mr. Specht, in making that argument, are you gonna be

22  citing any rules or regs?

23       MR. SPECHT:  No.

24       THE COURT:  I don't remember that testimony perfectly.

25       Does that testimony itself cite any rules or regs?

1        MR. SPECHT:  Not that I can recall, and in any of the

2   excerpts of testimony that would be showed, there's no

3   citation to a rule or reg and in any excerpt from an e-mail or

4   an exhibit, I don't believe there to be a reference to a rule

5   or reg.

6        THE COURT:  Okay.  I think that part of the

7   complexity -- Ms. Solano made a further complexity that she

8   only made the first of the two points she wanted to make; but

9   I think part of the problem is that the way that 9:51 p.m.,

10  February 22nd, e-mail was apparently written, it just conveys

11  something different than what you just conveyed.

12       Okay, Ms. Solano.

13       MS. SOLANO:  Thank you, Your Honor.

14       There are several issues that we have with the

15  Government's proposal here.

16       First, the knee laxity -- this idea that they want to

17  argue that a co-conspirator's understanding that there was a

18  requirement for a knee laxity test and they want to argue to

19  the jury that there was, in fact, that requirement is

20  incredibly misleading.  It is a very misleading argument and

21  there is no evidence in this case --

22       THE COURT:  But the problem is they're not saying

23  either thing anymore.  They're not saying that they're

24  going to put on evidence that somebody thought the rules and

25  regs were violated and they're not gonna say that the rules

1    and regs were violated.

2         Mr. Specht just represented that.

3         MS. SOLANO:  Your Honor, what I understand is that they

4    are going to say that the co-conspirators thought that the

5    knee laxity test was required and as a result they were told

6    that it couldn't happen --

7         THE COURT:  But stop there.

8         What Mr. Specht has just said is, in making that

9    argument of something being required, they're not gonna cite a

10   Medicare rule and they're not gonna cite a Medicare reg.

11        What they're gonna, I assume, argue is -- forgive me

12   for being colloquial -- but they're going to make the

13   commonsense argument.  That's the duh argument.  Duh.  There's

14   no way to think this is medically necessary if you're not

15   testing somebody in a kind of halfway bona fide way.  That's

16   gonna be their commonsense argument.

17        If that argument doesn't run through Medicare rules or

18   regs as to certain tests being required, what's the issue?

19        MS. SOLANO:  Your Honor, I think there are several

20   issues.

21        First, I don't believe that there's any evidence that

22   their doctors' orders, what was actually prepared or

23   submitted, falsely put in the knee laxity test.

24        THE COURT:  So you should argue that.

25        MS. SOLANO:  In addition, Your Honor, Ms. Lou stood up

1    and she, when asking the question, suggested that there is a

2    regulation involving knee laxity and my understanding is that

3    is not true.

4         And so right now what the jury has heard is that there

5    is a regulation requiring knee laxity and that is very, very

6    damaging if they are going to say -- if they're going to argue

7    that the co-conspirators not intended but knew that there was

8    in fact this knee laxity requirement, and I think the

9    probative value is vastly outweighed by its prejudicial

10   effect, under the circumstances where they have said that the

11   regulation requires joint laxity and they put somebody on to

12   talk about what regulations require, including an in-person

13   consultation, when none of that applied to DME.

14        The second problem that is presented by this is knee

15   laxity -- and I don't know all of it, but my understanding is

16   any sort of knee laxity and there need to be a particular test

17   comes from -- it doesn't come from any source of this; it

18   comes from like a local coverage determination, which is some

19   other piece of paper, and the Government did not produce that

20   to us.  And we kept asking for these types of things and they

21   didn't produce it.

22        And so if they are now gonna rely on the

23   co-conspirators' understanding of when or if a particular test

24   was performed and they didn't produce the actual materials of

25   like how did they know -- like, what is it?  Where does it

1   come from?  What does it actually say, so that I could

2   cross-examine their co-conspirators on that, then I believe

3   that there is a Rule 16 violation here, especially where we

4   kept asking for it so that we could -- it was material to our

5   defense.  Now they're going to argue it in their closing.

6           THE COURT:  But they're not saying that.  I think

7   you're not hearing the representation they're making.

8           What they're saying is that they're not gonna argue

9   from the rules and regs as to proving up the falsity of

10  certain claims.

11          And what I also just heard Mr. Specht saying is that

12  even when they're taking about the knowledge of alleged

13  co-conspirators, they're not gonna invoke rules and regs.

14  What they're gonna invoke is a commonsense understanding that

15  not doing a laxity test, it can't be consistent with a bona

16  fide effort to check medical necessity.

17          Neither of those arguments are running through rules

18  and regs.  They're just different.  Those are just different

19  ways.  They may be missing an argument that could help them

20  and you may be missing an argument that could help you, but

21  that doesn't mean that the United States' desire or decision

22  to argue this on a commonsense basis, which is to say just

23  from a commonsense perspective, it can't be medically

24  necessary; that doesn't make it a violation of -- it doesn't

25  make it a discovery failure.  They're not relying on the

1  documents that you say they need.

2      By the way, these documents, I'm pretty confident are

3  on the Internet.

4      MS. SOLANO:  But, Your Honor, telling us in advance,

5  identifying, we're gonna make knee laxity an issue here, you

6  need to know this local coverage determination, we're gonna

7  say this applied to the conduct.

8      Whether it's available on the Internet or not, knowing

9  that that's what they're going to use as a part of their case

10  in chief is something that was material to our defense,

11  because then I would have known what they were going to rely

12  on.

13      THE COURT:  But they're not using it.  That's sort of

14  the whole point is Mr. Specht just got up and said they're not

15  gonna argue from that.

16      I have to say, reading the trial transcript, they're

17  not arguing from it -- there's an area for Mr. Quindoza but

18  they're not arguing that a certain rule or reg was violated.

19      Mr. Specht, am I misunderstanding your closing?

20      MR. SPECHT:  No, Your Honor.

21      THE COURT:  Ms. Solano, I think that -- if Mr. Specht

22  crosses the line he has just laid down, there's gonna be a

23  problem and we'll all take it from there.

24      If he doesn't, you know, through a -- there's been some

25  complexity here because there's been belated discoveries of

 1   certain aspects of the rules and regs, but the basic truth is

 2   that had the United States discovered the accurate

 3   understanding of things with respect to what Mr. Webman says

 4   he discovered overnight, they would have a stronger case.

 5        So all we're talking about is Mr. Webman, if he tried

 6   to say, well, gee, I want to argue from what I discovered

 7   overnight, we would have that conversation.  And part of that

 8   conversation would run through unfairness to the defendant of

 9   a belated legal theory and we'd have a conversation about it.

10   I don't know what the answer would be.

11        But where we are today is, given the way Mr. Specht has

12   represented he's gonna close, given my read of the trial

13   transcript, what we're left with is a need to correct -- we're

14   left with a need to be sure that nobody confuses a

15   co-conspirator's sense of certain things with falseness and we

16   need to correct what Mr. Quindoza said but I don't think

17   there's anything much further needed.

18        Ms. Solano, do you have anything else on this you want

19   to say?

20        MS. SOLANO:  Just two points.

21        THE COURT:  Sure.

22        MS. SOLANO:  If the Government would have identified

23   this for us, this knee laxity issue, I would have been in a

24   position to cross-examine their witnesses on their

25   understanding of the joint laxity test, and I was not in a

```
 1   position to do that because they failed to disclose it to me.

 2         THE COURT:  What did you need them to disclose?

 3         MS. SOLANO:  That they were going to say that there was

 4   a joint -- that part of what they were going to do in their

 5   presentation of the case in trying to prove medical necessity

 6   or lack thereof is that they were going to rely on whatever

 7   document in existence purportedly required a knee laxity test

 8   in order for the claim to be reimbursable.

 9         THE COURT:  But what they're saying is they're not

10   gonna rely on that.

11         MS. SOLANO:  But their witnesses testified that they

12   understood that there was a rule, and they did that them

13   eliciting that testimony.  And if I understood the rule

14   beforehand, I understood that this was actually a local

15   coverage determination, and it actually has -- here is this

16   whole thing about how those are different than a reg or here

17   is what you would need to know to find those things, I could

18   have crossed Quindoza on it and I could have crossed the

19   cooperators on it.

20         THE COURT:  I'm struggling to see the point.  If a

21   cooperator thinks something is illegal -- I've just never

22   heard of anything remotely like this; that a cooperator

23   thinking that moving cocaine is illegal triggers an obligation

24   from the United States to produce in discovery statutes and

25   regs that speak to the illegality of cocaine.  That's just
```

1    really far afield.

2        And especially given -- that's not even Rule 16

3    material, especially given that the United States is saying

4    that they're not gonna be relying on it.  That is the faintest

5    possible theory, so to the extent there's an argument from a

6    Rule 16 violation, I don't see it.

7        Anything else?

8        MS. SOLANO:  I would just say -- I don't know if I

9    followed what the Government was saying about this price

10   fixing list.  I don't believe that they produced the price

11   fixing list, and it's certainly not in evidence in this case.

12       I know that when we pulled the list that was in effect

13   at the time, we had to do so by capturing it by the Wayback

14   Machine.  It wasn't something that was publicly available that

15   anyone could find.

16       I don't believe that the price fixing list that's in

17   effect that's being discussed in this reg is in evidence in

18   this case or is in -- I don't believe it's in Rule 16.

19       THE COURT:  I don't know if it's in evidence or not.

20   It certainly hasn't been published.  Even if I don't know if

21   it's in evidence I've been doing what I'm supposed to do which

22   is I'm looking at all the exhibits.

23       The thing that gives me pause is Mr. Webman said it's

24   such a big Excel spreadsheet that maybe I didn't understand

25   the import of a piece of it or something.

1        I don't think this was in evidence.

2        Was this in evidence, Mr. Webman?

3        MR. WEBMAN:  It's not, Your Honor.  I didn't know

4   about it until last night.

5        THE COURT:  So it's not in evidence and it's not

6   going to be argued from.

7        Mr. Webman, is this a rule or reg?  Is this a schedule

8   attached to a rule or reg?

9        MR. WEBMAN:  It's a schedule that is referred to in the

10  reg.

11       THE COURT:  This was obtained from CMS's website?

12       MR. WEBMAN:  Last night, yes.  It's publicly available.

13  We can get it today.

14       THE COURT:  I'm not sure what the -- if Mr. Webman knew

15  about that four weeks ago, that would have been -- there would

16  have been -- either it would have been produced or not or

17  argued from or not.  At this point it hasn't been produced.

18  It hasn't been argued from.  It's not gonna be part of the

19  closing or rebuttal.  I still don't know what the issue is.

20       MS. SOLANO:  The only thing I have to say about -- if

21  it's not gonna be in and they're not gonna argue from it, I

22  understand.  I just want the record to be clear that I don't

23  believe it's in evidence.

24       My final point is that if the Court is going to permit

25  this understanding of joint laxity argument, particularly in

 1   light of the comment to, like, while my client was on the

 2   stand that the joint laxity was a regulation and a

 3   requirement, I believe there needs to be a specific curative

 4   instruction.

 5          THE COURT:  I heard you say that and that's not in the

 6   papers, but understandably so.  Why don't I give you my

 7   limiting instruction and then show me, Ms. Solano, because I

 8   appreciate that might be at a different place.

 9          MS. SOLANO:  It actually is in my motion in limine,

10   Your Honor.

11          THE COURT:  I'm sorry I missed it, then.  I apologize.

12   It seems like I didn't bring it.

13          MS. SOLANO:  I have a copy.

14          THE COURT:  Would you mind passing it.

15          MS. SOLANO:  Of course.  (Tendered document.)

16          THE COURT:  Ms. Solano, do you know where in the

17   letter?

18          MS. SOLANO:  Yes.  I'm trying to find it.  It is on

19   page 3 and the paragraph that starts on Friday:

20          Ms. Lou said:  You knew that Medicare wouldn't pay for

21   knee braces because of regulations --

22          THE COURT:  I'm sorry.  I see that.  Okay.

23          Ms. Lou, I'm sure you'll agree that the jury needs to

24   be instructed that statements that are buried within the

25   lawyer's questions cannot be considered, et cetera.

 1          MS. LOU:  Of course, Your Honor, that's a standard

 2    instruction.  Also if you look in the transcript, Your Honor,

 3    Ms. Solano rightfully objected, assumes facts not in evidence

 4    and you sustained it.

 5          THE COURT:  I'm sorry I missed this in my memory.

 6          MS. LOU:  So the defendant was not permitted to answer.

 7    It is a misstatement.  The question was a misstatement, but

 8    Ms. Solano rightfully objected and that was the end of that.

 9          THE COURT:  Right.  Okay.  I get it.

10          MS. SOLANO:  Your Honor, I just think given the

11    sensitivity of this and the high likelihood that it's

12    misleading under -- and what the Government is gonna argue, it

13    needs to be a curative instruction that is stronger than

14    "don't listen to the lawyers."

15          THE COURT:  Let me take you through my thinking on this

16    real quick.  I've played a little bit with the instruction and

17    I'll read to you what I'm planning on doing.

18          Look, first of all, in thinking all of this stuff

19    through, I've read all your papers which, as I've said, are

20    excellent and much appreciated.  I have also been actively and

21    attentively present and also have been reviewing the

22    transcript, and so I have a very close sense of how the case

23    has been tried.

24          The United States' basic theory here is twofold.  The

25    basic theory is that fraudulent claims were being sent off to

1    Medicare, which is taken here to mean three different

2    programs, because the doctors' orders -- I thought the

3    United States put this very well in one of its letters of

4    yesterday, that they were not provided through a process --

5    this is to use their language -- that was calculated to make a

6    bona fide determination that these were needed or useful.

7         I think that's the way they have tried this case.  And

8    part of the proof of that is that some people got braces they

9    didn't want.  That theory of the case does not run through

10   citation of a particular Medicare rule or reg.  It just

11   doesn't.  It didn't purport to.

12        Then there's -- the other part of their theory is

13   related to the Anti-Kickback Statute, and that one is that the

14   DME companies were paying kickbacks to marketers for doctors'

15   orders that were -- for doctors' orders.

16        Again, a theory that has been suffusing the case that

17   operates a level of common sense that does not lean on

18   particular Medicare rules or regs except in the most

19   background sort of way, which is to say to establish that

20   Medicare exists.

21        The reason I started off with wanting to get the

22   United States' representations as to closing and, to a lesser

23   extent, rebuttal is because that's how I read the trial

24   transcript, and I wanted to confirm that the United States was

25   not reading it and, therefore, attempting to use it in a

1  different way.  And it's not.

2        That was Mr. Webman's representation on Friday.  That's

3  how I took his letter of yesterday, and that's how I take the

4  United States' representations of today.  That's a very

5  important part of the background here.

6        I also think that it's probably important -- in fact

7  it is important -- that there is excising of the indictment

8  that will go back to the jury of certain references to rules

9  and regulations which could insert rules and regs in a more

10  direct way into the case.

11        There is just simply no theory from the United States

12  here that claims submitted were fraudulent because they

13  violated a rule or because they violated a regulation.  That

14  wasn't in their opening.  It will not be, as represented, in

15  their closing.  It's not how they have tried the case.

16        The way they have tried the case, putting aside the

17  anti-kickback part of it, has been about trying to show that

18  there is a kind of utter indifference to medical necessity.

19        The reason we're kind of needing to fix this is that

20  there's no doubt that the testimony of Mr. Quindoza had a

21  misstatement in it, maybe more than one misstatement; and the

22  misstatement would allow, if it were left alone, the jury to

23  make an inference as to why Mr. Naviwala might be guilty that

24  is separate and apart from how the United States has argued

25  this whole case.

1         Now, in looking back at Mr. Quindoza's testimony, I

2    have to say I think, in reading it, it can be over-read.

3    Ms. Solano just complete -- the cross was devastating on this

4    point.  It completely forced Mr. Quindoza to walk away and to

5    accede to the way Ms. Solano was seeing things.  It was an

6    extremely effective line of cross.

7         I don't even know if what is left behind afterward is

8    any meaningful statement from Mr. Quindoza.  Mr. Quindoza

9    essentially agreed with the key point that Ms. Solano pushed

10   him to.

11        Having sat in the room, there's nothing about the way

12   she did it, in my judgment, that would cause a jury to believe

13   the way Mr. Quindoza spoke about it on direct versus the way

14   she did it on cross -- versus the way he said it on cross.

15        Ms. Solano was not engaged in a tricky cross.  She was

16   not engaged in a belligerent cross.  It was a straightforward

17   and highly effective cross.  And the impression, I think for

18   everyone in the room, was that what Mr. Quindoza said on this

19   point to Ms. Solano on cross was right, not the somewhat

20   contrary thing he had said on direct.

21        Look, there's also a little bit of complexity and

22   confusion here.  There's slightly equivocal statements that

23   you can look at in isolation, and to deal with those and to

24   deal with the possibility that a jury disbelieved what

25   Mr. Quindoza said in the face of cross but agreed with what he

1    said on direct, I think we need a limiting instruction.

2         For the little bit of confusion and for the statement

3    on direct, there's some need for a limiting instruction.  I

4    don't want to overstate it.

5         There's also, as has been discussed, some references

6    from the co-conspirators about what they thought was legal or

7    illegal.  And to an extent that I can barely remember and

8    barely saw glimpses of in reviewing the trial transcript, some

9    of those are not generic invocations of civil or criminal

10   liability being on their horizon.

11        Some of those are something different.  Some of those

12   are a tiny bit of indications of particular rules and regs and

13   that, arguably, also needs a little bit of correction.

14        The reason I say "arguably" is that the United States

15   has argued the case in a certain way, it's put on the evidence

16   in a certain way, and there's been a representation made about

17   how they will close.

18        Given all this, the question is:  Can a limiting

19   instruction work to solve any problem that exists?  And,

20   first, the answer is yes in my judgment.

21        The first reason is what I have already covered.  the

22   need for a limiting instruction here is very faint.  It

23   presumes that Mr. Quindoza didn't walk away from his key

24   testimony in cross.

25        It presumes that the somewhat lightly, lightly, lightly

1   confusing testimony that Mr. Quindoza offered on cross means a

2   very particular thing.  I don't know if it does.  And it also

3   requires a view that when the co-conspirators spoke about

4   illegality, there was boring in on a particular rule and reg,

5   which they did hardly at all, if ever.

6          So, first of all, there's not much to correct.

7          Second of all, in terms of the efficacy of a limiting

8   instruction, I would just note a couple things.  First of all,

9   there's certain kinds of things that are impossible to put

10  back in to -- pick your cliché.

11         There are certain bells that are impossible to un-ring,

12  a very gory murder scene photo that was improper.  This is not

13  that.  This is bloodless testimony of a kind that is easily

14  corrected by a legal instruction.

15         Second of all, I have a strong impression it's a good

16  jury.  They're attentive.  They're focused.  They're locked

17  in.  I asked them two questions in their questionnaire about

18  their ability to follow legal instructions.  All of these

19  people answered that they had no issues with that.

20         So I have every reason to think that they are perfectly

21  comfortable with following my instructions.  In addition, this

22  is not a case in which I have given a lot of instructions.

23  The limiting instruction I give them is gonna stand out and,

24  therefore, it's another reason to think it will be

25  efficacious.

1          Finally, my plan is to give the limiting instruction in

2     a freestanding way separate from the jury instructions so it

3     stands out even more.

4          The limiting instruction in my plan is to give -- and

5     I'm just going to read it to you.  This is what I'm planning

6     to give.  It's gonna be a little long.  It is drawn largely

7     from what I previously said I would give plus what the

8     United States has proffered (Reading:)

9               You have heard testimony from certain witnesses

10              about their understanding of various rules and

11              requirements of Medicare.  That testimony, other

12              than from Stephen Quindoza, was introduced for a

13              limited purpose.

14         The limited purpose was explaining those

15              witnesses' understanding of the rules and

16              requirements, not to prove the truth of what those

17              rules and requirements were.

18              You are not permitted to infer anything about

19              the content of Medicare rules and regulations from

20              what those witnesses said.  As you know, the

21              Medicare rules and regulations in place in one

22              year may have been different than the ones in

23              place in another year.

24              Stephen Quindoza is different.  He testified

25              directly about various statutes and regulations

1    related to Medicare.  Among those were 42CFR

2    Section 410.38 entitled, "Durable Medical

3    Equipment, Scope and Conditions," which is the

4    regulation that sets forth circumstances under

5    which Medicare Part B pays for durable medical

6    equipment or DME.

7        This regulation was admitted in evidence as

8    Defense Exhibit 9068.  I instruct you that 42CFR

9    Section 410.38 was the Medicare regulation

10   applicable to the reimbursement of durable medical

11   equipment from 2017 to 2019.

12       During this his direct examination, Stephen

13   Quindoza testified at one point that, under this

14   regulation, a doctor cannot make a determination

15   of medical necessity for DME in the absence of an

16   in-person visit or a valid telehealth visit.

17       This testimony was inaccurate as applied to the

18   DME at issue in this case.  Under 42CFR 410.38,

19   the requirement that a doctor have an in-person

20   visit or a valid telehealth visit before

21   prescribing apply to only certain types of DME and

22   do not apply to the orthotic braces at issue in

23   this case.

24       I instruct you to disregard entirely and

25   completely any suggestion from Mr. Quindoza that,

1          as to the braces at issue here, a medical

2          necessity determination could be made only based

3          on an in-person visit or a valid telehealth visit.

4          Put that entirely out of your mind in your

5          deliberations.  Do not rely on it.

6          I think that's a very strong instruction and I have no

7     doubt that that cures any potential issues that are left over.

8          Is there anything in this language that the

9     United States would like to comment on?

10          MR. WEBMAN:  Yes, Your Honor.

11          Just based on, again, what I discovered last night, I

12     think that part of this instruction is not entirely accurate.

13     I think that the sentence that starts this testimony -- sorry,

14     reads right now:  "This testimony was inaccurate as applied to

15     the DME at issue in this case," I would ask that that be

16     revised to say "certain of the DME at issue in this case."

17          THE COURT:  No.  No, because the testimony -- it's

18     hooked to the testimony that was offered in court.

19          MR. WEBMAN:  Your Honor, I believe that certain -- that

20     the back brace and the knee brace, the two main braces in this

21     case, were -- what he said was accurate with respect to those

22     is that the --

23          THE COURT:  It wasn't because he was -- his testimony

24     was bundled with an understanding of the source of the

25     face-to-face obligation and it wasn't bundled with that

1    understanding.

2        So I appreciate the point, which is that there are

3    certain parts of his testimony that may have turned out to be

4    correct, but the testimony offered was based on the reg and to

5    the extent he was testifying from that reg, that testimony was

6    inaccurate.

7        MR. WEBMAN:  Understood.

8        THE COURT:  Any comments on the wording, Ms. Solano?

9        MS. SOLANO:  Your Honor, we would ask for one addition.

10       THE COURT:  Yeah.

11       MS. SOLANO:  Stephen Quindoza testified extensively

12   that the reg required it be a treating physician, that it had

13   to be a treating physician.  This went throughout his cross,

14   this went throughout much of the examination, and it also was

15   elicited by the Government.  And as I thought effectively

16   showed on cross, the portion that discusses it needing to be

17   with a treating physician doesn't apply to DME; it applied to

18   wheelchairs.

19       THE COURT:  Hang on for a second.

20       MR. WEBMAN:  Your Honor, again, this is another place

21   where we have this complexity where Mr. Quindoza was -- during

22   this our January 24th pre-trial hearing, the pre-trial

23   conference, we were told that Mr. Quindoza could testify to

24   background about how generally Medicare works.

25       THE COURT:  Right.

1      MR. WEBMAN:  This is part of generally how Medicare

2  works.  It comes from policy guidance, not from this

3  particular reg as it applies to this DME.

4      To the extent Your Honor had said, on January 24th,

5  that he could talk generally about background, this is true

6  and the defendant has not put on any evidence to rebut it.

7      And so, Your Honor, even though this particular reg

8  does not say that the treating physician needs to be the one

9  to write the order, there are other policy documents that say

10 it.

11     THE COURT:  Hang on.  Is the United States gonna say in

12 closing anything about a treating physician?

13     MR. WEBMAN:  I don't believe so, Your Honor.  Not about

14 the definition of the treating physician as it's in the --

15     THE COURT:  Is the United States going to say anything

16 about a treating physician?

17     MR. SPECHT:  No.  The word "treating physician" will

18 not be spoken.

19     THE COURT:  So why does this matter?  I'm just not sure

20 I get it.

21     I understand what Mr. Specht is -- look, the treating

22 physician thing was --

23     MS. SOLANO:  Can I respond, Your Honor?

24     THE COURT:  Yeah.  Just hang on for one second.

25     What are the parties' views -- I'm going to re-read you

```
 1   with a slight change.  This is the end of the proposed

 2   instruction:

 3        (Reading:)

 4          I instruct you to disregard entirely and

 5          completely any suggestion from Mr. Quindoza that

 6          as to the braces at issue here a medical necessity

 7          determination can be made only based on an

 8          in-person visit with a treating physician or a

 9          valid telemedical visit with the treating

10          physician.

11        MR. WEBMAN:  Your Honor, the Government is fine with

12   that.

13        THE COURT:  That seems to solve the issue, Ms. Solano.

14        MS. SOLANO:  Yes, Your Honor.

15        As long as the Government -- the Government opened on,

16   these were not their real doctors.

17        THE COURT:  Let me make sure I have this right.

18        It would say:  A medical necessity determination can be

19   based only on an in-person visit with the treating physician.

20        MS. SOLANO:  Or a valid telemedicine visit with a

21   treating physician?

22        THE COURT:  Yeah.  That seems to address the issue.

23        Ms. Solano, I cut you off.  Continue.  You're okay with

24   that but you wanted to add something else.  Do I have that

25   right?
```

1          MS. SOLANO:  Yes, Your Honor.  The Government opened

2     on this was -- the Government opened on they weren't their

3     real doctors, they weren't their true doctors.  They elicited

4     testimony from all the beneficiaries these weren't their real

5     doctors.

6          Mr. Specht hesitated and said, "I'm not going to use

7     the word treating physician."

8          THE COURT:  It wasn't much of a hesitation.  He was

9     just thinking but --

10          Look, I think we're back to the same thing.  The

11     curative instruction makes clear that the reg is not gonna be

12     brought to bear.  Again, the United States has opted to try

13     this case in a common-sensy way, which is to say they're just

14     gonna get up and say no one ever heard of these doctors and

15     so, therefore, this isn't a bona fide effort to generate a

16     doctor's order that could comport with medical necessity.

17          Your point, which you've argued very well, is that in

18     making that argument, they can't bootstrap -- they can't grab

19     onto the idea that that's also a violation of Medicare rules

20     and regs.  And I think you've just solved that.

21          MS. SOLANO:  I just want to make sure that they're not

22     going to say that Medicare required it being a treating

23     physician -- being a real doctor, a treating physician, their

24     own doctors.

25          THE COURT:  But they have already represented they're

1  not gonna invoke Medicare rules and regs at all, so that's

2  implicit in that representation.

3       Mr. Specht, do I have that right?  Implicit in that

4  representation is that the treating physician point is not

5  gonna be there.

6       MR. SPECHT:  Correct, Your Honor.  Of course the

7  Government will talk about that these are not their real

8  doctors.  They hadn't heard of them.

9       THE COURT:  Here is an example.  I don't speak French.

10 If I consulted with a doctor in French, someone could argue

11 that's not a real consultation, regardless of what Medicare

12 rules and regs say or don't say.  That's just a different sort

13 of argument.

14      The French argument is a commonsense argument that

15 might be strengthened, might be yeasted up by a rule or reg,

16 but the United States is saying they're not gonna do that.

17      Do I have that right, Mr. Specht?

18      MR. SPECHT:  Yes, Your Honor.

19      THE COURT:  Any other comments on these words,

20 Ms. Solano?

21      MS. SOLANO:  No, Your Honor.  Thank you for the

22 addition.

23      THE COURT:  For the United States, any additional

24 comments on the words?

25      MR. WEBMAN:  No, Your Honor.

```
 1          THE COURT:  So I'm gonna go through the jury

 2   instructions and I'm gonna go through the track change version

 3   I got.  This is ECF155 supplied by the defendant yesterday

 4   evening.  It is dated 2/23/2025.

 5          I appreciate the creation of this document.  It makes

 6   this a lot easier.

 7          So I just want to -- what I'm gonna do is I'm gonna

 8   tick through what I understand to be the parts of this that

 9   are still contested and the track changes makes that pretty

10   easy to see.

11          Is there an issue, Mr. Webman?

12          MR. WEBMAN:  I think there were -- I had discussed this

13   with Ms. Brown this morning.  After our charge conference on

14   Thursday, I went back and -- or maybe it was on Friday, I went

15   back and implemented some of the changes Your Honor told us,

16   for example, for request 4, we had each made a proposal,

17   Your Honor gave a different one.  I put that in.  That's not

18   reflected in here.  I just wanted to make sure Your Honor

19   understood --

20          THE COURT:  I got it.  Mr. Webman and Ms. Brown, let's

21   say this:  What I'm gonna say now is subject to you all

22   agreeing together as to other changes we've made as to which

23   there's no dispute and those will get imported into the final

24   document.

25          Does that work for you?
```

1          MR. WEBMAN:  Yes, Your Honor.  What Ms. Brown and I

2    discussed was me going back, as much as I would like to see

3    the end of the defendant's cross, was going back with one of

4    the attorneys from the defendant's team and ticking through

5    that together and making sure we have a version we all agree

6    to.

7          THE COURT:  Ms. Brown, that works for you?

8          MS. BROWN:  Yes, Your Honor.

9          THE COURT:  Separate and apart from that cluster of

10   things, what I'm gonna do is, I'm gonna read off what I take

11   to be still in play, and unless someone objects now, I'm gonna

12   treat everything else as having been consented to by the

13   parties.

14         So here are the things that I understand there's still

15   to be disputation about.

16         Page 47, request X; request 35, page 56; request 41,

17   page 63; request 45A, pages 68 to 71.

18         There will be some of these that I think there's an

19   issue on that you may not.

20         Request 47, page 75; request 48, page 76; request 65,

21   page 105; and request 69, pages 106 to 107.

22         Everything else is fine by the United States?

23         MR. WEBMAN:  Sorry, Your Honor.  That was very fast.

24         THE COURT:  So here are the ones.  Ready?  Request X,

25   page 47; request 35, page 56; request 41, page 63; request

1   45A, page 68 to 71; request 47, page 75; request 48, page 76;

2   request 65, page 105; request 69, pages 106 to 107.

3        MR. WEBMAN:  Your Honor, I think some of those may have

4   already been resolved but I don't think that you've left out

5   any that are not resolved.

6        THE COURT:  Aside from that which I have mentioned, the

7   United States consents that the jury instruction at ECF155 is

8   all 100 percent fine?

9        MR. WEBMAN:  Yes.

10        THE COURT:  For the defendant.  Same question.

11        MS. SOLANO:  Yes, Your Honor.

12        THE COURT:  So let's just move through these and we'll

13   do it relatively quickly.

14        Page 47, request X.  This is a defense request.

15        Do I have that right?

16        MS. SOLANO:  Yes, Your Honor.

17        THE COURT:  I assume no one has an issue with the first

18   sentence.

19        MR. WEBMAN:  No, Your Honor.

20        THE COURT:  I assume no one has an issue with the

21   second sentence.

22        MR. WEBMAN:  No, Your Honor.

23        THE COURT:  And I assume no one has an issue with the

24   third sentence.

25        MR. WEBMAN:  No, Your Honor.

1          THE COURT:  Okay.  There is a lacing in here of the

2     concept of objective interpretation of the term "medical

3     necessity."  I appreciate that there is case law that says

4     that when there is an ambiguity, there are obligations on the

5     United States to make a proof with respect to every objective

6     interpretation of the potentially ambiguous statement.

7          There is nothing ambiguous about the term "medical

8     necessity."  It is a straightforward, commonsensical,

9     plain-spoken phrase.  It is not hard to understand.

10         By comparison with all of the other words that are in

11    criminal statutes, this is just not technical.  It's not hard.

12    It's not big words.  They don't come together in unusual ways.

13    It doesn't have a term-of-art meaning, so far as I can tell.

14    It's not encumbered with a common law that is complicated or

15    strange.

16         It's not borrowed from a weird place.  None of the

17    things that suggest ambiguity are here.  There is just no

18    linguistic complexity or ambiguity here.

19         There was a little bit of discussion last week where,

20    for a moment, the United States suggested that this term was

21    ambiguous.  I expressed immediate puzzlement and, indeed,

22    shock that the United States was taking that position.

23         And what became clear immediately was that the

24    United States was not actually taking that position.  The

25    United States was engaged in a horse-trading approach to the

1   jury instructions, and as part of that, to move things along,

2   was treating it as ambiguous for the purpose of triggering the

3   objective reasonableness way of thinking about things.

4       I am not bound in what I say about the law by that, and

5   the United States walked away from its momentary assertion

6   that medical necessity is ambiguous within probably 2 1/2

7   minutes.

8       The assistant United States attorneys bind the

9   United States; but one assistant United States attorney making

10  a statement that is corrected two minutes later does not bind

11  the United States in a meaningful way.  It certainly does not

12  bind my understanding of what the law is, and it certainly

13  created no reliance interests of any kind that require some

14  sort of estoppel.

15      So I do not proceed here on the understanding that

16  medical necessity is ambiguous, such that there's a need to

17  trigger the case law that runs to proof of all objective

18  interpretations required by the United States.

19      This is just not an ambiguous term in my judgment.

20  I'll also note that I have done a bunch of case law research.

21  I haven't seen anything that suggests it is.  In addition, I

22  haven't seen anything from the defendant or from the

23  United States that sheds any light on the idea that this term

24  is ambiguous.

25      I have seen, and I appreciate the defendant citing,

1    case law that speaks to when a term is ambiguous and when

2    there is a false statement as to that term.  The objective

3    interpretation way of thinking about things controls, but

4    there has been no effort to show me that that term is

5    ambiguous and, as I've noted, I don't find that it is in any

6    way.

7            So here is how I will plan to give the fourth sentence

8    at page 47, request number X: (Reading:)

9            To prove that the claim was false, the

10           Government must prove that the prescription was

11           not medically necessary, semicolon, that term was

12           not defined by any Medicare regulation.

13           That's the fourth sentence I plan to give.

14           As to the fifth sentence, I plan to give it as follows:

15           (Reading:)

16           I am instructing you that making a false

17           statement and the mental states associated with

18           making a false statement are separate things.  The

19           element of falsity and the element of mental state

20           are not the same thing.

21           Therefore, the United States must prove that

22           the claim of medical necessity was false and that

23           the claim was made willfully and with an intent to

24           defraud, as I have defined those terms.

25           Then the sixth -- then I think the sixth line, I don't

1  think is necessary, although I'm open to hearing differently

2  from either party.

3       Any comments on the particular words I have chosen for

4  the fourth and fifth sentences from the United States?

5       MR. WEBMAN:  No, Your Honor.

6       THE COURT:  From the defendant?

7       MS. SOLANO:  No, Your Honor.

8       THE COURT:  With respect to that sixth sentence, my

9  inclination is just to get rid of it.  I think it actually

10 confuses the point Ms. Solano was trying to make at this

11 point.

12      Do you want me to get rid of it, Ms. Solano?

13      MS. SOLANO:  Yes, Your Honor.

14      THE COURT:  I assume the United States is fine with me

15 getting rid of it?

16      MR. WEBMAN:  Yes, Your Honor.

17      THE COURT:  That's that.

18      I'm gonna ask Mr. Webman and Ms. Brown, when you give

19 me the final, reflect these words if you could.

20      Is that doable?

21      MR. WEBMAN:  Yes, Your Honor.  I was not at all able to

22 take it all down in real time.  I would ask Ms. Larsen to do

23 what she did the other day and send us the snippet, if that's

24 possible.  It was probably easier when Ms. Witte was the court

25 reporter and Ms. Larsen was --

```
 1          THE COURT:  I see Ms. Larsen nodding.
 2          Now we'll go to page 56, which is request 35.  This has
 3  now been covered by --
 4          Ms. Solano, you agree this is no longer --
 5          MS. SOLANO:  This is not a part of the case at all.
 6          THE COURT:  So that's out.
 7          And then Ms. Solano just withdrew request 35, and that
 8  was her request.
 9          Do I have that right, Mr. Webman?
10          MR. WEBMAN:  Yes, Your Honor.
11          THE COURT:  Request 41, page 63.  This was just a
12  question.  I thought that everyone agreed that request 41,
13  running from page 63 to 64, was just fine.
14          MR. WEBMAN:  I think that's correct, Your Honor.  I
15  think that was one of the things I mentioned at the outset
16  that we had resolved but is not reflected --
17          THE COURT:  I thought so.  You all said that on Friday.
18  I just wasn't sure.  I wanted to confirm, that's all.
19          MS. SOLANO:  Yes, Your Honor.  I think we used a Word
20  document from the Government, and I think that this was in
21  there.
22          THE COURT:  All right.  Request 45A.  This is at
23  pages 68, 71.  As to this, I have looked at the case law.  I
24  don't think there's any ambiguity that the safe harbor
25  obligation is an affirmative defense.
```

1          The United States' instruction, which runs pages 68 to

2     69, is the instruction that is legally correct, in part,

3     because it is squarely and simply premised on the idea that

4     this is an affirmative defense and works that way.

5          I think the precise words that have been used by the

6     United States are absolutely correct in terms of the statement

7     of the law.  I think there was a couple of changes that need

8     making for a little bit of clarity.

9          So at page 68, the second sentence:  The defendant

10    contends his conduct exempted from criminal liability under --

11    instead of "under the personal services contract safe harbor

12    and the Anti-Kickback Statute," I would say, "The defendant

13    contends his conduct is exempted" --

14          MR. WEBMAN:  Your Honor, I don't mean to interrupt you,

15    but I believe that, given Your Honor's ruling that this is the

16    appropriate instruction, just to save time, Your Honor, I

17    think the defendant is -- intends to withdraw the request for

18    safe harbor instruction, in which case the Government doesn't

19    want one either, so I think we can strike that.

20          THE COURT:  Got it.

21          So in other words -- so, Ms. Solano, you have preserved

22    your objection to the idea that the safe harbor -- the

23    United States' position is the safe harbor is an affirmative

24    defense.  The defendant's position is that the safe harbor is

25    not an affirmative defense.

1          Is that right?

2          MS. SOLANO:  Yes, Your Honor.

3          THE COURT:  Fair enough.  I agree with the

4    United States.  You know, the Fifth Circuit, the Eleventh

5    Circuit, that case law is strong and simple, but the objection

6    is preserved.

7          So, then, there's no request 45A at pages 67 to 71 to

8    discuss.  It's withdrawn.

9          Page 75, request 47, the paragraph -- the big paragraph

10   at the beginning is already covered by the freestanding

11   limiting instruction I would give, and then I think the second

12   paragraph at page 75 is fine.

13         Any issues with proceeding that way from the

14   United States?

15         MR. WEBMAN:  No, Your Honor.

16         THE COURT:  Ms. Solano?

17         MS. SOLANO:  Your Honor, I just want to make sure I

18   understand what you're saying is fine.

19         THE COURT:  I mean, it's obviated by the limiting

20   instruction we discussed at the top, and my plan is to have

21   that limiting instruction be given before these jury

22   instructions so it stands out more rather than sticking it in

23   here.

24         MS. SOLANO:  So the only issue, the only thing that I

25   don't believe is covered by your limiting instruction,

1   Your Honor, is this requirement -- whether there was a

2   requirement that they have a written order as a condition of

3   payment.

4        The regulation makes clear that these items did not

5   require a written order as a condition of payment, and that is

6   something that I think is important, because if they're

7   talking about, well, they tried to create these fake orders

8   and they tried to keep them because this was part of the

9   fraud, then I think it's important that the jury knows that,

10  under that regulation, there wasn't even an order required.

11       MR. WEBMAN:  Your Honor, if I may respond?

12       THE COURT:  Sure.

13       MR. WEBMAN:  Again, I don't want to rehash what I've

14  already said.  I think that, first of all, on the face of the

15  regulation, that requirement does apply to the two main

16  braces, the 0650 and 1851.

17       Also, I think that to say those were not required would

18  be misleading to the jury because there is a body of policy

19  documents that -- again, we have hashed out, we have gone

20  through this -- but there's a body of policy documents that do

21  require it.  So I think it's misleading to say that they're

22  not required at all.  I'll leave it at that.

23       THE COURT:  Where does this come up in the case?  I'm

24  just not sure I -- where does this come up?

25       MS. SOLANO:  Well, Your Honor, they have spent a lot of

1    time on how they were trying -- this whole thing with the

2    joint laxity issue is that they made it to be in the doctor's

3    order and written that they had the joint laxity test

4    performed, which -- even though many of the orders don't make

5    that representation at all.

6          And so for the jury to understand that, under the regs,

7    there wasn't even a requirement that there be a doctor's order

8    at all, they're going to -- I think it's important for them to

9    know.  Because what they're going to say is, well, the

10   marketers filled out these forms and then the forms were

11   copied over by the doctors and then --

12         There's going to be process -- there's going to be, I

13   believe, argument on that process, and so I think it's

14   important for the jury to know that this regulation didn't

15   even require a doctor's order.

16         THE COURT:  But you're making an argument that can be

17   criticized on obvious sword and shield grounds.  I mean, on

18   the one hand, you want to preclude the United States from

19   arguing that violations of rules and regs yields a criminal

20   violation, and they're not gonna do that.  They haven't

21   charged the case that way and they haven't tried the case that

22   way.

23         On the other hand, you want to say the exact opposite.

24   Well, the fact that there isn't a rule or reg as to orders,

25   whether that's true or not, is exonerating or dissipating of

1    mens rea or something.

2        So that's a problem.  People, though, can make sword

3    and shield arguments.  I just don't see anything in this case

4    that's meaningful about the rules and regs as to written

5    orders, and it would just be very confusing.

6        The simple fact of the matter is that what we have seen

7    proof of is that people wrote down that certain things

8    happened.

9        And if the United States is gonna just argue from a

10   commonsense perspective that what was written down was just

11   kind of made up or not realistically true or not -- or just

12   deeply implausible, that just doesn't run through the

13   question, which is pretty technical, of whether Medicare

14   required a writing in the first place.

15       There's no obligation that a statement be legally

16   compelled at time one for the content of that statement at

17   time two to have been illegal, under the criminal law.  And

18   the United States is not suggesting anything one way or

19   another about the written order being legally compelled to

20   time one.

21       Mr. Specht, are you gonna mention anything in closing

22   that says that there had to be a written order under a

23   Medicare rule or reg or otherwise?

24       MR. SPECHT:  No.

25       THE COURT:  I just think that's not -- there are

1   triggers as to the context in which a statement is made, a

2   statement under 1001 is to be made in the jurisdiction of the

3   United States.

4        A statement under a perjury statute has to be made

5   under oath.

6        But there's no suggestion here that a fraudulent

7   statement needs to have been made in a required order.  It

8   hasn't come up in the evidence.  It would confuse the jury to

9   suggest something along those lines, and it's not legally

10  necessary.

11       MS. SOLANO:  Yes, Your Honor.  I just want to make

12  clear, so the record is clear, this language in here where

13  it's highlighted, the regulation is silent as to whether the

14  types of orthotic braces were subject of the claims, that was

15  put in by the Government.  We disagree with that language.

16       THE COURT:  I'm just getting rid of that whole

17  paragraph.

18       MS. SOLANO:  I just want to be clear that as we read it

19  and which I think is correct, is the regulation isn't just

20  silent; the regulation affirmatively says that there's no

21  order required for these types of things.

22       THE COURT:  But you've sort of put them on notice, and

23  I'm assuming the assistant United States attorneys have heard

24  that, that you're not gonna, God forbid, make an argument that

25  is premised on an erroneous understanding of the law.

```
1        Ms. Solano has put you on notice.  That paragraph
2   page 47, the first one, is gone.  The second paragraph will
3   simply be left alone as it is.
4        Ms. Solano.
5        MS. SOLANO:  Thank you, Your Honor.
6        THE COURT:  Is there any issue with that, Ms. Solano?
7        MS. SOLANO:  No, Your Honor.  I thought that they
8   opened on this idea that there was a requirement for a written
9   doctor, they needed these doctors' orders, so if they're not
10  going to --
11       THE COURT:  I don't recall that on the opening.
12  Did you open on that?
13       MR. WEBMAN:  Your Honor, I did say that they needed
14  prescriptions in order to bill.  I believe that that is true.
15  I think that it's not in this specific regulation but I think
16  that -- and it's evidenced by the fact that they went to great
17  lengths to get doctors' orders.
18       THE COURT:  But the point of this is simply whether or
19  not -- we're having the same discussion over and over again
20  because it's pretty obvious that you need a prescription in
21  order to bill.
22       What Mr. Webman is saying is he didn't point to a reg
23  that says you need one and so it's not telling that you might
24  turn around, Ms. Solano, and say that actually there's no reg
25  that says you need it because the prescriptions were sent in.
```

1        MS. SOLANO:  Your Honor, I just want -- the Government

2   has now several times argued that, well, it's because of the

3   policy statements, it's because of these, it's because of

4   these.  They walked that back as a part of when they decided

5   to have Quindoza as a fact expert.

6        And so to the extent they intend to argue something to

7   the jury that's based on the things that were not disclosed to

8   us, which we asked for several times, we would object to that

9   on a Rule 16 basis.

10       THE COURT:  But they just said they're not going to

11   argue that so I think it's okay.

12       MS. SOLANO:  Thank you, Your Honor.

13       MR. WEBMAN:  Just on the Rule 16 point, because he was

14   not an expert there was no requirement that we hand these

15   things over.  We are, as I've said over and over again, not

16   relying on the policies.

17       THE COURT:  So now let's go to request 48.

18       Does anyone still want this instruction?  I don't know

19   whose this is.  Does anyone still want this, given everything

20   that we discussed?

21       MS. SOLANO:  Yes, Your Honor.  I believe -- is this

22   still an issue?

23       MR. WEBMAN:  My understanding is that when we discussed

24   this last week it was agreed that we would include it, I think

25   everyone was okay with it, with certain changes.

1    THE COURT:  So I just want to understand this.  So here

2  is how I would change this.  I would change it as follows:

3    (Reading:)

4    During this trial, there was some testimony

5    about Medicare's audit rules, civil penalties, and

6    other guidelines.  A violation of these rules,

7    civil penalties, and other guidelines, is not in

8    and of itself a crime, nor does it necessarily

9    mean that a crime has been committed.

10    Even if you find that the claims -- I'm sorry.

11    Let me just read to you the whole thing as I would do

12  it.

13    (Reading:)

14    During this trial, there was some testimony

15    about Medicare's audit rules, civil penalties, and

16    other guidelines.  A violation of these rules,

17    civil penalties, and other guidelines is not in

18    and of itself a crime, nor does it necessarily

19    mean that a crime has been committed.

20    A defendant cannot be convicted of a crime

21    merely for breaching these types of audit rules,

22    civil penalties, or other guidelines.

23    I think that's a simpler way of being protective of the

24  problem Mr. Naviwala is trying to protect against.  It's

25  clearer and more protective.

1          Any issues with that from either side?

2          MS. SOLANO:  No, Your Honor.

3          MR. WEBMAN:  Not from the Government.  I would ask

4    again that Ms. Larsen provide us that language.  I don't write

5    as quickly as she types.

6          THE COURT:  Okay.  I'm going to read again, request 48.

7          (Reading:)

8              During this trial, there was some testimony

9          about Medicare's audit rules, civil penalties, and

10         other guidelines.  A violation of these rules,

11         civil penalties, and other guidelines is not in

12         and of itself a crime, nor does it necessarily

13         mean that a crime has been committed.

14             A defendant cannot be convicted of a crime

15         merely for breaching these types of audit rules,

16         civil penalties, or other guidelines.

17             Fine?

18         MR. WEBMAN:  Yes, Your Honor.

19         THE COURT:  Ms. Solano?

20         MS. SOLANO:  Yes, Your Honor.

21         THE COURT:  Request 105 -- excuse me.  Request 65,

22    excuse me, at page 105.

23             I just had a question on this.  Is this the model rule?

24             Here is why I just think it's a little strange.  I

25    would have thought the instruction was:  You should examine

1   and evaluate the defendant's testimony just as you would the

2   testimony of any witness, and just leave it at that.

3         I'm not sure why there is a discussion of the

4   defendant's constitutional right to testify or not to testify.

5         What difference does that make?

6         MR. WEBMAN:  I believe it is the model rule,

7   Your Honor, but I don't -- if the defendant doesn't take a

8   strong position on it, I don't think the Government does

9   either.

10        MS. SOLANO:  I mean we thought it was the model rule.

11  If there's a question --

12        THE COURT:  It might be the model rule.  Fundamentally,

13  I just don't get why we're talking about he didn't have to

14  testify but he did.

15        MS. SOLANO:  Right.  I agree with Your Honor.

16        THE COURT:  It just seems like it should just be:  You

17  should examine and evaluate the defendant's testimony as you

18  would the testimony of any witness, and just leave it alone.

19        MS. SOLANO:  We would prefer that, Your Honor.

20        MR. WEBMAN:  Yes, Your Honor.  We can confirm that it

21  is the model instruction, but we are fine with leaving it as

22  Your Honor and the defense counsel have discussed.

23        THE COURT:  The problem with it is that I think if you

24  have all the stuff in the beginning, it makes the jury say,

25  well, gee, what about other evidence he could have put on?  I

1    think the better way to do it is just to say that you should

2    evaluate his testimony as you would the testimony of any

3    witness.

4           The United States is fine with that also?

5           MR. WEBMAN:  Yes, Your Honor.

6           THE COURT:  In request 65 at page 105 it's simply and

7    solely gonna be the last sentence.

8           Venue.  Venue is a little complicated here I think.

9    Here is why venue is complicated, in my judgment.  This is a

10   terribly abstract context and it's abstract because, as I held

11   last week under *Perez*, I do not believe -- *Perez* has a

12   three-part test.  It is in the conjunctive, not in the

13   disjunctive, and I do not believe that clause 2 of *Perez* has

14   been satisfied.  Ms. Lou echoed that point in her letter of

15   yesterday.

16          So we are talking about in abstraction and I simply do

17   not believe that clause 2 -- excuse me, prong 2 of the *Perez*

18   test has been satisfied, so the defendant is not actually

19   entitled at this point to a venue instruction.

20          On the other hand, I have two comments.

21          First, the United States has consistent as it's noted

22   with general practice put forward a venue instruction solely

23   based on the defendant's request for one and I understand why

24   the United States has done so.

25          There is risk in not acceding to such a request.  The

1    other reason -- so that's that.  I'll leave it at that.  So

2    I'm going to give a venue instruction, based on what the

3    United States wants, and understanding that that is something

4    of a standard practice here.

5         I think that the core problem here looks something like

6    this:  Ms. Solano has argued from Chief Judge Chagares'

7    opinion, and for reasons we discussed last week, that decision

8    is, on its face, appears to be of limited utility.

9         It appears, to me, that it aims to focus just on a

10   setting which the United States Congress has not come in and

11   itself said where venue should be applied.

12        That would seem to suggest that there is no place here

13   for complicated discussions of where the essential core of a

14   crime took place, because the United States Congress has a

15   continuing crime statute, and as various circuits have held,

16   the substantive offenses here are continuing crimes.

17        And they clearly are, in general, because they require

18   someone to do something, and then someone to do something

19   almost always later, almost always in a different place.

20        And there are continuing crimes on the facts of this

21   case where that is precisely how it allegedly went; that

22   people in different places worked together to do crimes that

23   were continuing, both temporally, and importantly for these

24   purposes, spatially.

25        So it looks like we're in a continuing crime zone and

1    for a continuing crime zone there is a venue statute that is

2    on point.  And indeed, the line before the one that Ms. Solano

3    has quoted to me from Chief Judge Chagares seems to carve out

4    things in precisely this way.

5         The problem is that the cases over and over again say

6    that there is a carveout for congressional statutes, but then

7    seem not to apply the carveout.

8         So, for example, Chief Judge Chagares' opinion notes

9    the idea of a continuing crime carveout, but then does not

10   analyze whether the Computer Fraud Act is indeed a continuing

11   crime act.

12        Similarly, Justice Ginsburg's opinion for the

13   United States Supreme Court in *Caballes* perceives in a little

14   bit the same way.

15        Ms. Lou, did I quote the name wrong?

16        MS. LOU:  No, Your Honor.  I was just marveling at your

17   recall of the Supreme Court.

18        THE COURT:  But Justice Ginsburg's case decision for

19   United States Supreme Court in *Caballes* does the same thing:

20   it invokes the concept of the carveout but then doesn't go

21   down that road.

22        It's fundamentally a little difficult to know why.  One

23   explanation as to why might be that the statutory carveout in

24   the venue statute talks, for example, about the use of mails,

25   and the Computer Fraud Act discussed by the Third Circuit or

1   the money laundering statute discussed by the Supreme Court

2   through Justice Ginsburg, are focused on statutes that

3   themselves do not talk about the mails.  Okay.

4        But the problem is, is that even when we are talking

5   about something that surely looks like a continuing crime and

6   that has mailing in the elements, mail fraud being the obvious

7   example, there is Third Circuit precedent that does not allow

8   venue to be based solely on where mail is received in those

9   contexts.

10       So the difficulty becomes the case law, on its face,

11  has a carveout for when congress has set a venue statute, but

12  the way that the case law proceeds does not look to that

13  carveout.  It doesn't look to it in cases like Judge Chagares'

14  and Justice Ginsburg's where the statutes don't have mailing

15  as an element.

16       But, indeed, the Third Circuit has suggested a number

17  of times that the statute -- the venue statute for continuing

18  crimes -- also doesn't control when mailing is an element,

19  which is to say the mail fraud statute.

20       So we are left in a very complicated position, one

21  where, under *Perez,* there's no need for a venue instruction,

22  and, number two, where the venue instructions as to the

23  substantives are complicated.

24       Where I think that leaves us is that there is something

25  like the need to do a little bit of a lex delicti kind of

1   analysis, but not one that is as technical, in my judgment, as

2   Ms. Solano mentioned.

3        When we first raised this issue, I kind of brought up

4   the first restatement of choice of law, and I brought it up

5   because there was associated with that regime an

6   extraordinarily artificial and formalistic sense of what is

7   the core of an offense or -- excuse me -- in that context of a

8   civil wrong that then triggers the choice of a body of law.

9        I think that Ms. Solano's proposed jury instructions

10  with respect to venue partake of that problem.  They do not --

11  they pick out very small and very random aspects of the crime

12  charged and elevate them in a substantial way.

13       On the other hand, it's not clear how to proceed,

14  because something needs to be found if we are to assume that

15  the statute does not simply control, that is, at the core of

16  the offense as to which venue is sought.

17       I don't mean to lay down any systematic thinking on

18  that subject for the simple reason that it would be doubly

19  advisory.  Advisory because the *Perez* standard hasn't been met

20  and advisory in addition because there's no reason for it to

21  be in play.

22       And the reason that it doesn't need to be in play is

23  that, in looking to what is central enough to an alleged

24  crime, that there's venue based on the location of such an

25  activity, the courts have generally looked to the substance of

1    the crime as it's been written down in a congressional

2    statute.

3         Here, though, the particular substantive offenses --

4    and that's where the fight is about venue -- the particular

5    substantive offenses, both the health care fraud and the

6    anti-kickback, run through ideas about the delivery/provision

7    of medical items.

8         And so rather than trying to figure out all of the

9    different ways in which venue might be satisfied here, I think

10   it makes a lot more sense to instruct the jury on a venue

11   theory that is clearly at the core of both health care fraud

12   substantive and anti-kickback substantive, and that venue

13   theory is about the delivery of the relevant medical stuff

14   into New Jersey.

15        So what I'm gonna do is I'm gonna read the proposed

16   venue instruction, and then everyone can react to it and see

17   what you think, in practice, and see if it works.  That's a

18   kinda long intro to what will be a pretty short thing.

19        I'll read the first paragraph, and I'm reading off the

20   United States' instruction.

21        (Reading:)

22          The superseding indictment alleges that some

23          act in furtherance of each of the offenses charged

24          occurred here in the District of New Jersey.

25          There is no requirement that all aspects of each

1          of the offenses charged or that the entire

2          conspiracy takes place here in the District of

3          New Jersey.

4              But for you to return a guilty verdict, the

5          Government must convince you that, for each count,

6          some meaningful act in furtherance of that count

7          took place here in the District of New Jersey.

8              So far, I have made only one change to what the

9   United States has proposed in its first paragraph, which is in

10  the final sentence.  It reads as follows:

11         (Reading:)

12             But for you to return a guilty verdict, the

13         Government must convince you that, for each count,

14         some meaningful act in furtherance of that count

15         took place here in the District of New Jersey.

16         That's the first one.

17         Then simply an additional sentence:  The

18  substantives -- let me just ask you all, the substantives here

19  are Two, Three, Four, Eight, and Nine.

20         Do I have that right?

21         MS. LOU:  Your Honor, it's Counts 2, 3, 4 and 6, 7, 8.

22         THE COURT:  Okay.  So then the next sentence would

23  read:

24         (Reading:)

25             In addition, as to Counts 2, 3, 4, 6, 7, and 8,

1          the meaningful act in furtherance of that count

2          must have been the delivery of DME into

3          New Jersey.

4          Must have been the delivery of DME into New Jersey.

5          I'll read you that again.

6          (Reading:)

7              In addition, as to Counts 2, 3, 4, 6, 7, and 8,

8          the meaningful act in furtherance of that count

9          must have been the delivery of DME into

10         New Jersey.

11         Then from there, it would simply continue with the

12  remaining two paragraphs, the one that begins "unlike" and the

13  one that begins "remember."

14         For the United States, thoughts?

15         MS. LOU:  Yes, Your Honor.  I believe there's also been

16  evidence from which the jury can infer that the doctors'

17  orders were also signed in New Jersey for these beneficiaries.

18         Just looking at Friday's testimony, for example, in the

19  cross, Mr. Naviwala admitted that, if the domicile criteria

20  that one of his clients insisted on was being implemented, he

21  would expect that the doctors for New Jersey patients also

22  would be based in New Jersey, and we have doctors' orders that

23  support that.  So not just the delivery of the DME --

24         THE COURT:  I got it.

25         Here is the complexity:  I think the complexity is if

 1   what we're doing is going off the statutory language, that

 2   argument is a much stronger argument for venue of the

 3   Anti-Kickback Statute than it is for the substantives of

 4   health care fraud.  I think it's potentially confusing.

 5        So right now, what we have is a conspiracy venue theory

 6   and then we have, for all the substantives, the meaningful act

 7   has to be -- must have been the delivery.

 8        If we do it your way, then there's an argument that we

 9   have to say the meaningful act must have been the delivery of

10   DME for the health care fraud statutes.  And then, for the

11   anti-kickback, either the delivery of the DME or the writing

12   of doctors' orders in New Jersey.

13        I'm open to that, but it's a pretty complicating

14   wrinkle to follow.

15        MS. LOU:  I understand, Your Honor.  I don't feel as

16   though we're hampered by the way that you asked -- the

17   evidence supports that and we're able to argue that, and so we

18   take your point.

19        THE COURT:  Just reflect on it some more.

20        Let me hear from Ms. Solano.

21        MS. SOLANO:  Thank you, Your Honor.

22        I'll start with the kickback substantive charges first.

23   We don't believe that the kickback -- the substantive kickback

24   charges, as charged here, are continuing offenses.  What the

25   Government charged was a specific act: the receipt of payment

1    on a specific day.

2            THE COURT:  Right.

3            MS. SOLANO:  And unlike a wire fraud statute or a money

4    laundering circumstance, it doesn't prohibit or even discuss a

5    transfer.  It's very specific to receipt.  And the kickback

6    statute itself doesn't contain -- the elements of the kickback

7    statute doesn't contain any sort of language about delivery.

8    And so I believe that --

9            THE COURT:  Here is the problem with the latter

10   argument.  I'm just flipping to the indictment.

11           I'm presuming that the United States -- excuse me --

12   that the indictment, this is Count Eight, page 20, is quoting

13   the statute.  It says:

14           (Reading:)

15              Knowingly solicited and received remuneration

16           directly or indirectly, overtly and covertly, in

17           cash and in kind, that is kickbacks and bribes, in

18           the manner specified below in return for referring

19           an individual to a person for the furnishing... of

20           any item...

21           That is why, at the center under any arguable theory of

22   lex delicti, the key essential -- "element" is the wrong word,

23   but the key essential concept that links together both the

24   Anti-Kickback Statute and health care fraud piece is what the

25   health care fraud statute calls "delivering" and what the

1    kickback statute calls "furnishing an item."

2        So that's why I've hit on this particular thing.  It

3    strikes me as getting to anyone's concept of what might be

4    essential if essentiality is indeed necessary, and it's right

5    there in the statute.

6        MS. SOLANO:  I understand Your Honor's position.

7        Our position is that only the two actus reuses of the

8    Anti-Kickback Statute would support venue here, and so here,

9    what is the actus reus that the Government charged was receipt

10   on a particular point in time, and receipt, obviously, is the

11   end of the line.

12       And so that is what we think would be appropriate for

13   venue.  And perhaps if it would be possible to include -- I

14   believe that the way in which the proposed instruction reads,

15   the focus is on delivery; and I think for the Anti-Kickback

16   Statute, it should, if Your Honor wants to include delivery,

17   it should also include the receiving the remuneration.

18       THE COURT:  I don't think so.  I think there are, there

19   are a bunch of different things that are central to this, but

20   I think the way the case law looks is it just looks to the

21   statute to figure out what's at the core of the offense.

22       And I think it's a little strange to imagine -- it's a

23   little strange to imagine that furnishing an item, which is

24   what the statute said, is not at the core of the offense.  And

25   it's also a little strange to imagine that it's not part of

1    the actus reus.

2         You agreed to a jury instruction that makes

3    furnishing -- that then makes the provision of an item part of

4    the offense, and that was the right thing to do.

5         MS. SOLANO:  Yes, Your Honor.  I didn't want to

6    interrupt you.

7         THE COURT:  I just think this is clearly at the heart

8    of the allegation, of the crime.

9         MS. SOLANO:  But what the Government charged and the

10   act that is actually criminal here, the delivery, from the

11   jury instruction is the -- I'm sorry, I'm trying to say two

12   different things.

13        The delivery of the purchase of the item, that is

14   subsumed in what the purpose of the remuneration is; but the

15   actus reus of an anti-kickback crime, as reflected in how the

16   Government charged it in this case, is the receipt of the

17   money.  The Government doesn't make any reference in any of

18   their substantive AKS counts about delivery of the braces that

19   were purportedly induced by these -- this illegal

20   remuneration.

21        THE COURT:  It's a very -- essentially what you're

22   saying -- I don't think this is right -- well, let's assume

23   it's right.  What you're essentially saying is that the actus

24   reus generates venue or not.  And although the statute on your

25   read requires that mens rea be directed toward the furnishing

```
 1   of an item, which necessarily has a physical location, only
 2   the actus reus can supply venue; but the physically, spatially
 3   directed mens rea cannot supply venue.
 4        But why?
 5        MS. SOLANO:  Well, Your Honor, I believe that, one,
 6   I do think that the actus reus has to be included in where
 7   proper venue would be.  And here, I don't believe that the
 8   proposed instruction includes that it could be also where
 9   the -- I'm sorry, where the remuneration was received.
10        But as I understand the way that an anti-kickback
11   charge would be is at the point in time when a defendant or
12   anyone receives remuneration with the purpose of these other
13   things, the anti-kickback charge would be a completed act.
14        And so it wouldn't matter whether the delivery of an
15   item actually did go forth.  The act, at that point when the
16   person receives the illegal remuneration with the intent, is a
17   completed offense at that point.
18        THE COURT:  That may -- everything you have just said
19   may or may not be right, but let's assume it is right.  If
20   it is right, it still falls back on the implicit legal
21   principle that I just mentioned, which is what you're saying
22   is that mens rea directed a particular place, i.e., the place
23   where an item is furnished doesn't matter.  And I'm asking you
24   why.
25        MS. SOLANO:  Well, Your Honor, because at that point
```

1    the crime is complete.

2         THE COURT:  Right.  But at that moment when the crime

3    is complete, I have given money to someone in Massachusetts

4    for something that, the next day, is gonna be delivered in

5    New Jersey.  And you're saying that it's complete upon the

6    provision of the money in Massachusetts and my thought process

7    as to New Jersey doesn't matter.  Okay.

8         But why are you right, that the thought process focused

9    on New Jersey and the furnishing into New Jersey is irrelevant

10   for venue purposes?  That's the question.

11        MS. SOLANO:  Well, Your Honor, I think that the reason

12   why it doesn't matter at that point is because in determining

13   the -- where venue can occur, you have to look at the nature

14   of the crime and you have to look at where it begins and where

15   it ends.

16        And if the crime is complete upon receipt of illegal

17   remuneration, which I believe it is, then any acts that happen

18   thereafter -- which are the facts of this case, right, that

19   the money was sent before there were orders shipped out, and

20   so at that point the act is done.  The act that could confer

21   venue is finished.

22        And we cited to, for example, a Second Circuit case in

23   which they discussed that, for example, the intent for the

24   scheme to defraud can't supply venue.  So if something about

25   the intended scheme to defraud can't supply venue because it's

 1    tied to a mens rea, then what you're talking about --

 2         THE COURT:  I see the point.  But there is a body of

 3    law that I think supports the intuition behind what you're

 4    saying which is the body of law about events after the

 5    completion of the crime.  This is a little bit what

 6    Justice Ginsburg is getting to in terms of money laundering

 7    being done.

 8         I think it's bundled together much more tightly here.

 9    I just do.  I hear what you're saying but, on balance, unless

10    we're gonna be formalistic in a choice of law first

11    re-statement sort of way, the question is, what is -- given

12    the words congress has chosen -- the core of the thing of the

13    crime, not that which happens afterward.

14         It may be -- although I see no distinction like this in

15    the case law.  I understand the Second Circuit case you're

16    talking about.  But the sharp divide between actus reus and

17    mens rea I think is not really there, and I think there is no

18    conceivable way to think about an anti-kickback violation

19    without this part that congress has picked out which is that

20    it's furnishing an item.

21         Any other comments on the venue instruction?

22         MS. SOLANO:  Your Honor, we would request that for the

23    anti-kickback charges, that in addition to the delivery piece

24    that the actus reus would be included.

25         THE COURT:  I assume the United States is opposed to

1    that but let's hear from the United States.

2         MS. LOU:  Your Honor, is the proposal that it would be

3    an "or" rather than an "and"?

4         THE COURT:  Ms. Solano?

5         MS. SOLANO:  I think the proposal would be that the

6    jury can decide what they think -- they have to decide venue.

7    It's a factual issue for them.

8         And so I think for the kickback charges, the offense

9    would discuss that jury could be proper regarding the delivery

10   of services; it could also be proper regarding where the

11   payment was received.

12        THE COURT:  So, then, the way you would -- so your

13   answer to Ms. Lou's question is yes, it's "or."  What you want

14   it to say is in addition -- we're reading the second paragraph

15   of the venue instruction:  In addition, as to Counts 2, 3, 4,

16   6, 7, and 8, the meaningful act in furtherance of that count

17   must have been causing delivery of DME into New Jersey or

18   making a payment into New Jersey.

19        Do I have that right?

20        MS. SOLANO:  I think it has to be "receipt."

21        THE COURT:  Or receiving a payment in New Jersey.

22        MS. SOLANO:  Yes.

23        THE COURT:  Okay.

24        MS. SOLANO:  Just so the record is clear, we are

25   standing by our requested venue instruction.

1          THE COURT:  I got it but just --

2          MS. SOLANO:  Yes, Your Honor.

3          THE COURT:  The question of what's preserved and what's

4    not preserved, I don't presume to say anything about that.

5          But the question, Ms. Lou, how do you feel about that?

6    So just to:  In addition, as to Counts 2, 3, 4, 6, 7, and 8,

7    the meaningful act in furtherance of that count must have been

8    either causing the delivery of DME into New Jersey or

9    receiving a payment into New Jersey.

10         MS. LOU:  Your Honor, given how we have charged it, not

11   just -- I think everybody in this room knows that no payments

12   were received in New Jersey, but we have also alleged that

13   they were sent through New Jersey via Fedwire.  It's right

14   here in the indictment.

15         So to leave that out -- if we're going to include

16   discussion about payments and where they're being received and

17   also -- excuse me, Your Honor -- we have also charged aiding

18   and abetting and so it also has to include the sending, too,

19   not just the receiving.

20         So if we're talking about all the places in which the

21   payment has been initiated or received, I think we should also

22   include that being passed through.

23         THE COURT:  I think the problem becomes, that begins to

24   run afoul of the case law here being averse to --

25         Look, the reading of the continuing crimes statute I

1   think would support what you're saying, but that's not how

2   it's been read, for example, by the Circuit in the Computer

3   Fraud Act case which doesn't want purely incidental things.

4   So I'm a little hesitant about that.

5        So I appreciate your point, which is, oh, my gosh, says

6   Ms. Lou, I know for the United States that I am not gonna be

7   able to argue from that second venue prong.  But you can argue

8   from the first one, so what difference does it make?

9        MS. LOU:  Right.  Then my point would be, Your Honor,

10  the earlier point that I made about the doctors having

11  signed -- you know, the -- in return for the kickback payment

12  what's being exchanged is not just the medical items being

13  shipped and the furnishing of that item but the furnishing of

14  the item also being doctors' orders that were signed by

15  doctors in New Jersey.

16       THE COURT:  I assume you're okay with that, Ms. Solano.

17       MS. SOLANO:  Your Honor, I don't believe that there's

18  evidence that would support that.

19       THE COURT:  That's a different question, though.  If

20  Ms. Lou is proposing a -- there's many things here that you're

21  going to argue the evidence doesn't support.  That's a

22  different point.

23       MS. SOLANO:  I just want to make sure that it is --

24       THE COURT:  So --

25       MS. SOLANO:  -- perhaps phrased a different way.

 1   Because I think if you assume that there are doctors' orders

 2   signed in New Jersey, then --

 3        THE COURT:  So I think that it would say something

 4   like --

 5        MS. SOLANO:  Your Honor, just one point.

 6        THE COURT:  Go on.

 7        MS. SOLANO:  What we're arguing with respect to this

 8   receipt is it only applies to the AKS charges.  It does not

 9   apply to --

10        THE COURT:  That's the problem I was trying to avoid by

11   not going down this road.  I was trying to provide a single

12   solution to the substantive venue issue.  It does not require

13   two venue charges -- that requires only two venue charges

14   instead of three.

15        MS. SOLANO:  Your Honor, we don't believe a venue

16   charge is necessary for a conspiracy.  We are not arguing

17   that.

18        THE COURT:  But that's too complicated.  You sorta

19   can't have this both ways.  You can't ask for venue on some

20   things where you like it and not where you don't.  There has

21   to be some -- I don't want to leave the jury with a question

22   mark of, gee, what the heck happened to venue on a certain

23   count?  That's too weird.

24        Look, here is where the rubber meets the road:  As

25   to -- Ms. Solano has a general objection, the scope of which

 1    is in the record and it speaks for itself, as to the way venue

 2    is being handled here.

 3         Can someone remind me of the health care fraud charges,

 4    the substantives are Two, Three, and Four?  I keep getting

 5    this wrong.

 6         MS. LOU:  Yes, Your Honor.

 7         THE COURT:  The substantives under Anti-Kickback

 8    Statute are Six, Seven, and Eight?

 9         MS. LOU:  Correct, Your Honor.

10         THE COURT:  I think where we are is that, putting aside

11    the general objections Ms. Solano has, it would read like

12    this:  I'm gonna start again.  Page 106.

13              (Reading:)

14              The superseding indictment alleges that some

15              act in furtherance of each of the offenses charged

16              occurred here in the District of New Jersey.

17              There is no requirement that all aspects of each

18              of the offenses charged or that the entire

19              conspiracies take place here in the District of

20              New Jersey.  But for you to return a guilty

21              verdict, the Government must convince you that for

22              each count some meaningful act in furtherance of

23              that count took place here in the District of

24              New Jersey.  Period.  New paragraph.

25              In addition, as to Counts 2, 3, and 4, the

1          meaningful act in furtherance of those counts must

2          have been causing the delivery of DME into

3          New Jersey.  Period.  New paragraph.

4              As to Counts 6, 7, and 8, the meaningful act in

5          furtherance of those counts must have been either

6          causing the delivery of DME into New Jersey, or

7          receiving a payment into New Jersey, or the

8          signing of a doctor's order in New Jersey.

9          Ms. Solano?

10          MS. SOLANO:  Yes, Your Honor.  I don't -- well, with

11  respect to the -- I just want to be clear.

12          With respect to the health care fraud offense, I

13  believe that an actus reus for that would be submission of the

14  false claim itself.

15          THE COURT:  Ms. Solano, I just disagree with you on

16  that but let's just stick with the language here.

17          MS. SOLANO:  With Your Honor's rulings, we are fine

18  with that language.

19          THE COURT:  Ms. Lou, what do you think?

20          MS. LOU:  Your Honor, I'm fine with that language.

21  Bottom line, I just want to correct my misstatement earlier as

22  to the furnishing of the items serviced being the doctors'

23  orders.  We still believe it's appropriate to add that

24  third prong.

25          THE COURT:  That's why I said it with respect to

```
 1   Counts 6, 7, and 8.  It's now three -- it's "or" not "and,"

 2   it's "or."  Three things under 6, 7, and 8.

 3         MS. LOU:  Understood.

 4         THE COURT:  So that's that.

 5         We're at the end of our list.  I think probably the

 6   most useful thing to do, if I might, is for those who have the

 7   task of putting this into a final state, which also, you know,

 8   is just ready for me to read, it's probably going to make

 9   sense for us to stop now and deal with that.  The jury is

10   gonna be ready, one hopes, in 32 minutes and we'll be ready to

11   go then.

12         So that's my preference.

13         Ms. Solano made a filing yesterday that seeks discovery

14   with respect to grand jury minutes.

15         The United States' plan is to respond to that by when?

16         MS. SOLANO:  Your Honor, I actually haven't made that

17   application.  I made the request to make the application.

18         THE COURT:  Well, didn't you file like a long letter

19   about that?

20         MS. SOLANO:  It was a long sentence but it was a

21   one-sentence request to have permission to make the

22   application.

23         THE COURT:  So here is the question on that.  Is there

24   anything else that's an open issue?

25         MS. SOLANO:  Your Honor, I have two open issues but we
```

1    can address --

2         THE COURT:  Just tell me what they are.  One is grand

3    jury minutes.  What's the second one?

4         MS. SOLANO:  Yes, Your Honor.  The other one is the --

5    I think we need a curative instruction regarding Ms. Lou's

6    statement that the joint laxity thing was a regulation.

7         THE COURT:  But her answer is fully satisfactory.  We

8    have said over and over again that -- I've said over and over

9    again lawyers' questions are not statements.

10        And that question -- Ms. Lou is right -- that question

11   was objected to by you and I sustained the objection.  The

12   question wasn't answered, so if it goes back to the jury

13   they're not even gonna see that.  I think we can move on.

14        It presumes that the jury is not following the law and

15   not following my instructions to give them an instruction on

16   that and there's no reason to presume that.

17        What's the next issue?

18        MS. SOLANO:  The next issue is we want to -- at the

19   beginning of this case, Your Honor I'm sure remembers, we

20   raised the -- in the motion to dismiss the superseding

21   indictment, we raised the issue that an -- I'm sorry, that the

22   portions of the indictment that say that the conduct was --

23   something was submitted to Medicare without regard to medical

24   necessity, that that was outside the scope of what the fraud

25   statute actually criminalizes and that it was a due process

```
 1    violation for fair notice.

 2         Your Honor I think addressed that by saying that if we

 3    wanted to re-urge that towards the end of trial we could do so

 4    to strike out those portions, and so I'm making that

 5    application that I do believe that charging something that

 6    could be medically necessary but was submitted without regard

 7    to medical necessity is outside the scope of the fraud

 8    statutes and I'm renewing our due process argument.

 9         THE COURT:  But is the argument about -- I mean, I'm

10    not -- I don't think it's weird to pull things out of the

11    indictment, if that's what's going on.  I mean, there is

12    just -- if someone had asked me not to send the indictment

13    back, I don't know what I would have done.  I don't love

14    sending indictments back.

15         Does the United States have an issue with just excising

16    those words from the indictment?  We're just talking about

17    what's in the indictment.

18         MS. LOU:  Rather than what is required to be proven; is

19    that what Your Honor is saying?

20         THE COURT:  Yeah.  Ms. Solano's argument is no longer

21    about the jury instructions.  We're done with that.  This is

22    just about whether those words are gonna appear in the

23    indictment that the parties have assumed goes back to the

24    jury.

25         MS. LOU:  Your Honor, the issue with excising those
```

1   words is that, without our ability to argue that, for example,

2   that something is not actually medically required without

3   reference to regulations or rules, what we're left with, as

4   Your Honor noted on Friday, is the -- in Your Honor's words, I

5   believe the mountain of evidence that the whole scheme was set

6   up to medical necessity.

7         I believe that one of our core theories is that, given

8   the scheme that was set up in an absence of, you know,

9   attending to the medical necessity, that amounted to medical

10  unnecessariness itself.  So to cut that out is really cutting

11  the leg out from under us in terms of what we can argue.

12        THE COURT:  I agree.  I'm not going to do that.

13        First of all, there's no fair notice violation.  I just

14  don't think that's what's going on here.  There's no need to

15  excise it.  So I'm denying the motion.

16        I think what Ms. Solano is really aiming to argue is,

17  candidly, not for now.  It's an argument she's gonna want to

18  make if there's a conviction, to me and/or to the court of

19  appeals.

20        And the argument is basically, the United States needs

21  to prove -- I think what Ms. Solano is envisioning and I'm

22  expressing no opinion on -- there's no fair notice problem.

23  There's no due process problem.  I think what Ms. Solano is

24  envisioning is, let's imagine that the process for deciding

25  whether someone gets a brace is throwing a dart against the

1    wall.

2        In the United States' telling, that's total reckless

3    disregard for medical necessity and, therefore, is enough.

4        Ms. Solano's point is, if you threw the dart against

5    the wall and it turned out it landed on the precise brace a

6    patient actually needed, that's not fraud.  That's an argument

7    she can opt to make after the trial.

8        The problem you're gonna have with that argument,

9    Ms. Solano, even if you're legally right, probably -- I

10   suspect this is how, and you have heard it over and over again

11   how the United States is gonna argue it, that there are people

12   here who have put in themselves affirmative evidence.  They

13   got something they didn't want, didn't need.

14       So it functions ex ante as maybe a fair notice

15   argument.  I find that it's not, for obvious reasons, related

16   to the thickness of the discovery, the speakingness in the

17   indictment, et cetera, et cetera, et cetera.  It hardly needs

18   discussion.  Fair notice problems with criminal law are very

19   rare.

20       The problem ex post you're gonna have, I suspect, runs

21   through the fact that, even on the dart theory, it looks like

22   there has been some affirmative evidence in this case that it

23   didn't all work out in a just-so way that people didn't get

24   what they wanted.  But that's an argument that you can take up

25   later if you'd like to.

1       MS. SOLANO:  Yes, Your Honor.  Just to put a bit of a
2   finer point on it, I think that the argument is not -- I do
3   think the dart example is a good one, but the argument is also
4   that they have created something where it's not a false
5   statement because it's without regard to medical necessity;
6   but it's also creating, I think, confusion on confusing an
7   intent to defraud versus some sort of affirmative obligation
8   to investigate medical necessity, which I don't believe is
9   here.
10      He's not a doctor, and the idea that somebody could be
11  charged with health care fraud because a claim was submitted,
12  even if a claim was submitted over and over and over again,
13  without regard to medical necessity, assumes that there is
14  some sort of duty to undertake a sort of inquiry that is
15  separate and apart from whether something was submitted with
16  the intent to deceive and defraud because it was medically
17  unnecessary.
18      THE COURT:  There could be a case in which that's a
19  live issue and there could be a case in which that presents a
20  fair notice-type problem.  It's just that the indictment here,
21  and supplemented by the evidence you've received, doesn't make
22  this even remotely like that case.
23      There's -- I don't believe I used the word "mountain,"
24  but there is a large volume of evidence that is very
25  affirmative on this and has been affirmatively presented as

 1    allegations from a much earlier time.  So I don't think

 2    there's a fair notice problem.

 3         I think that there could be a case in which there is a

 4    fair notice problem, but my intuition is this is not that

 5    case.  If the jury comes back a certain way, you can argue it

 6    ex post, ex ante.  I don't think there's anything like that.

 7         MS. SOLANO:  Thank you, Your Honor.

 8         In our papers we wrote that it was a fair notice

 9    problem, and it's also just the due process issue that we have

10    raised and briefed several times with respect to that standard

11    as what due regard you must undertake for medical necessity is

12    a vague standard.

13         THE COURT:  I don't see that.  Okay.  I have it.

14         So Ms. Solano's third point, got it.

15         The curative instruction, I have already ruled on,

16    which is to say as to the statement built into Ms. Lou's

17    question that was never answered because it was objected to

18    and the objection was sustained, I've said there was no need

19    for a curative instruction because the need for a curative

20    instruction there presumes that the jury is not already

21    following instructions, and as I outlined toward the beginning

22    of today's proceeding, I think this jury is not that kind of

23    jury at all.  I'm not worried about it.

24         Then there is the permission to make a motion for

25    inspection of grand jury minutes, and the permission for that

1    is granted.

2         Anything else?

3         MS. LOU:  Your Honor, just to clarify on the venue

4    instruction.  After your rider insertion, is it your intention

5    to read the rest of --

6         THE COURT:  Yeah.

7         MS. LOU:  I just wanted to clarify.

8         THE COURT:  Yes.  I think the rest has to be there;

9    otherwise --

10        MS. LOU:  Of course, the burden --

11        THE COURT:  Yeah, it has to be there to protect the

12   defendant.

13        Ms. Lou, anything else?

14        MS. LOU:  No, Your Honor.

15        THE COURT:  Ms. Solano?

16        MS. SOLANO:  Just a housekeeping point, Your Honor.

17        If the defendant gets off of the stand today and we

18   rest, it's my understanding that the Government will do

19   whatever it's gonna do; but if the Government also rests, I

20   believe that I need to make an application at that point.  I

21   need to renew my application.  I don't think you want me to do

22   that in front of the jury, so I'm just raising that as a --

23        THE COURT:  Do you need to make an application that is

24   anything other than just making an application to preserve it,

25   or do you actually want to have argumentation at that point?

1          MS. SOLANO:  It wasn't going to be long, but I was

2    going to say certain things.  I could do it at sidebar.  That

3    would be fine, too.  I wanted to know your preference --

4          THE COURT:  I just don't want you to do in it front of

5    the jury.  I just also want to move quickly.  Why don't we

6    have a sidebar at that point.

7          MS. SOLANO:  I want to remind that I do need -- it may

8    not be an issue today, but in the event -- we'll raise --

9          THE COURT:  This jury instruction is going to take a

10   while.  You're talking about getting to your closing.  There's

11   no way.  Ms. Lou is gonna take whatever.  Then there's gonna

12   be jury charge and then Mr. Specht is gonna spend whatever

13   it is --

14         MS. SOLANO:  I'm not arguing with you.

15         THE COURT:  There's no way we're getting there.

16         MS. SOLANO:  Thank you, Your Honor.

17         THE COURT:  And then we're going to have a couple days

18   to prepare.

19         Anything else?

20         We will be back in 20 minutes.  Thank you, all.

21         Good luck preparing this charge and, please, as soon as

22   you have -- as soon as you have it, e-mail it to my courtroom

23   deputy and also bring a hard copy because I will hope to read

24   it to the jury today.  Thank you.

25              (Recess taken.)

RAHEEL NAVIWALA - CX - BY MS. LOU                    **2265**

1          THE DEPUTY CLERK:  All rise.

2              (Witness Raheel Naviwala resumes the witness stand.)

3          (Jury enters the courtroom at 11:10 a.m.)

4              (Whereupon, the following proceedings were held in

5               the presence of the jury:)

6          THE DEPUTY CLERK:  All rise.

7          THE COURT:  Ladies and gentlemen of the jury, good

8   morning to each of you.  As you know, we started a little late

9   and later yet by two minutes.  I saw you in the hallway as we

10  were passing each other.  Sorry I didn't get here the moment

11  before you did, but here we are.  Welcome back.

12         To the witness, I'll remind you that you remain under

13  oath.

14         Please continue.

15         MS. LOU:  Thank you, Your Honor.

16                      RAHEEL NAVIWALA,

17    having been previously duly sworn, testified as follows:

18                    CROSS-EXAMINATION

19                       (Resumed)

20                      By Ms. Lou:

21  **Q.**   Good morning.

22  **A.**   Good morning.

23  **Q.**   On Friday, if you recall, I showed you an e-mail between

24  you and Nelly Petrosyan.

25         Do you recall that?

1    **A.**    Yes.

2    **Q.**    I can pull it up, but do you recall that e-mail was

3    dated, I believe, June 13th of 2018?

4    **A.**    Yes.

5    **Q.**    You dealt with Ms. Petrosyan and US Orthopedics Corp, her

6    company, after that time; correct?

7    **A.**    Yes, I believe so.

8    **Q.**    And you communicated with her, among other ways, using

9    theprudentgroup@gmail.com e-mail address?

10   **A.**    I think it was primarily through text, and then Amman

11   handled that account, primarily.

12   **Q.**    Theprudentgroup@gmail.com account?

13   **A.**    Just Nelly in general.

14   **Q.**    The account with US Orthopedics; is that what you're

15   saying?

16   **A.**    Yes.

17   **Q.**    I'm going to show you what's not been admitted into

18   evidence, marked for identification as Government Exhibit

19   4801.

20        MS. LOU:  Just for the witness and the parties, please.

21   **Q.**    Do you see this e-mail?

22   **A.**    Yes.

23   **Q.**    Do you recognize it?

24   **A.**    I don't recognize it exactly, no.

25   **Q.**    Is it an e-mail between Ms. Petrosyan at US Ortho Group

1    and theprudentgroup@gmail.com?

2    **A.**   Yes.

3          MS. LOU:  Your Honor, I move to offer this e-mail into

4    evidence.

5          MS. SOLANO:  Your Honor, can we just scroll out.  Is

6    this one page?

7          MS. LOU:  Yes.  This is the whole document.

8          MS. SOLANO:  No objection.

9          THE COURT:  Government Exhibit 4801 is admitted.

10          (Government's Exhibit No. 4801 was received in

11           evidence.)

12   BY MS. LOU:

13   **Q.**   Looking at the second e-mail from Nelly Petrosyan, do you

14   see the date of that?

15   **A.**   Yes.

16   **Q.**   That's June 20th, 2018.  Correct?

17   **A.**   Yes.

18   **Q.**   Do you see where she writes (Reading:)

19          Raheel, I hope to see some clients coming over

20       tomorrow.

21   **A.**   Yes.

22   **Q.**   And the response from The Prudent Group e-mail,

23   June 21st, 2018.

24          Do you see that?

25   **A.**   Yes.

RAHEEL NAZWALA - CX - BY MS. LOU                    *2268*

```
 1   Q.   And it says (Reading:)
 2             We just sent over your orders.  Thanks.
 3   A.   Yes.
 4   Q.   Is there anywhere in this e-mail that mentions John Fusco
 5   at all?
 6             MS. SOLANO:  Objection.
 7             THE COURT:  Basis?
 8             MS. SOLANO:  Speaks for itself.
 9             THE COURT:  Overruled.
10             THE WITNESS:  No.
11   BY MS. LOU:
12   Q.   You never told Nelly Petrosyan or US Orthopedics that
13   John Fusco was using this Prudent Group at Gmail.com address,
14   did you?
15   A.   No, I probably told her Amman was using it.  I don't know
16   about John.
17   Q.   To your recollection, not John; is that right?
18   A.   I don't think so.
19             MS. LOU:  Thank you.  You can take that down.
20   Q.   On Friday, you said that you didn't profit from Elite
21   after February 1st of 2019; is that accurate?
22   A.   Yes.
23   Q.   But before then, you did?
24   A.   Yes.
25   Q.   And, in fact, there are wires that were sent to you at
```

 1   your direction from the Elite bank account; is that accurate?

 2   **A.**   Yes.

 3   **Q.**   And that those wires totaled something like 8.75 million?

 4   **A.**   Probably around there.  It was to my entity before any of

 5   my expenses.

 6   **Q.**   And that's Raheel Naviwala, PA?

 7   **A.**   Yes.

 8   **Q.**   Again, you had directed John Fusco to send those wires.

 9   Right?

10   **A.**   Yes.

11   **Q.**   Also on Friday -- withdrawn.

12       On Thursday, I believe you said that you ran into

13   Kareem for the first time in ten years before getting into the

14   DME business.  Right?

15   **A.**   Yes.

16   **Q.**   You said that he was driving a nice car?

17   **A.**   Yes.

18   **Q.**   And you asked what he was doing because you wanted to

19   know how he could afford such a nice car?

20   **A.**   Yes.

21   **Q.**   And you jumped into that business with him because you

22   also wanted to make money?

23   **A.**   He reached out to me about a business opportunity and

24   after doing a little bit of research it seemed appealing.

25   **Q.**   You knew that he had prior experience in the call center

RAHEEL NAZZALA - CX - BY MS. LOU

1   business with regard to pain creams; right?

2   **A.**   With pharmacy for sure.  I don't know if it was pain

3   creams exactly.

4   **Q.**   And Kareem had told you that he left that pharmacy

5   business because of arrests being made?

6   **A.**   No, not at that time.

7   **Q.**   That's something he told you later on?

8   **A.**   Way later on after all of this was over and I ran into

9   him, I expressed that I was very upset with him.

10  **Q.**   You recall during Armani's testimony text messages

11  between you and Armani where Armani sent you a video of a

12  Ferrari he had purchased.

13  **A.**   Yes.

14  **Q.**   You were jealous of that Ferrari?

15       MS. SOLANO:  Objection.  401, 403.

16       THE COURT:  Sustained.

17  BY MS. LOU:

18  **Q.**   At some point between 2017 and 2019, did you buy your own

19  Ferrari?

20  **A.**   I did.

21  **Q.**   And you also bought jewelry?

22       MS. SOLANO:  Objection.  401, 403.

23       THE COURT:  Overruled.

24       THE WITNESS:  Yes.

25       MS. LOU:  Mr. Klimaski, if you could pull up Government

RAHEEL NAZWALA - CX - BY MS. LOU                    **2271**

1   Exhibit 6017d, like David, which is already in evidence,

2   page 45.  Then we can zoom in on the front of the check,

3   please.

4   BY MS. LOU:

5   **Q.**   This is the check from the Elite Healthcare Solutions

6   account; right?

7   **A.**   Yes.

8   **Q.**   It's dated 10/10/18?

9   **A.**   Yes.

10  **Q.**   It's a check to Babylon Jewelry; correct?

11  **A.**   Yes.

12  **Q.**   For $39,390?

13  **A.**   Yes.

14  **Q.**   It's signed using John Fusco's stamp; right?

15  **A.**   Looks like it, yes.

16        MS. LOU:  If we could turn to the next page, please.

17  **Q.**   Same thing, another check to Babylon Jewelry.  I believe

18  it says 10/18/18 for $50,000?

19        THE COURT:  Hold on a second.

20        MS. SOLANO:  Objection.  401, 403.

21        THE COURT:  Overruled.

22        THE WITNESS:  Yes.

23  BY MS. LOU:

24  **Q.**   Again, using John Fusco's stamp?

25  **A.**   Looks like it, yes.

RAHEEL NAWALA - CX - BY MS. LOU

1    **Q.**    That's the stamp that you had; right?

2    **A.**    A few people had access to the stamp.

3    **Q.**    On Friday, I believe you said that you had the stamp; is

4    that not accurate?

5    **A.**    It was in our office but it was used by a few people.

6    **Q.**    But in this case you signed this check using the stamp;

7    right?

8    **A.**    I'm not sure if I was the one that actually did it but

9    I know about the transaction.

10   **Q.**    In fact, there's a series of checks is --

11        MS. LOU:  Mr. Klimaski, if you can scroll slowly.  This

12   is page 46, I believe.  Page 47, page 48, page 49, page 50,

13   51, 52.

14        Stop there for a second.  Go back to 52.

15   **Q.**    This is a check for $120,000 and this one is

16   November 28th, 2018; right?

17        MS. SOLANO:  Objection.  The way that it's just

18   compounded and narrative in its current form of the question.

19        THE COURT:  Rephrase solely as to form.

20   BY MS. LOU:

21   **Q.**    This is a check that we're looking on page 52 of 6017d

22   dated 11/28/18 to Babylon Jewelry; correct?

23   **A.**    Yes.

24   **Q.**    And for $120,150?

25   **A.**    Yes.

1    **Q.**   Also using John Fusco's stamp?

2    **A.**   Looks like it.

3    **Q.**   We had just looked at a series of checks all to Babylon

4    Jewelry; correct?

5    **A.**   Yes.

6    **Q.**   All for the same roughly two-month time period?

7    **A.**   Yeah, it looks like it.  This would have all been

8    accurately reported on my financials.

9         MS. LOU:  You can take that down.  Thank you.

10   **Q.**   You bought Rolexes for the people you worked with; right?

11   **A.**   Yes.

12   **Q.**   Including Amman Majid; right?

13   **A.**   Yes.

14   **Q.**   John Fusco?

15   **A.**   Yes.

16   **Q.**   And your brother?

17   **A.**   Yes.

18   **Q.**   But others, also?

19   **A.**   Yes.  Pretty much everybody on the Navtek team, because

20   I was trying to incentivize them to work as hard as possible.

21   **Q.**   In December of 2017, you paid a $5,000 retainer to Brown

22   & Fortunato; correct?

23   **A.**   Yes.

24   **Q.**   You talked to Armani on the day that search warrants were

25   executed on his businesses in April 2019?

RAHEEL NAZWALA - CX - BY MS. LOU                    *2274*

1   **A.**    I don't know if they're search warrants.  I know that his

2   bank accounts were frozen.

3   **Q.**    You talked to him on that day?

4   **A.**    He called me, yes.

5   **Q.**    And you told him that it was your worst nightmare; right?

6   **A.**    No, I don't recall saying that, actually.  I just

7   remembered him laughing.

8        And that was, like:  What are you laughing about?

9        And he was like:  We didn't do anything wrong.

10       That's all I can remember.

11  **Q.**    Didn't he say, I'm laughing instead of crying?

12  **A.**    What's that?

13  **Q.**    Didn't Armani say, I'm laughing so as not to cry?

14  **A.**    No.  All I remember was him saying we didn't do anything

15  wrong.

16  **Q.**    But you were still selling completed doctors' orders on a

17  per-brace basis to Armani until his bank accounts were frozen

18  in April of 2019; right?

19  **A.**    I told you I'm not a hundred percent sure after February.

20  A lot of changes were implemented in February so I'm not

21  exactly a hundred percent sure.

22  **Q.**    But wires from Armani continued to come in from his

23  individual DME businesses past February as they had been

24  before; right?

25  **A.**    Yes.  It was just limited to I think four or five that

RAHEEL NAZWALA - CX - BY MS. LOU

**2275**

1    were consistently sending the same amounts weekly.  And he

2    hired that quality control team, I mentioned.

3    **Q.**    We talked on Friday about the reason why they were

4    consistently sending the same; it's because there was an

5    expectation as to the volume of business that you and Armani

6    would do; right?

7    **A.**    Kind of.  I mean, he was sending payments consistently

8    and I just remember that he was saying that I or we owed him a

9    lot of money at the same time but he was still sending

10   payments so... I'm not sure.  That's why at the end of it I

11   think he said I owe him millions of dollars or something, but

12   he was consistently sending payments.

13        But, yeah, February, March is really like -- I can't

14   remember too much because I was so focused on Navtek.

15   **Q.**    The consistent payments he was sending were for completed

16   doctors' orders; correct?

17   **A.**    They would have involved completed doctors' orders, for

18   sure.

19        MS. LOU:  Mr. Klimaski, you could please pull up

20   Government Exhibit 5404 which is in evidence, page 31, please.

21   **Q.**    Do you see this?

22   **A.**    Yes.

23   **Q.**    Is this a text message chain between you and Armani?

24   **A.**    Yes.

25   **Q.**    And you see there at the bottom, March 12th, 2019?

RAHEEL NAZARWALA - CX - BY MS. LOU
**2276**

1    **A.**    Yes.

2          MS. LOU:  If we could turn to the next page of this

3    exhibit, please.

4    **Q.**    Do you understand this to be a continuation of the text

5    messages we saw on the prior page?

6    **A.**    Yes.

7    **Q.**    The bottom message above March 12th, 2019, at 9:45 p.m.?

8    **A.**    Yes.

9    **Q.**    Do you see that?

10   **A.**    Uh-huh.

11   **Q.**    That's a message from you; right?

12   **A.**    Yes.

13   **Q.**    And it says:  Got 2,000 elbows ready to go?

14   **A.**    Yeah.  I remember elbows and hip braces were two new

15   braces implemented on the software, and they weren't getting

16   caught in the system so that was, like, one of the glitches

17   I was referring to because we weren't used to those braces.

18   **Q.**    But, again, this is because you're selling doctors'

19   orders for those braces to Armani; right?

20   **A.**    I think he was supposed to get them.  I don't know if --

21   I doubt you see a $2,000 transaction.  I'd be surprised but --

22   yeah, I mean, we always used it as a metric I guess, no matter

23   what, so...

24          Does that answer the question?

25          MS. LOU:  Can we pull up Government Exhibit 6017i,

1    please, and scrolling to the statements in March of 2019.  I'm

2    sorry I don't have the page.

3         129.  Thank you.

4         If we could zoom in on the March 18 through all of the

5    incoming wire transfers, please.

6    **Q.**   These are all wire transfers from Armani's individual DME

7    companies; right?

8    **A.**   Yes.

9    **Q.**   It's for doctors' orders?

10   **A.**   It would have been for doctors' orders and the services

11   we're providing, as well, as the intermediary.

12        MS. LOU:  You can take that down.  Thank you.

13   **Q.**   What happened in April 2019 not just to Armani, scared

14   you; right?

15   **A.**   Yes.

16   **Q.**   And John Fusco couldn't reach you a few days after he

17   received a subpoena?

18   **A.**   I don't know when he received the subpoena.  I don't know

19   if I was aware he couldn't reach me but that's what he said.

20   **Q.**   And Michael Underdue couldn't reach you as well; right?

21   **A.**   I'm not sure if he was trying to reach out to me.

22   **Q.**   You went to meet Fusco several days after he received a

23   subpoena in front of his house; right?

24   **A.**   Yes.

25   **Q.**   Michael Underdue was also there?

1   **A.**   I don't think he was originally there but, like, maybe

2   like 5, 10 minutes into the meeting he pulled up in his car.

3   **Q.**   And you were surprised that he showed up?

4   **A.**   Not too surprised.  I mean, all three of us were partners

5   in the Deerfield office so not too surprising.

6   **Q.**   During that meeting, you told Fusco to get a lawyer;

7   right?

8   **A.**   I don't know if I told him to get a lawyer or to, like,

9   be prepared to get a lawyer if anything was to happen.

10  **Q.**   You told him to use the money in the Elite account to pay

11  the taxes on Elite.

12  **A.**   Yes.

13  **Q.**   And you told him not to rat you out.

14  **A.**   I don't recall that.

15  **Q.**   You were worried that you were next.

16  **A.**   No.

17  **Q.**   Did you keep tabs of who was arrested on the Department

18  of Justice website as arrests were being made in this?

19  **A.**   I would look every so often.

20  **Q.**   You were arrested, but not until March of 2023; right?

21  **A.**   Yes, four years later.

22  **Q.**   And after that time, you were voluntarily interviewed by

23  law enforcement agents?

24  **A.**   Yes.

25  **Q.**   And you recall that you were interviewed at the U.S.

RAHEEL NAZWALA - CX - BY MS. LOU
*2279*

```
 1    Attorney's Office on May 9th, 2023; right?
 2  A.    Yes.
 3  Q.    And you had two lawyers with you?
 4  A.    Yes.
 5  Q.    One in person and one virtually?
 6  A.    They were actually both there in person.
 7  Q.    That's Daniel Rashbaum and Jeff Marcus?
 8  A.    Yes.
 9  Q.    Before the interview began, you were shown an agreement;
10  right?
11  A.    Yes.
12  Q.    And that's an agreement called a proffer letter?
13  A.    I believe so.
14  Q.    And it's a contract with the Government that sets out the
15  ground rules on the interview; right?
16  A.    Yes.
17  Q.    And the agreement states in paragraph 1 that no
18  statements will be used against you in the Government's case
19  in chief.
20        Is that your recollection?
21        THE COURT:  Hold on for a second.
22        MS. SOLANO:  I object to counsel reading from a
23  document not in evidence.
24        THE COURT:  Overruled.
25        THE WITNESS:  What was the question?
```

RAHEEL NAQWALA - CX - BY MS. LOU                    **2280**

```
 1            MS. LOU:  I'll withdraw the question.
 2            Mr. Klimaski, can you please pull up what's been marked
 3   for identification as Government Exhibit 8051.
 4   Q.   Is this that proffer letter?
 5   A.   Yes.
 6            MS. LOU:  If we could turn to the last page, please.
 7   Q.   Did you sign this proffer letter?
 8   A.   Yes.
 9            MS. LOU:  Your Honor, I move to admit Government
10   Exhibit 8051 into evidence.
11            MS. SOLANO:  401 and 403.
12            THE COURT:  Sustained.
13   BY MS. LOU:
14   Q.   Do you recall that the agreement said that any statements
15   you made during the interview wouldn't be used against you in
16   the Government's case in chief?
17            MS. SOLANO:  Objection, assumes facts not in evidence.
18            THE COURT:  Overruled.
19            THE WITNESS:  I don't recall the specifics.  I just
20   know that the attorney told me to sign off on it.
21   BY MS. LOU:
22   Q.   Would it help to refresh your recollection if I showed
23   you the proffer letter?
24   A.   Yeah, sure.
25            MS. LOU:  If we could please pull up the agreement
```

 1   again, please.

 2        THE WITNESS:  What number are you talking about?

 3        MS. LOU:  Paragraph 1.  You can read that to yourself.

 4        THE WITNESS:  Yes.

 5   BY MS. LOU:

 6   **Q.**   Does that refresh your recollection as to --

 7        MS. LOU:  You can take that down.

 8   **Q.**   -- as to whether, in the proffer letter, you agreed and

 9   the Government agreed that no statements made by you during

10   the interview would be used against you in the Government's

11   case in chief?

12        MS. SOLANO:  Objection.  401, 403.

13        THE COURT:  Overruled.

14        THE WITNESS:  Yes.  I think there's more to it.

15   BY MS. LOU:

16   **Q.**   In fact, there's an exception, right, that the Government

17   can use the statements against you during cross-examination?

18        Do you recall that in the letter?

19   **A.**   Yes.

20   **Q.**   And you reviewed that agreement with your attorneys

21   before the interview started; right?

22   **A.**   Briefly.

23   **Q.**   And you've already said that you signed that agreement?

24   **A.**   Yes.

25   **Q.**   And that you understood what it said; correct?

**1**    **A.**    Yes.

**2**    **Q.**    And so you knew that the Government could cross-examine

**3**    you with your statements if the case ever went to trial and

**4**    you testified; right?

**5**    **A.**    Yes.

**6**    **Q.**    So, again, it was important to be accurate during that

**7**    interview?

**8**    **A.**    Yes, I think so.

**9**    **Q.**    Because you might some day be confronted with those

**10**    statements in court; right?

**11**    **A.**    Yeah.  I didn't think so at the time, but yes.

**12**    **Q.**    That is the exact situation we're in today and Friday;

**13**    right?

**14**        MS. SOLANO:  Objection.  401, and this is a statement,

**15**    not a question.

**16**        THE COURT:  Sustained.

**17**    BY MS. LOU:

**18**    **Q.**    You've been on cross-examination since Friday; is that

**19**    accurate?

**20**    **A.**    Yes.

**21**    **Q.**    At the interview, you already said that you were

**22**    voluntarily interviewed by federal law enforcement agents, but

**23**    the federal prosecutor was also there; right?

**24**    **A.**    Yes.

**25**    **Q.**    I'd like to go over some of the things you said during

RAHEEL NAZMALA - CX - BY MS. LOU                    **2283**

 1    this interview, during this proffer.

 2          MS. SOLANO:  Objection.

 3          THE COURT:  Basis?

 4          MS. SOLANO:  Can we have a sidebar, Your Honor?

 5          THE COURT:  There wasn't a question put yet.

 6          MS. SOLANO:  I believe she said she's going to go

 7    through some of the statements.  I have an objection to that

 8    under the terms of the proffer.

 9          THE COURT:  Okay.  Sidebar.

10          (Sidebar conference held on the record in the

11           presence of the Court and counsel.)

12          THE COURT:  Objection?

13          MS. SOLANO:  My objection is the scope of the proffer

14    is that the Government can use statements to rebut the

15    defendant, but there hasn't been any -- I have no idea what

16    she's going to ask.

17          THE COURT:  But I have made a ruling that the door has

18    been opened.  I imagine that Ms. Lou understands that that

19    which she can elicit here is subject to the ruling I have made

20    as to door-opening.

21          If she goes beyond it, then you'll have an objection

22    and, indeed, I would trust and hope that Ms. Lou, if she's

23    gonna go beyond my prior ruling, is gonna seek permission

24    outside of the hearing of the jury first.

25          Do I have that right, Ms. Lou?

1        MS. LOU:  Actually, Your Honor, I'm glad we're

2   clarifying because I understood you were ruling as to the

3   door-opening to be our ability to use the proffer during our

4   case in chief.

5        Now that he has testified, I intend to impeach him with

6   statements from the proffer that are outside Your Honor's

7   ruling, but that directly contradict his testimony.

8        THE COURT:  Can I see the proffer agreement?

9        MS. LOU:  (Tendered document.)

10       THE COURT:  Thanks.

11          (Brief pause.)

12       THE COURT:  Okay.  I appreciate that point, I see it.

13   What's your issue there?

14       MS. SOLANO:  So --

15       THE COURT:  It says it very directly.  This says any

16   information provided by your client to cross-examine your

17   client and to rebut any evidence.  Cross-examine your client.

18       MS. SOLANO:  My only concern is that I have no idea

19   what she's going to ask.

20       THE COURT:  But Ms. Lou has just made a pretty good

21   point, which I hadn't been focused on -- my fault -- that

22   there's two separate things in paragraph 4 of the May 9, 2023,

23   proffer agreement.

24       The second part, which has been the focus until now,

25   which has been to rebut any evidence or arguments, that's been

 1   the focus of door-opening.  But the prior piece is about using

 2   his statements to cross-examine him.

 3        What could be objectionable?

 4        MS. SOLANO:  Your Honor, I'm sorry.  I'm trying to

 5   look.

 6        THE COURT:  These are just separate prongs.

 7        MS. SOLANO:  Yes, Your Honor.

 8        THE COURT:  So I can't imagine there's an objection.

 9        MS. SOLANO:  No, Your Honor.  I just -- she's going to

10   say that she's using the --

11        I'm sorry, thank you.

12        If she's going to say she's using it to impeach, then I

13   think that the proper process needs to go through with

14   impeachment instead of her just saying:  You said all of these

15   statements.

16        THE COURT:  We can take every question as it comes,

17   but -- we'll just take the questions as they come, but I

18   appreciate why and that you have, Ms. Solano, your objection

19   to this line, anything here being violative of the proffer

20   agreement.  It's not.  It's just being used to cross-examine

21   him.

22        MS. SOLANO:  Yes, Your Honor.

23        THE COURT:  We'll take objections as they come.

24        MS. SOLANO:  Thank you, Your Honor.

25        THE COURT:  All right.

```
 1              (Sidebar discussion is concluded.)
 2    BY MS. LOU:
 3    Q.    A few minutes ago we were talking about your conversation
 4    with Adams in April of 2019.
 5           Do you recall that?
 6    A.    Yes.
 7    Q.    Then I asked you whether you told him it was your worst
 8    nightmare.
 9    A.    Yes.
10    Q.    Correct me if I'm wrong, but you said that you don't
11    recall saying that?
12    A.    All I remember from that conversation was him telling me
13    that the accounts were frozen and he was laughing.
14           And I asked him:  What are you laughing about?
15           And he said:  We didn't do anything wrong.
16    Q.    But after that time, after that conversation in April of
17    2019, everything ended; correct?
18    A.    Yeah.  I mean, in theory, we could have continued, but
19    I was, I guess just shooken up because everything was tailored
20    for him, and it would be difficult.  I think the company did
21    continue for like a month because we built such a strong team.
22    We were trying to figure out how to move forward.
23    Q.    But during our proffer, didn't you say that everything
24    ended when you received the phone call from Adams in April of
25    2019?
```

RAHEEL NAZWALA - CX - BY MS. LOU

1    **A.**    Everything ended, yeah, in the DME space, yes.  I mean,

2    eventually nothing worked out and we dissolved it.

3    **Q.**    And you had only perfected the software right before that

4    April 2019 time frame; right?

5    **A.**    I said perfected, but I don't know if that's the right

6    word because we had more plans with it; but as far as getting

7    the bugs out so those glitches would stop.

8    **Q.**    Underdue was not involved in the DME fraud; right?

9    **A.**    Underdue?  I mean, he wanted to be part of Parra, but

10   like I said, we stopped billing, so there was not really much

11   to be a part of.

12   **Q.**    And you only used his name on the account and the

13   business?

14   **A.**    He wanted to be a partner, and I think that he actually

15   ended up taking the entity on his own, and I saw that he

16   opened up another bank account without me.

17   **Q.**    But in your proffer, you said that he didn't become a

18   part of Parra Health; right?

19   **A.**    That's because there was nothing to become a part of.

20   **Q.**    And that you only used his name.  That's what you said

21   during your proffer; right?

22   **A.**    I'm pretty sure that in my proffer I said that he wanted

23   a piece and he wanted Parra to be billing and he was kind of

24   disappointed.  I don't think that part is in there, but he

25   wanted a piece of DME.

RAHEEL NAZIWALA - CX - BY MS. LOU                    *2288*

```
 1   Q.    You didn't say that during your proffer; right?

 2   A.    I did say that.  There's some inconsistencies between the

 3   302 you guys wrote up and the written notes.  Maybe it's worth

 4   looking at the written notes.

 5   Q.    But the report of the proffer doesn't say that; right?

 6         MS. SOLANO:  Objection.

 7         THE COURT:  Overruled.

 8         THE WITNESS:  There's actually a lot of inaccuracies

 9   between the written notes and the typed report so...

10         You just stated how important it was for me to be

11   accurate in that interview.  I could argue the same, that it

12   would be really important to be accurate from the written

13   notes to the written report.

14         MS. LOU:  Your Honor, move to strike the witness's

15   commentary about the accuracy.

16         THE COURT:  The motion is granted.

17         Mr. Naviwala, when a question is put to you, answer the

18   question that was put to you.  Okay?

19         THE WITNESS:  Okay.

20         THE COURT:  Continue.

21   BY MS. LOU:

22   Q.    You knew that receiving kickbacks for doctors' orders on

23   a per-brace basis was illegal; right?

24   A.    At a certain point, definitely not in the beginning.

25   Q.    But you continued to, even after knowing that point,
```

1  receive kickbacks for doctors' orders while knowing it was

2  illegal; right?

3  **A.**   Yes, while I was building the software, between when I

4  went to Armani and told him I wanted out and before the

5  software was live.

6  **Q.**   But while you were building the software, you continued

7  to receive kickbacks for doctors' orders on a per-brace basis?

8  **A.**   Yes.

9  **Q.**   And you worked with the Alberinos; correct?

10  **A.**   Yes.

11  **Q.**   And their company was Atlantic Power & Gas?

12  **A.**   That was one of them.

13  **Q.**   And that was shortened to APGE on some documents.

14      Do you recall that?

15  **A.**   Yes.

16  **Q.**   And you had a straight kickback arrangement with them;

17  right?

18  **A.**   Yes.  But I would also -- the way Armani made it seem

19  legit was if you change the prices every quarter, so I would

20  do that with him too.

21  **Q.**   Even when you changed the prices, that was still a

22  kickback arrangement; right?

23      MS. SOLANO:  Objection.

24      THE COURT:  Basis?

25      MS. SOLANO:  Calls for speculation.

1          THE COURT:  Overruled.

2          THE WITNESS:  What was that?  Sorry.

3   BY MS. LOU:

4   **Q.**   Even when Armani would change the prices quoting, that

5   was still a kickback arrangement; right?

6   **A.**   Yes, I learned later.  Like I said, eventually he was put

7   on flat fee.

8   **Q.**   While you were at Elite, I believe you testified on

9   Friday that you were acting as a broker during that time;

10  right?

11  **A.**   Yes.

12  **Q.**   While you were acting as a broker at Elite, you were

13  still profiting from the difference between what Armani paid

14  you and then what you were paying to the Alberinos; right?

15  **A.**   Yes.

16  **Q.**   Going back to your time at Prudent, you were surprised

17  that all the leads that Prudent submitted to RediDoc went

18  through; right?

19  **A.**   I don't know if it was actually all the leads, but my

20  experience with them compared to the previous two

21  telemedicines that we were using, it was a much better

22  conversion rate.

23  **Q.**   You said that that was crazy; right?

24  **A.**   I mean, just based off of my limited experience before.

25  I was only in the industry for a few months and only dealt

 1   with two other telemedicines and they weren't converting or

 2   turning around as quick as RediDoc would.

 3   **Q.**   But just based on your experience at the time, it

 4   appeared to you that RediDoc was both turning them around

 5   quickly and you were getting a very high percentage of

 6   completed signed doctors' orders; correct?

 7   **A.**   In comparison to the other two telemedicines, yes.

 8   **Q.**   Mr. Naviwala, you've been charged with crimes.  That's

 9   why you're here; correct?

10   **A.**   Yes.

11   **Q.**   Being charged criminally is very serious?

12   **A.**   Yes.

13   **Q.**   You're testifying here in your defense; right?

14   **A.**   Yes.

15   **Q.**   And you're claiming your innocence; is that accurate?

16       MS. SOLANO:  Objection.

17       THE COURT:  Basis.

18       MS. SOLANO:  It's assuming facts not in evidence.

19       THE COURT:  Sustained.

20   BY MS. LOU:

21   **Q.**   You're testifying here in the hopes of not being found

22   guilty; is that accurate?

23   **A.**   Yes.

24   **Q.**   And so you would say anything to try to prove that you

25   are not guilty?

RAHEEL NAZARALA - CX - BY MS. LOU

```
 1   A.    No.  You have my proffer.

 2   Q.    You've been present throughout this trial; right?

 3   A.    Yes.

 4   Q.    And you've been paying close attention?

 5   A.    Been trying to.  It's been quite exhausting.

 6   Q.    And you heard Haas testify that she committed conspiracy

 7   to commit health care fraud; right?

 8   A.    Yes.

 9   Q.    And you heard Ken Pitter testify that he committed crimes

10   with you; right?

11         MS. SOLANO:  Objection.

12         THE COURT:  Basis.

13         MS. SOLANO:  401 and 403 and to...

14         THE COURT:  Overruled.

15         THE WITNESS:  What was the question again?

16   BY MS. LOU:

17   Q.    You heard Ken Pitter testify that he committed crimes

18   with you; right?

19   A.    Yes.

20   Q.    And you heard Armani Adams testify that he committed

21   crimes with you; right?

22   A.    Yes.  I can't remember how much knowledge they said I had

23   of everything at the time but, yes, that's what they're saying

24   so they could get reduced sentences.

25   Q.    Same thing you heard Kareem Memon testify that he
```

```
 1   committed crimes with you; right?

 2   A.    Yes.

 3   Q.    And you heard Nadia Levit testify that she committed

 4   crimes with you; right?

 5   A.    Yes.

 6   Q.    And you heard David Laughlin testify that he committed

 7   crimes with you; right?

 8   A.    Yes.

 9   Q.    You heard some of those individuals I just named testify

10   about conversations they said they had with you; right?

11         MS. SOLANO:  Objection.  401 and 403.

12         THE COURT:  Overruled.

13         THE WITNESS:  Yes.  They were all, already been

14   indicted and have much bigger roles in all of this.

15         MS. LOU:  Your Honor, move to strike as not responsive.

16         THE COURT:  Overruled.  Motion denied.

17         Continue, please.

18   BY MS. LOU:

19   Q.    You heard some of them testify about text messages,

20   e-mails they exchanged with you; right?

21   A.    Yes.

22   Q.    You saw some of those texts and e-mails up on the screen;

23   right?

24   A.    Yes.

25   Q.    And admitted into evidence?
```

RAHEEL NAZEALA - CX - BY MS. LOU                    *2294*

1   **A.**    Yes.

2   **Q.**    You heard each of these people testify that as part of

3   their cooperation agreements with the Government they were

4   required to tell the truth; correct?

5          MS. SOLANO:  Objection.  401, 403, and counsel is just

6   making statements.

7          THE COURT:  Sustained.

8   BY MS. LOU:

9   **Q.**    Is it your testimony that all of these individuals lied

10  when they said they committed crimes with you?

11         MS. SOLANO:  Objection.

12         THE COURT:  Overruled.

13         THE WITNESS:  What was the question?

14  BY MS. LOU:

15  **Q.**    Is it your testimony that all of these people lied when

16  they said they were committing crimes with you?

17  **A.**    I think I have a different answer for each of them, but

18  did all of them lie?

19         I mean, am I supposed to go through each one and tell

20  you what my perspective is on each?

21  **Q.**    I'm just asking a yes-or-no question.

22         MS. SOLANO:  Objection.

23         THE COURT:  Overruled.

24         THE WITNESS:  Yeah, sure.  Ken lied about ever talking

25  to me about compliance or telling me anything was wrong.

RAHEEL NAVIANA - RDX - BY MS. SOLANO

1          Kareem was the worst of this whole thing.  He is just

2    lying, like -- I was shocked.  I was thrown back by some of

3    that stuff.

4          MS. LOU:  I'm sorry.  Again, I just answered [*sic*] a

5    yes-or-no question.

6          THE COURT:  No, no.  There's no cutting off the witness

7    while he's speaking.

8          MS. LOU:  I apologize, Your Honor.

9          THE COURT:  Continue.

10          THE WITNESS:  I'm trying to think of Armani because he

11    was the biggest one that I did business with.  I can't recall

12    exactly.  I can't pinpoint it.

13          But, yeah, I could say that everybody had their own

14    motive and I know what I was going up against and you guys --

15    this has been going on for two years and I gave you my proffer

16    statement and you produced 10 million documents against me and

17    I'm still here.

18          MS. LOU:  Your Honor, no further questions.

19          THE COURT:  Okay.

20          Redirect, if any.

21                    REDIRECT EXAMINATION

22                    By Ms. Solano:

23    **Q.**  Good morning, Raheel.

24    **A.**  Good morning, Jamie.

25    **Q.**  Just to be clear, Raheel, you and I have not spoken about

1  your testimony since you were in front of this jury last week;

2  right?

3  **A.**    Yes.  That's correct.

4        THE COURT:  Is there an objection?

5        MS. LOU:  No, Your Honor.  I'm sorry.  I was reaching.

6        THE COURT:  Continue.

7  BY MS. SOLANO:

8  **Q.**    I believe the last question you said you didn't remember

9  about Armani.

10        Did you and Armani work on the Navtek software

11  together?

12  **A.**    Yes.

13  **Q.**    And how extensively?

14  **A.**    Well, I mean, it was tailored to him so as much as we

15  needed to talk to him to get all his input and guidance.  I

16  mean, he wasn't working day to day building it, but whenever

17  we needed more input, he would always give it to us.

18  **Q.**    How often did that happen?

19  **A.**    Maybe every week almost.

20  **Q.**    And at the time that you were arrested, you were charged

21  with an Anti-Kickback Statute charge; is that your

22  understanding?

23  **A.**    Yes.

24  **Q.**    That was the same when you proffered with all of the

25  people from the U.S. Government?

RAHEEL NAVIWALA - RDX - BY MS. SOLANO

1   **A.**    Yes.

2   **Q.**    And, Raheel, I think you mentioned you received a lot of

3   discovery through the course of this case; is that right?

4   **A.**    Tons, tons.  I don't even know how much.  It's like

5   terabytes.

6   **Q.**    Did you come to learn things through reviewing that

7   discovery that you didn't know in the time period of 2017 to

8   2019?

9   **A.**    Yes, of course.

10  **Q.**    Ms. Lou asked you -- there were questions about you not

11  speaking to Mr. Fusco and a subpoena.

12        Do you remember those questions?

13  **A.**    Yes.

14  **Q.**    A subpoena asks you to do something; is that right?

15  **A.**    Yes.

16  **Q.**    You have to respond to the subpoena?

17  **A.**    Yes.

18        MS. LOU:  Objection.

19        THE COURT:  Basis.

20        MS. LOU:  Assumes facts not in evidence.

21        THE COURT:  Overruled.

22  BY MS. SOLANO:

23  **Q.**    And so at the time when you're having this conversation

24  with Mr. Fusco, you knew he was going to have to do something

25  in response to that subpoena; is that fair?

RAHEEL NAVIKZGA - RDX - BY MS. SOLANO

1    **A.**    Yes.

2    **Q.**    Raheel, you were asked about RediDoc.

3         At the time you were working with RediDoc, did you

4    think the doctors were actually contacting patients?

5    **A.**    Yes.

6    **Q.**    You were asked last week about some of the software and

7    processes that you put in place over time.

8    **A.**    Yes.

9    **Q.**    Elite also had software and processes in place; right?

10   **A.**    Yes.  Almost all of them -- almost all of the same.

11   **Q.**    Just so everyone is clear, Elite had software and then

12   Navtek was software?

13   **A.**    Yes, because Elite was -- we were trying to do a

14   management company at first and then realized it wasn't really

15   gonna be feasible, but we already implemented all these

16   processes; so after talking to Armani's attorney, we figured

17   starting the entity from scratch that was just software was

18   the best way to go.

19   **Q.**    Raheel, last week you were shown an org chart.

20         Do you remember that?

21   **A.**    Yes.

22   **Q.**    Do you recall reviewing that org chart before it was

23   submitted to Medicare?

24   **A.**    No, I don't recall -- I don't remember any of those

25   documents, really.  It was just, like, telling me to sign.

1  **Q.**   Did you have any firsthand knowledge of if that document

2  was even sent to Medicare?

3  **A.**   No.  I don't know if it was even -- if they even required

4  that to be sent.  I don't know if it was for that or Pam

5  created it for some other reason.  I don't know.

6  **Q.**   Raheel, is there anything else you want to tell the jury?

7  **A.**   Yes.  I truly did everything I could to be compliant.

8  Being up here, I admitted that I was violating an

9  Anti-Kickback Statute for some time and I was trying my best

10  to be compliant.

11       I even wanted to get out of the industry and Armani

12  encouraged me to do the software.  I wasn't even thinking

13  about profits once we got to Navtek.  I was trying to spoil my

14  team because -- to try to work hard.  I was really embracing

15  Navtek.

16       It was all about processes and really -- I really

17  thought what we were doing was good.  I mean, we were really

18  trying to ensure that patients wanted these things and they

19  were high quality.

20       Like, all the criteria.  If you just saw all the rules

21  we put in place, like we were really -- the chargebacks we

22  earned, an analysis said that it went from 40 percent to 4

23  percent, and we blocked over $50 million of prescriptions to

24  go through the DME.

25       So I never understood that any of this could be fraud

1    and that's why I'm up here, fighting for my life.

2         MS. SOLANO:  No further questions.

3         THE COURT:  Okay.  Further cross-examination, if any?

4         MS. LOU:  Just very briefly, Your Honor.

5                         RECROSS-EXAMINATION

6                         By Ms. Lou:

7    **Q.**   I want to clarify one thing.

8         While you were developing the software, you continued

9    to sell doctors' orders on a per-brace basis; right?

10   **A.**   I know we switched to flat fee with Nick, and I can't

11   remember really February, March.  It's -- it's in my proffer,

12   too.

13   **Q.**   But on Friday, you testified that you started developing

14   the software as early as April of 2018; right?

15   **A.**   The initial phase of trying to get analytics down and

16   processes down.

17   **Q.**   And the software developing ramped up more fulsomely in

18   the fall of 2018; right?

19   **A.**   Yes, after I met with Armani.

20   **Q.**   And during that time -- in the spring of 2018, summer of

21   2018, fall of 2019 -- you continued in the DME business and

22   continued -- excuse me -- withdrawn.

23        You continued in the DME business during that time;

24   right?

25   **A.**   Yes, but I didn't just always know what was wrong.  I was

1  learning more and more, and I was relying on guidance from

2  maybe the wrong people.

3  **Q.**   Wasn't it your testimony on Friday that, as of April

4  2018, you knew that what you were doing was illegal?

5  **A.**   As of April 2018, I knew that the structure with Prudent

6  was not right, was, yeah, illegal.  That's why we switched.

7  Instead of doing marketing ourselves and having a DME and

8  billing Medicare ourselves, we transitioned to being a broker

9  so we weren't a marketer and we weren't a DME either.

10 **Q.**   But wasn't one of the things that you understood to be

11 illegal was selling doctors' orders in exchange for money that

12 was paid on a per-brace basis?

13 **A.**   Not exactly at that point.  I think we were -- that's

14 what we were trying to strive for and that's why I hired all

15 these expensive consultants and analytics teams to try to get

16 that down and people committed, and eventually I realized that

17 it wasn't even feasible.

18 **Q.**   In that time that you were trying to do it, you still

19 continued to run the business in the way that you had been;

20 right?  Selling doctors' orders on a per-brace basis.

21      MS. SOLANO:  Objection to the form of the question.

22      THE COURT:  Overruled.

23      THE WITNESS:  Well, the marketers would front us the

24 leads, so I wasn't really buying them and the DMEs were

25 fronting us the cash, though.  They weren't really just buying

 1    them either.
 2         But, yeah, I mean, I admit that it was wrong.  I mean,
 3    I'm seeing it now, especially with the AKS, but I never knew
 4    that this could have anything to do with fraud.  I never,
 5    never had that understanding, ever.
 6         MS. LOU:  No further questions, Your Honor.
 7         THE COURT:  Okay.  Any redirect?
 8         MS. SOLANO:  No, Your Honor.
 9         THE COURT:  Mr. Naviwala, you're excused.  You can go
10    back to your spot.
11             (The witness is excused.)
12         THE COURT:  Ms. Solano?
13         MS. SOLANO:  Thank you, Your Honor.  I just need to
14    read out a revised stipulation quickly.
15         THE COURT:  Do you want to do it from there so it's
16    more easily heard?
17         MS. SOLANO:  Thank you, Your Honor.
18         With Your Honor's permission, I'll just read the
19    revised portion and note for the record that the revised
20    stipulation one will be what we're offering to the --
21         THE COURT:  I think that works.
22         MS. SOLANO:  Paragraph 3, Stipulation 1.
23             (Reading:)
24             If called to testify, an FBI special agent
25             would testify to having interviewed Frank Pringle

```
 1              over the phone on January 2nd, 2024.
 2              THE COURT:  Okay.  Thank you.
 3              MS. SOLANO:  The defense rests.
 4              THE COURT:  Is there anything further from the
 5     United States?
 6              MS. LOU:  No, Your Honor.
 7              THE COURT:  So the United States rests?
 8              MS. LOU:  Yes, Your Honor.
 9              THE COURT:  We'll talk at sidebar in a minute.
10              Let me just tell you where we are in the process.
11              There are four things left to do in terms of what I set
12     out for you in the beginning.  The last of them is your
13     verdict, and just before that is your deliberations, and just
14     before that is arguments from the United States in its main
15     summation, and then from the defendant in his main summation.
16              And then, you'll remember, that the United States gets
17     an extra rebuttal summation because it has the burden of
18     proof.  Then before that are my legal instructions to you.
19              Now, if you look around at the legal tables, you'll
20     notice that from each side there's a missing lawyer.  The
21     reason there's a missing lawyer is I have been working with
22     the lawyers this morning, and at other times we have been
23     here, to put together the legal instructions.  And they're
24     being finally stitched together, just kind of in terms of the
25     final changes that I've made to them so that they're all put
```

 1   together.

 2        The legal instructions are a little strange.  They're

 3   not going to be me talking to you.  They're gonna be me

 4   reading to you.

 5        The reason I'm gonna be reading them to you is that

 6   they're the same from courthouse to courthouse, from judge to

 7   judge.  The law is bigger than this room.  It's bigger than

 8   me.  It's standard.  It's the same law that applies in every

 9   similar case.

10        So they're gonna finish putting together those --

11   they're really just collating at this point.  They're gonna

12   finish putting it together.  When they're back, while you're

13   on a break, what I'll do is I'll have it here and when you

14   come back, I'll read it to you.

15        Before we get to that, there's one limiting instruction

16   that I'm also going to read to you that I want to give you,

17   and then I just have that in front of me so I'll read it to

18   you right now.  Okay?

19        Here is the limiting instruction:

20        You have heard testimony from certain witnesses during

21   this trial about their understanding of the various rules and

22   requirements of Medicare.  That testimony, other than from

23   Stephen Quindoza, who is a witness from toward the beginning

24   of the trial, was introduced for a limited purpose.

25        The limited purpose was explaining those witnesses'

1  understanding of the rules and requirements, not to prove the

2  truth of what those rules and requirements were.  You're not

3  permitted to infer anything about the content of Medicare

4  rules and regulations from what those witnesses said.

5       As you know, the Medicare rules and regulations in

6  place in one year may have been different from the ones that

7  were in place in another year.

8       Stephen Quindoza, who I mentioned a moment ago, he's

9  different.  He testified directly about various statutes and

10  regulations related to Medicare.

11       Among those was 42 CFR -- that means Code of Federal

12  Regulations -- Section 410.38, which is called "Durable

13  Medical Equipment, Scope and Conditions," and that's the

14  regulation that sets out the circumstances under which

15  Medicare Part B, which Mr. Quindoza testified about as well,

16  pays for durable medical equipment, which we all know from

17  this trial is known as DME.

18       This regulation was admitted into evidence and it was

19  admitted as Defense Exhibit 9068.

20       I instruct you that 42 CFR Section 410.38 -- that's the

21  code of federal regulation we've been talking about -- was the

22  Medicare regulation applicable to the reimbursement of durable

23  medical equipment from 2017 through to 2019.

24       During his direct examination, Mr. Quindoza testified,

25  at one point that, under that regulation, a doctor cannot make

1   a determination of medical necessity for DME in the absence of

2   an in-person visit or a valid telehealth visit.  That

3   testimony was inaccurate as applied to the DME that's at issue

4   in this case.

5          Under 42 CFR 410.38, the regulations we have just now

6   mentioned a couple times, the requirement that a doctor have

7   an in-person visit or a valid telehealth visit before

8   prescribing applied to only certain types of DME and did not

9   apply to the particular braces at issue in this case.

10          I instruct you to disregard entirely and completely any

11   suggestion from Mr. Quindoza that, as to the braces at issue

12   here, a medical necessity determination could be made only

13   based on an in-person visit with a treating physician or a

14   valid telehealth visit with a treating physician.  Put that

15   out of your mind in your deliberations.  Don't rely on it.

16          So that's one little instruction.  All of my

17   instructions are equally important.

18          What we're gonna do now is we're gonna take a short

19   break.  The break is gonna be long enough for me to get the

20   collated papers back, just to look through them a final time

21   myself and make sure they reflect the law that I have set down

22   and I've asked the parties to collate, as I said, for me.

23          And then when that's done, what's gonna happen is we're

24   gonna ask you to come back, I'll communicate with you through

25   my courtroom deputy as always, and I will read you those

```
 1   instructions.  They can take a long time.
 2        As I said at the outset, it's not a memory game.  When
 3   you go back to deliberate, I'm going to send back with you a
 4   few copies of the instructions so you can have them.  Some
 5   people process things a little better from hearing, some
 6   through looking, so I'm going to read them, but you'll also
 7   have copies in there.
 8        At the close of those instructions, as I mentioned, we
 9   will hear the arguments from the lawyers; and at the close of
10   that, you will get the case; and after that, we'll get your
11   verdict.
12        So let's all please rise for the jury as they take
13   their recess.
14             (Jury leaves the courtroom at 12:12 p.m.)
15             (Whereupon, the following proceedings were held
16              outside the presence of the jury:)
17        THE COURT:  The jurors have left, the door is closed.
18   Let's all be seated.
19        Ms. Solano, you have an application?
20        MS. SOLANO:  Yes, Your Honor.  We would reiterate our
21   Rule 29 motion with respect to all counts.  I believe that
22   there's insufficient evidence beyond a reasonable doubt.
23        There is no evidence that there was one large
24   conspiracy.  Instead, there was evidence of multiple
25   conspiracies with no interdependence amongst the different
```

1    business owners and across the different business units.

2         There was also insufficiency of evidence with intent to

3    defraud, and insufficient evidence of not medically necessary,

4    insufficient evidence regarding an intent to defraud, and we

5    believe there was insufficient evidence to support venue for

6    the substantive charges; and in addition, Your Honor, we would

7    say that venue over the AKS counts, there's a constitutional

8    venue deficiency.

9         THE COURT:  Okay.

10        For the United States, your preference is as before,

11   for me to reserve on this decision pending the jury's verdict?

12        MR. SPECHT:  Yes, Your Honor.

13        THE COURT:  Ms. Solano, I assume there's no objection

14   to my doing that?

15        MS. SOLANO:  No objection.

16        THE COURT:  I will reserve decision.

17        Ms. Lou, anything else?

18        MS. LOU:  I wanted to give you an update, Your Honor,

19   on the status of the jury instructions.  They have been

20   finalized.  I understand two copies have successfully made its

21   way out of the printer.  We're just waiting on a third.

22        THE COURT:  My courtroom deputy will grab them when

23   they're here and I'll take a look at them for a few minutes.

24        If you all please could take a look at them.  I

25   understand there's a frantic process at the end of pulling

```
 1  them together, but it's worth spending an extra five minutes
 2  for both parties to read them through and make sure that the
 3  work that the two lawyers have done together, one from each
 4  side outside of the room working together on this, so it seems
 5  obvious that what I'm going to get is fine, but it's worth
 6  spending those extra five minutes, and then I'll come out and
 7  we'll read them.
 8        Anything else?
 9        MS. LOU:  No, Your Honor.
10        THE COURT:  Ms. Solano, for yourself?
11        MS. SOLANO:  No, Your Honor.
12        THE COURT:  We'll see each other soon.  Thank you.
13        THE DEPUTY CLERK:  All rise.
14          (Recess taken.)
15          (Whereupon, the following proceedings were held
16           outside the presence of the jury:)
17        THE DEPUTY CLERK:  All rise.
18        THE COURT:  Let's have a seat, please.  I understand
19  there's an issue with what's been passed to me.
20        What's the issue?
21        MR. WEBMAN:  So we previewed this with you this
22  morning, Your Honor.  We didn't fully carry it out when we
23  went back together, which is that in between the version that
24  I sent to Your Honor that we reviewed together on Friday and
25  this morning there were other changes that had been agreed to,
```

1    but when Ms. Brown submitted her proposed instruction, that

2    version was based on the version I submitted to Your Honor on

3    Friday, so it was missing some of the changes that were

4    already agreed to.

5           Then when we were organizing everything, we lost sight

6    of that.  We are right now working to find what those things

7    are.

8           THE COURT:  Okay.  Sounds good.  First, do it as

9    quickly as humanly can.

10          Second of all, I need to see those changes.  So however

11   you're doing it, it has to be in a way that I can look at them

12   and -- look at them.

13          MR. WEBMAN:  Your Honor, I'm doing it right now in

14   track changes here.  I'll print you that version.  Once Your

15   Honor has signed off on everything, I'll clean it up.

16          THE COURT:  How long is that going to take?

17          MS. SOLANO:  Just so I understand, you're taking the

18   document that you guys filed with the Court last night.

19   Right?

20          THE COURT:  I understand what's being said.  Let me

21   restate it.

22          MS. SOLANO:  Okay.

23          THE COURT:  On Friday, a document was filed that was

24   the subject of a very long conversation.  Then over the

25   weekend apparently the parties came to further tweaks on that.

1    And to compare a document that was provided last night by the

2    defense and was the subject of today's discussion compared

3    last night's, that is to say February 23rd's, jury

4    instructions as filed by the defendant to the February 21st

5    jury instructions as filed by the United States.

6          Because of that, there are some agreed-upon changes

7    over the weekend that it was both parties' intention to

8    reflect in the final jury instructions but did not make it

9    through.

10          What Mr. Webman has indicated is that the parties are

11    now acting quickly to get that in front of me so I can pass

12    off on the incremental changes.

13          Do I have that right, Mr. Webman?

14          MR. WEBMAN:  Absolutely, Your Honor.

15          THE COURT:  Ms. Solano, good?

16          MS. SOLANO:  Yes, Your Honor.

17          THE COURT:  I will come back as soon as you are ready

18    for me to look at any track changes.

19          How long do we think that will be?

20          MR. WEBMAN:  I'm afraid to promise something without --

21          THE COURT:  And yet, and yet, and yet, what's our best

22    guess?

23          MR. WEBMAN:  I would love for it to be a half hour,

24    Your Honor.

25          THE COURT:  Half hour is a lot of time.

1          MR. WEBMAN:  We're hustling.

2          THE COURT:  How big are these changes?

3          MR. WEBMAN:  I want to be sure we're not doing many

4    iterations of this.  I want to be very careful with it.

5          THE COURT:  Me too.  We have a lot of human beings who

6    are waiting.

7          MR. WEBMAN:  I understand, Your Honor.

8          THE COURT:  Half hour is a little too much time for a

9    task this straightforward.  Between Friday and Sunday night I

10   can't imagine these are so many changes, so let's be as fast

11   as we really can.

12         MR. WEBMAN:  Absolutely.

13         THE COURT:  I will come back to look at a track changes

14   document the second you all have it.  Thank you all.

15              (The following proceedings were held in open court

16               outside the presence of the jury:)

17         THE COURT:  Have a seat, everyone.  Have a seat.  We're

18   back on the record.

19         I have just come out.  The assistant United States

20   attorneys are largely present, the defendant is present, his

21   attorneys are all present.

22         So I have just been passed a hard copy document.

23         Is that the document that reflects all of the parties

24   agreed-upon changes, Mr. Webman?

25         MR. WEBMAN:  From the Government's perspective, yes.

1          THE COURT:  Okay.

2          MS. SOLANO:  Yes.

3          THE COURT:  I'm just gonna look through it for a

4    minute.

5               (Brief pause.)

6          THE COURT:  What is at page 34?  It looks like a brand

7    new request or is that just an artifact of that?

8          (Off-the-record discussion.)

9          THE COURT:  Page 34, request 22.

10         MR. WEBMAN:  Your Honor, that was just -- the parties

11   agreed that it made sense to move up the single multiple

12   conspiracies --

13         THE COURT:  It's just moved to a different spot.

14         MR. WEBMAN:  Yes.

15         THE COURT:  Okay.  Thanks.

16              (Brief pause.)

17         THE COURT:  We can get the jury.  We're ready to roll.

18         Mr. Webman, I'm gonna direct you, please, to file today

19   the document that's been passed up to me that we have been

20   discussing here in the last three minutes so that there is a

21   record of what we have been talking about.

22         MR. WEBMAN:  Absolutely, Your Honor.

23         THE COURT:  And then after that, to file a separate

24   document with a one-sentence cover letter that explains what

25   it is that accepts these changes and changes the word

1    "request" to the word "instruction" throughout.

2         MR. WEBMAN:  Two other questions, Your Honor.  For that

3    final, one is, I know it's the defendant's preference and I

4    think the Government agrees to taking out the legal

5    references.

6         THE COURT:  Sorry, of course.  A hundred percent of

7    course.  My apologies.  I should have said that.

8         MR. WEBMAN:  So with the version that's clean that

9    changes request to instruct -- instruction.

10        One other thing, I noticed a typographical error as

11   I was reading through just now.  The places where it says

12   "renumeration" it should say "remuneration."

13        THE COURT:  I think that's it.  In the removal --

14   folks, let's take this down.  I'm doing the jury instruction.

15   Thank you.

16        When we have -- you're removing the below the header

17   legal points, also remove the word "Pinkerton liability" from

18   the heading.  It's also a legal concept that has no place in

19   it.

20        MS. SOLANO:  I don't have any applications.  I just

21   want to make sure that the record is clear.  The entirety of

22   the requested relief in my motion in limine, you have elected

23   to deny.

24        THE COURT:  Which motion in limine?

25        MS. SOLANO:  The application regarding the arguments

1    involving any of the --

2          THE COURT:  I think the record is what it is.  I mean,

3    are you saying there are any open motions, in your judgment?

4          MS. SOLANO:  I don't.  I'm just trying to make clear

5    that there's not some open motion carried through this.  It's

6    my understanding that it was resolved by Your Honor's ruling

7    this morning.

8          THE COURT:  You think there's a motion you've made that

9    I haven't spoken to and ruled on?

10         MS. SOLANO:  No, Your Honor.  That's all I'm trying to

11   make clear.

12         THE COURT:  How would you characterize the motion in

13   limine you're just mentioning now?

14         MS. SOLANO:  It was a motion in limine to preclude the

15   Government from proceeding forward with the theory of medical

16   necessity and/or any reliance on standards or regulations

17   involving Medicare.

18         THE COURT:  The motion in limine was denied -- was

19   addressed and has been ruled upon.  Calling it denied or not,

20   the motion in limine was addressed and ruled upon, and it was

21   addressed in part because the United States made certain

22   strong representations about what would not come up in the

23   closing and there was curative instructions.

24         And so the motion was, after all of those things, there

25   was very little, if anything, even left of the motion.

1          The first part of your sentence -- whatever is left of

2    that motion is denied, but the first part of your sentence

3    suggested that you moved in limine to prevent the

4    United States from arguing -- you moved in limine to prevent

5    the United States arguing from lack of medical necessity.  I

6    don't think you argued that.

7          MS. SOLANO:  I stand by whatever are in the papers,

8    Your Honor.  I just wanted to clarify.  My understanding is

9    consistent with everything you're saying, Your Honor.

10         THE COURT:  All right.  So I think we can move on.

11         The motion as to arguing from violations of rules and

12   regs has been addressed in part by the United States'

13   representations, in part by the limiting instructions that

14   have been given.

15         If there's anything left of those, I denied it based in

16   part as I described, on a close reading of the jury record

17   including other evidence and also of the opening.  I don't

18   think this case was argued in a certain way.  It came in a

19   certain way as to Mr. Quindoza but not in a way that was

20   otherwise meaningful let alone -- that was otherwise

21   meaningful.

22         I didn't hear a motion that was separate from that as

23   to preventing the United States from arguing that there is a

24   lack of medical necessity here, but I would have denied that

25   of course.

1        Anything else?

2        MS. SOLANO:  The defendant is requesting that the words

3    of the limiting instruction that you gave the jury on the

4    regs, that that be printed and included with the rest of the

5    instructions.  It's my understanding the Government has no

6    objection.

7        THE COURT:  That makes sense to me.  We should do that.

8        MS. SOLANO:  Thank you, Your Honor.

9        THE COURT:  Anything else?

10       MS. SOLANO:  No.

11       THE COURT:  We should get the jury.

12       THE DEPUTY CLERK:  All rise.

13           (Jury enters the courtroom at 1:46 p.m.)

14           (Whereupon, the following proceedings were held in

15            the presence of the jury:)

16       THE COURT:  Let's all please have a seat.  Members of

17   the jury are back.  That took a little longer than we

18   expected.  I'm sorry that it did but it sometimes happens.

19       As I told you, I'm going to be reading the jury

20   instructions and explained to you before why.  I just want to

21   say it again.

22       Part of the integrity of our system is that the law is

23   bigger than any courtroom, any judge, any courthouse, and so

24   there are standardized parts of the law.  We want to make sure

25   we're giving you the standard instructions that juries hear

1  when cases that raise these particular issues, that charge

2  these particular counts come up.

3       I don't drink during the day, I don't mean drink -- I

4  don't drink coffee or water when we're sitting together

5  because I want to be sympathetic to all of you because you are

6  sitting there, but I have water this time.  I have water

7  because this is a whole lot of reading and it's a whole lot of

8  listening as well, but I hope you'll forgive me in advance

9  when I take a sip of water.

10       Again, just to remind you, not a memory trick.  When

11  you go back to deliberate, you'll have multiple copies.

12       So here is where we are:

13       You have seen and heard all of the evidence, and you're

14  soon gonna hear the arguments from the lawyers, and I'm gonna

15  tell you about the instructions on the law.

16       You have two duties as a jury.  The first is to decide

17  the facts from the evidence that you have heard and that

18  you've seen in court during this trial.  That is your job,

19  it is entirely your job alone.  I don't play any part in

20  finding the facts.

21       And as part of that, it's important for you to

22  understand that you shouldn't take anything that I've said or

23  done during the trial as indicating, as suggesting anything

24  about what the -- what I think the evidence is, what I think

25  the facts should be drawn from the evidence is, or what your

1    verdict should be.  That's not my role and you shouldn't take

2    anything at all from how you've seen me.

3        The second duty you have is to apply the law that I

4    give you to the facts and what I'm gonna do now is I'm gonna

5    explain that law to you that's gonna guide your decision.

6        You have to apply the instructions that I'm going to

7    give you carefully and entirely faithfully.  Each of these

8    instructions is important, and you have to apply all of them.

9    You cannot substitute -- as we talked about from the

10   beginning, you can't substitute or follow your own ideas or

11   notions or opinions about what the law is or ought to be.  You

12   have to apply the law as I give it to you, whether you agree

13   with a piece of it or all of it or not.

14       Whatever your verdict is, it's going to have to be

15   unanimous.  All of you are going to have to agree on it or

16   there's just going to be no verdict.

17       In the jury room, the jurors are going to discuss the

18   case amongst themselves, but ultimately each juror has to make

19   up his or her own mind.  That's a responsibility that every

20   juror has and it's a responsibility nobody can avoid.

21       During your deliberations, you can't communicate with

22   or provide any information to anyone about anything about the

23   case, and you can't use, during your deliberations, any

24   electronic device like a phone or the Internet or anything

25   like that.

1      You can't communicate to anyone about this case.  You

2  can't talk to anyone about this case.  You can't, of course,

3  do research about the case until you're done with your

4  deliberations, you've come back in with your verdict, and I

5  have accepted it.

6      In other words, the same rules we have talked about

7  from the beginning continue to apply.  You just can't talk to

8  anyone at all about the case except, once you're in the jury

9  room, you can talk to each other.  You can't talk to anyone

10 else and you can't communicate about that case with anyone

11 outside.  You can only discuss the case with other jurors and

12 in the jury room so that you're all doing it together.

13     As I said, you can't do any investigation.  You've

14 known that from the very beginning of the case and you know

15 the reasons for this: it's because you all have seen the same

16 evidence, you all have seen the same witnesses, and you've all

17 -- shortly will have heard all the same legal instructions and

18 lawyers' arguments, and no one else but you-all will have done

19 all those things.

20     You have to perform your duties fairly and impartially.

21 That means not allowing sympathy or prejudice or fear or what

22 you perceive public opinion might be to influence you, and you

23 of course cannot be and will not be influenced by a person's

24 race or gender or color or religion or national ancestry or

25 ethnicity or anything like that; not occupation, not position

1    in life, none of it.  You can't do it and you won't do it.

2         Okay.  You have to make your decision here based on

3    only the evidence that you saw and heard.  Suspicions, rumors,

4    guts, anything else that you have seen or heard outside of the

5    courtroom, don't let it influence your decision here.

6         Here is the evidence and I think you all know this very

7    well, but I want to say it.  The evidence here is the

8    testimony of the witnesses from that box when they were sworn;

9    things that I have admitted as exhibits, virtually all of that

10   here is documents, but there are some other things, as well,

11   like the paper bag, the Kohl's bag that had some things.  And

12   then any facts or testimony that was stipulated, there was a

13   little bit of that at the end of the case, you'll recall.

14        What's not evidence?  Everything else.  The indictment,

15   which you'll see, is not evidence; the arguments from the

16   lawyers is not evidence; their questions are not evidence; the

17   statements that sometimes are built into questions are not

18   evidence.

19        Questions that I might have asked wouldn't be evidence,

20   but I don't know if I asked any questions here.  Maybe I did

21   once or twice, but that's not evidence, either.

22        Objections from the lawyers are not evidence.  Any

23   testimony that I told you to -- that I granted a motion to

24   strike on, that I told you to disregard, none of that is

25   evidence, either.  And anything you've seen or heard outside

1    of the courtroom is not evidence.

2         If you look at the transcript, if there's something I

3    have struck, you'll see a gap in what you get, and that's just

4    because you're looking at the evidence and not things that are

5    not evidence.

6         In weighing the evidence, you're gonna use your common

7    sense.  You're gonna consider the evidence in light of your

8    everyday experience with people, with events, with anything

9    that -- with people and events, and you're gonna give it the

10   weight that you think it deserves.

11        If your experience, if your common sense, if your

12   intent to focus here tells you that certain evidence

13   reasonably leads to a certain conclusion, you can reach that

14   conclusion.

15        As I told you way back when, it's the Rules of Evidence

16   that control what can be admitted into evidence and, during a

17   trial, you saw lawyers objecting and me speaking about moments

18   when they thought the evidence was offered was not allowed and

19   I made a ruling on that.

20        As you know, those objections are just the lawyers

21   asking me to decide what evidence should come in, and those

22   objections and my responses to them are, of course, not

23   evidence.

24        Don't be influenced by the fact that an objection was

25   made and don't be influenced by my rulings.  There's a few

1    times inevitably when I said some things to explain why I was

2    giving a ruling.  That is completely 100 percent not evidence,

3    not to be considered.  That's just me, in a shorthand way, for

4    transparency for the lawyers and also so that they can plan

5    how they will want to go, saying something to them, it's not

6    evidence, don't consider it, whatsoever.

7          When I have overruled an objection and something was

8    admitted, a piece of evidence was admitted like an exhibit,

9    you treat it like any other piece of evidence, whether it was

10   objected to on the way in or not.

11         And when I allowed something in for a limited

12   purpose -- there have been a couple times -- you have to

13   consider the evidence only for that limited purpose that I

14   told you was the relevant one.

15         Flip side of all this is when I sustained an objection

16   and a question was answered or an exhibit was not received

17   into evidence, don't think about or guess what would the

18   witness have said about that.  Don't think about or guess what

19   was that exhibit.  Don't do that.

20         What's evidence is what the witnesses say, the exhibits

21   that were actually admitted, and the stipulations, but put

22   out of your mind any guesses based on objected-to questions or

23   objected-to pieces of evidence.

24         A couple of times what happened here is a witness

25   answered before a lawyer objected or before I ruled on the

1    objection.  That happened a couple times.  And I sustained the

2    objection.  And when that happened, you have to disregard the

3    answer that was given in your mind.  That happened only a

4    couple times here.

5           There was a few times, as I mentioned a moment ago,

6    when I granted a motion to strike something, that means to

7    take something out of the record, and you have to put that

8    out of your mind in thinking about the case.  You just have to

9    disregard it entirely.

10          Sometimes the lawyers have said, and they are about to

11   also in their summations, point you to evidence that they

12   think is especially important that they want you to focus on,

13   but what the lawyers say about the evidence is not the

14   evidence.

15          The evidence is the evidence itself.  It's your

16   recollection of the evidence that controls.  It's your

17   interpretation of the evidence that controls your decision in

18   this case.  And I just want to remind you that, please don't

19   take anything I've said in the course of our proceedings here

20   as any indication, any indication of what I think you should

21   do, what your verdict should be, what facts you should find.

22   You should completely and entirely disregard anything you

23   perceived along those lines.

24          I just want to remind you a little bit about something

25   we talked about way back when, because it's sometimes a source

1   of confusion.  It's about direct versus circumstantial

2   evidence.  And I just want to say you can use both direct and

3   circumstantial evidence in reaching your verdict.

4         Direct evidence is just evidence which, if believed,

5   directly proves a fact.  An example of direct evidence, it's

6   straightforward.  A witness says that he or she saw something

7   from their own eyes, they heard something from their own ears,

8   they perceived something from their own senses.

9         Direct evidence is something that directly proves a

10  fact and the witness testifies about what they directly saw or

11  heard.

12        Circumstantial evidence is evidence that indirectly

13  proves a fact.  It's evidence that proves a fact from which

14  you can reasonably find or infer or conclude that some other

15  fact is true, and you have to find that in a reasonable way.

16        What's a reasonable inference?  It's just a deduction

17  or conclusion that reason, experience, common sense, lead you

18  to make from the facts.  A reasonable inference, it's not a

19  suspicion or a guess; it's a reasoned, logical decision that

20  finds the existence of another fact based on one.

21        The classic example, and I don't remember if I shared

22  this with you right at the beginning, but the classic example

23  that's used in courthouses all over the United States is if

24  you hear thunder outside and then someone walks in and they're

25  holding an umbrella and the umbrella is wet, you could opt to

1    infer from that that it's raining outside.

2         You heard thunder, you saw the wet umbrella, that kind

3    of thing.  You wouldn't need to, but you could.  If you saw it

4    raining, you'd say that's direct evidence of rain.  If you

5    infer that it was raining from the sound of the thunder and

6    seeing the umbrella, that would be circumstantial evidence.

7    Bottom line is you can rely here on circumstantial evidence

8    and you can rely here on direct evidence.  It's your call.

9         Sometimes different inferences can be derived, pulled

10   from the same set of facts.  One side may ask you to pull a

11   certain inference out of a certain set of facts.  The other

12   side may ask you to choose another.  But the bottom line is

13   it is for you and you all alone to decide what reasonable

14   inferences you want to make based on the evidence, based on

15   your experience, based on reason, and logic, and common sense.

16        You should consider all the evidence before you at

17   trial whether it's direct or circumstantial.  The law makes no

18   distinction between the weight you should give one category

19   versus another.  The weight you should give is really and

20   fully and completely up to you to decide.

21        Next, there was certain testimony from certain

22   witnesses about their understanding of various rules and

23   requirements of Medicare.  That testimony, as I mentioned

24   before a little more fully, other than from Stephen Quindoza,

25   who was introduced for a limited purpose, the limited purpose

1   was explaining those witnesses' understanding of the rule and

2   requirements, not to prove the truth of what those rules and

3   requirements were, and you have to follow that limited purpose

4   for which the evidence was given.

5         Although the United States has to prove a defendant in

6   this case and in any case guilty beyond a reasonable doubt, it

7   is not a requirement to present all possible evidence related

8   to the case.  It's not required to produce all possible

9   witnesses who might have some knowledge about the facts of the

10  case.

11        In addition, as I have explained to you before from the

12  outset, the defendant is not required to present any evidence

13  or to produce any witnesses at all.

14        Next, the defendant, Mr. Naviwala, as you know, he has

15  pleaded not guilty to the offenses charged and he is presumed

16  to be innocent.  He started the trial with a clean slate, with

17  no evidence against him.  That presumption is going to stay

18  with Mr. Naviwala unless and until the United States has

19  presented evidence that overcomes that presumption by

20  convincing you that the defendant is guilty of the offenses

21  charged beyond a reasonable doubt.

22        The presumption of innocence requires that you find the

23  defendant not guilty unless you are satisfied that the

24  United States has proved his guilt beyond a reasonable doubt.

25        That presumption of innocence means that the defendant

 1  has no burden, he has no obligation to present any evidence

 2  at all or to prove that he is not guilty.  The burden, the

 3  obligation, is on the United States to prove that the

 4  defendant is guilty, and that burden stays with the

 5  United States throughout this trial, including now.

 6      In order for you to find the defendant guilty of the

 7  offenses charged, as I mentioned, the United States has to

 8  prove in a way that convinces you that he is guilty beyond a

 9  reasonable doubt, and that means the United States has to

10  prove each and every element of the offenses charged beyond a

11  reasonable doubt, each element of each count.

12      The defendant can't be convicted based on suspicion, or

13  on conjecture, but only based on evidence proving guilt beyond

14  a reasonable doubt.

15      Proof beyond a reasonable doubt does not mean proof

16  beyond all possible doubt.  It does not mean proof to a

17  mathematical certainty.  Possible doubts or doubts based on

18  conjecture, speculation, hunch, those are not reasonable

19  doubts.

20      A reasonable doubt is a fair doubt based on reason,

21  logic, common sense, or experience.  It's a doubt that an

22  ordinary, reasonable person has after carefully weighing all

23  of the evidence, and it is a doubt that would cause that

24  ordinary, reasonable person to hesitate to act in manners of

25  importance in their own life.

1          It can arise from the evidence of reasonable doubt,

2    it can arise from a lack of evidence, or it can arise from the

3    nature of the evidence.

4          If having heard all of the evidence, you're convinced

5    that the United States proved each and every element of an

6    offense charged against the defendant beyond a reasonable

7    doubt, then you should return a verdict of guilty for that

8    offense.

9          On the flip side, if you have a reasonable doubt about

10   one or more elements of an offense charged against the

11   defendant, then you have to return a verdict of not guilty for

12   that particular offense.

13         Now, the defendant is charged here, as you know, with

14   more than one offense and each offense is a separate count in

15   the superseding indictment, which we'll talk about soon.

16         The number of offenses charged is not evidence of

17   guilt.  Nothing in that indictment is evidence of guilt and

18   that should not influence your decision here in any way

19   whatsoever.  You have to separately consider the evidence that

20   relates to each offense, and you have to return a separate

21   verdict for each offense as to each count.

22         For each offense charged, for each count charged, you

23   have to decide whether the United States has proved beyond a

24   reasonable doubt that the defendant is guilty of that

25   particular count.

1          Your decision on one count, guilty or not guilty,

2     should not influence your decision on any of the other

3     offenses charged, any of the other counts.  Those are all to

4     be considered separately one from the next.

5          A related point is that the defendant is not on trial

6     for any act, any conduct, anything other than what is charged

7     in that indictment, so you should only find the defendant

8     guilty of a count in the indictment if you believe that the

9     United States has proved each essential element of that count

10    beyond a reasonable doubt.  He is not on trial for anything

11    other than the counts in the indictment.

12         I just want to -- because we have used the term a bunch

13    of times just talk about for half a moment about what an

14    indictment is.

15         An indictment is just an informal way in our system of

16    specifying the exact crimes that the defendant is accused of

17    committing.  It's simply a description of the charges against

18    him.  It's an accusation.

19         A description of the charge is an accusation.  Those

20    things are not evidence and you cannot give -- you cannot give

21    any weight to the fact that the defendant was indicted in

22    making the decision that you-all are charged with making here.

23         I'm gonna get now a little more toward some of the law

24    that's gonna apply here in particular.  I just want to tell

25    you before we get to it, some of this is a little hard to

1    follow especially.  And it's hard to follow because, as a

2    structure, there may be a charge and it has a few elements,

3    and the instructions follow that structure more or less.

4         Structure is a little hard to hear, it's a bit easier

5    to see.  So it will be a bit clearer to you I suspect when you

6    see it in the jury room but I'm going to do it verbally now.

7         All of the offenses that the defendant is charged with,

8    all of them require that the United States prove that he acted

9    knowingly with respect to certain elements, at least.

10        What does knowingly mean?  It means that the

11   United States has to prove beyond a reasonable doubt that the

12   defendant was conscious and aware of the nature of his actions

13   and of the surrounding facts and circumstances as specified in

14   the definition of the offense charged, which we're gonna get

15   to soon.

16        If you find that the defendant made an agreement, for

17   example, accidentally or mistakenly, or as the result of

18   simple negligence, then the United States has failed to prove

19   that he acted knowingly, and you have to return a verdict of

20   not guilty.

21        In deciding whether the defendant acted knowingly in

22   his mind, you must -- you may consider evidence about what the

23   defendant said or did or failed to do, how the defendant acted

24   or failed to act, and all of the other facts and circumstances

25   shown by the evidence that may prove or may help you infer

```
 1   what was in the defendant's mind at that time.

 2        So that's knowingly.

 3        Now, certain offenses that are charged in the

 4   indictment, they require that the United States prove the

 5   defendant acted intentionally, sometimes phrased with intent,

 6   same thing.  Intentionally, with intent, with respect to

 7   certain elements of those offenses.

 8        Counts 1 and 5, which you'll hear about more soon,

 9   require that the defendant acted intentionally.  This means

10   that for each of Count 1 and Count 5, the United States has to

11   prove beyond a reasonable doubt that it was the defendant's

12   conscious desire or purpose to join together -- these are

13   conspiracy offenses -- that it was the defendant's conscious

14   desire or purpose to join together with at least one other

15   conspirator to achieve the conspiracy's objective, or that,

16   two, the defendant knew that he was joining with at least one

17   other conspirator to achieve the conspiracy's objective.

18        In deciding whether the defendant acted intentionally

19   or with intent at the moments when that becomes relevant, you

20   can consider the same things:  Evidence about what he said,

21   what he did, what he failed to do, how he acted, how he didn't

22   act, and all the other facts and circumstances shown by the

23   evidence that may prove, in your judgment, what was in the

24   defendant's mind at that time.

25        Count 1, as you'll learn, also requires that you find
```

1    the defendant acted with intent to defraud.

2         To act with intent to defraud means to act knowingly,

3    the term we talked about a moment ago, and with the intention

4    -- a term we talked about a minute ago -- with the intention

5    or the purpose to deceive or to cheat.

6         So we have talked a little bit about knowingly, we have

7    talked about intent and intentionally.  We have talked about

8    intent to defraud.  That's because these are terms that are

9    gonna come up again over and over again.  Here is another one

10   like that.  It's willfully.

11        Certain offenses charged in the indictment require the

12   United States to prove that the defendant acted willfully with

13   respect to certain elements of those crimes.  This means the

14   United States has to prove beyond a reasonable doubt that the

15   defendant knew that his conduct was unlawful and intends to do

16   something that the law forbids.  That is, to find that the

17   defendant acted willfully, you have to find that the evidence

18   presented at trial proved beyond a reasonable doubt that the

19   defendant acted with purpose to disobey or disregard the law.

20        The United States does not have to prove that the

21   defendant had any evil motive or bad purpose other than the

22   purpose to disobey or disregard the law, nor does the

23   Government -- nor does the Government have to prove that the

24   defendant knew of the existence and meaning of the federal

25   statute making his conduct criminal.

1     Over and over again we're gonna talk about the word

2  "Medicare" in the course of these instructions.  And when I

3  refer to Medicare, I'm going to be referring to three

4  different things all together for convenience.

5     One is Medicare, one is TRICARE, and one is CHAMPVA.

6  Those are programs that you've heard testimony about.  I'm

7  going to refer to those three collectively as Medicare just to

8  make things a little easier.

9     I want to get to the next concept here.  These will all

10 get laced through.

11    To find the defendant guilty of healthcare and wire

12 fraud conspiracy as those are charged in Count 1 and the

13 healthcare fraud that is charged in Counts 2 and 3 and 4, you

14 have to find that the United States proved beyond a reasonable

15 doubt that the defendant knew fraudulent claims were being

16 submitted to Medicare.

17    To find the defendant guilty of conspiring to violate

18 the Anti-Kickback Statute that's charged in Count 5, and with

19 conspiring -- let me slow down -- conspiring to violate the

20 Anti-Kickback Statute, Count 5, or violating the Anti-Kickback

21 Statute itself, Counts 6, 7, and 8, for that you have to find

22 that the United States proved beyond a reasonable doubt that

23 the defendant knew he was soliciting and receiving kickbacks

24 and bribes for referring Medicare beneficiaries to durable

25 medical equipment, DME supply companies, for DME.

1          In this case there's a question about whether the

2     defendant knew that fraudulent claims were being submitted to

3     Medicare, or he was soliciting, receiving kickbacks and bribes

4     for referring Medicare beneficiaries to DME companies for DME.

5     That's one of the debates between the parties.

6          When, as in this case, knowledge of a particular fact

7     or circumstances is an essential part of the offense charged,

8     the United States may prove that the defendant knew of that

9     fact or circumstance if the evidence proves beyond a

10    reasonable doubt that the defendant deliberately closed his

11    eyes to what would otherwise have been obvious to him.

12         No one can avoid responsibility for a crime by

13    deliberately ignoring what's obvious.  Thus, you may find that

14    the defendant knew that the fraudulent claims were being

15    submitted to Medicare based on evidence which proves that,

16    one, the defendant himself actually, subjectively believed

17    that there was a high probability that this fact or

18    circumstance existed; and

19         Two, that the defendant consciously used deliberate

20    efforts to avoid knowing about the existence of this fact and

21    circumstance.

22         Similarly, you can find that the defendant knew he was

23    soliciting and receiving kickbacks and bribes for referring

24    Medicare beneficiaries to DME companies for DME based on

25    evidence which proves that, one, the defendant himself

1    actually, subjectively believed that there was a high

2    probability that this fact or circumstance existed; and

3        Two, that the defendant consciously used deliberate

4    efforts to avoid knowing about the existence of this fact and

5    circumstance.

6        You may not find that the defendant knew that

7    fraudulent claims were being submitted to Medicare, or he was

8    soliciting or receiving kickbacks and bribes for referring

9    Medicare beneficiaries to DME companies for DME if you find

10   that the defendant actually believed that the respective fact

11   or circumstance did not exist.

12       Also, you may not find the defendant knew fraudulent

13   claims were being submitted to Medicare, or he was soliciting

14   and receiving kickbacks and bribes for referring Medicare

15   beneficiaries to DME companies for DME if you find only that

16   the defendant consciously disregarded the risk that the

17   respective fact or circumstance existed, or that the defendant

18   should have known that the respective fact or circumstance

19   existed, or that a reasonable person would have known of a

20   high probability that the fact or circumstance existed.

21       It is not enough the defendant may have been reckless

22   or stupid or foolish or may have acted out of inadvertence or

23   accident.

24       Those are a lot of big words, a lot of sentences with

25   multiple clauses in them.  I think when you slow down and read

1    the instructions in general, it will be easier to follow.

2         With respect to Counts 1 to 4, you need to find that

3    the defendant himself actually, subjectively believed there

4    was a high probability that fraudulent claims were being

5    submitted to Medicare and other federal and private health

6    care benefit programs, consciously used deliberate efforts to

7    avoid knowing about it, and did not actually believe it did

8    not exist.

9         With respect to Counts 5 through 8, you must find that

10   the defendant himself actually, subjectively believed there

11   was a high probability that he was soliciting and receiving

12   kickbacks and bribes for referring Medicare beneficiaries to

13   DME companies for DME, consciously used deliberate efforts to

14   avoid knowing about it, and did not actually believe that it

15   did not exist.

16        For the last little bit, I've been talking only about

17   willful blindness.  That is one of the instructions here.  Now

18   we're going to move on from that.  It's the kind of break in

19   things that's much easier to see on the page than it is

20   verbally.

21        Next thing up is motive.  Motive is not an element of

22   the offenses with which the defendant is charged.  Proof of a

23   bad motive is not required to convict.  Proof of bad motive

24   alone does not establish the defendant is guilty, just like

25   proof of a good motive alone does not establish that the

1   defendant is not guilty.  Evidence of his motive, however, may

2   help you to determine the defendant's intent.

3        Intent and motive are simply different concepts.

4   Motive is what prompts a person to act; it's what impels a

5   person forward.  Intent refers only to the state of mind with

6   which a particular act is done.

7        So examples:  Personal advancement, desire for

8   financial gain, those are motives of a lot of human conduct.

9   But those motives can prompt, can push one person to

10  intentionally do something that's perfectly acceptable while

11  prompting another person to intentionally do an act that is a

12  crime.

13       Motive and intent are separate things.  Motive is not

14  an element, but various kinds of intent are, and you'll see

15  them as we get further in.  Knowingly, willfully, those sort

16  of things.  Those are intent.

17       Next up is the following -- and this is going on for a

18  short, little bit.

19       The offenses charged in the indictment, they require

20  proof that the defendant acted knowingly, intentionally,

21  willfully, and with intent to defraud.  Those are all pieces

22  of intent.  Not motive, but intent.

23       If you find that the defendant acted in good faith,

24  that would be a complete defense, because good faith on the

25  part of the defendant would be inconsistent with him acting

 1    willfully or with intent to defraud.

 2         A person acts in good faith when he or she has an

 3    honestly held belief, opinion, or understanding that the

 4    alleged acts were not unlawful, even though that belief or

 5    opinion or understanding turns out to be inaccurate or

 6    incorrect.

 7         So in this case, if the defendant made an honest

 8    mistake or had an honest misunderstanding about the legality

 9    of the alleged acts, then he did not act willfully or with the

10    intent to defraud.

11         The defendant does not have the burden of proving good

12    faith.  Good faith is a defense.  It exists because it's just

13    inconsistent with the requirement of the offenses charged,

14    that the defendant acted willfully or with the intent to

15    defraud.

16         As I have told you, it's the United States' burden to

17    prove beyond a reasonable doubt each element of the offense,

18    including the required mental state elements.  In deciding

19    whether the United States has proved that the defendant acted

20    willfully or with intent to defraud or, instead, whether he

21    acted in good faith, you should consider all the evidence, as

22    you should on everything, anything that may bear, in your

23    judgment, on his state of mind.

24         If you find from the evidence that he acted in good

25    faith, as I have defined it, or if you find for any other

1  reason that the United States has not proved beyond a

2  reasonable doubt that he acted willfully or with intent to

3  defraud, you have to find him, the defendant, not guilty of

4  the offense at issue that you're considering.

5       Here's another general concept that matters throughout.

6  You cannot infer that the defendant is guilty of participating

7  in criminal conduct merely, solely from the fact that he

8  worked or did business with other people who were guilty of

9  wrongdoing.  Mere association by a defendant with someone else

10 does not make the -- with a conspirator does not make the

11 defendant a member of the conspiracy, even if he knows of the

12 existence of a conspiracy.

13      So everything I have talked to you about until now,

14 those are the kind of general things that suffuse the

15 instructions I'm going to start giving you now as to

16 particular counts.

17      We're going to start off with Count 1.

18      Count 1, I have mentioned it a couple times.  Count 1

19 is a conspiracy that is alleged to have two objects.  We'll

20 talk about what that means soon.  Those objects are to commit

21 health care fraud and to commit wire fraud.

22      Count 1 of the indictment charges that from in or

23 around February of 2017, through in or around April 2019, in

24 the District of New Jersey -- the District of New Jersey and

25 the State of New Jersey cover the same territory -- and

1    elsewhere, the defendant knowingly and intentionally conspired

2    and agreed with Aaron Williamsky, Nadia Levit,

3    Charles Burruss, Armani Adams, Kenneth Pitter, and others to

4    commit certain offenses, namely, one, to commit health care

5    fraud; and two, to commit wire fraud.

6          It is a federal crime for two or more persons to agree

7    or conspire to commit any offense against the United States,

8    even if they never actually achieve their objective.  A

9    conspiracy is a kind of criminal partnership.

10          In order for you to find the defendant guilty of

11   conspiracy to commit health care fraud or wire fraud, you have

12   to find that the United States proved beyond a reasonable

13   doubt each of the following three elements:

14          The first element:  Two or more people agreed to commit

15   health care or wire fraud, as the indictment charged;

16          Second:  The defendant was a party to or member of that

17   agreement; and

18          Third, the defendant joined that agreement or

19   conspiracy knowing of its objective to commit health care

20   fraud or wire fraud and intending to join together with at

21   least one other alleged co-conspirator to achieve that

22   objective.  That is, the defendant and at least one other

23   alleged co-conspirator shared a unity of purpose and the

24   intent to achieve a common goal or objective to commit health

25   care fraud or wire fraud.

1        I'm going to explain each of those three elements in a

2   little more detail now.  Of the three elements, here is the

3   first element:

4        The first element of the crime of conspiracy, as I just

5   mentioned, that's the existence of an agreement.  The

6   United States has to prove beyond a reasonable doubt that two

7   or more people knowingly and intentionally -- see how these

8   words are coming back, knowingly and intentionally -- arrived

9   at a mutual understanding or agreement, either spoken or

10  unspoken, to work together to achieve the overall objective of

11  the conspiracy.

12       Now, the United States does not have to prove the

13  existence of a formal or written agreement or an expressed

14  oral agreement spelling out the details of the understanding.

15  The United States also does not have to prove that all of the

16  members of the conspiracy directly met or discussed between

17  themselves their unlawful objectives or somehow agreed to all

18  the details or agreed to what the means were by which the

19  objectives were to be accomplished.

20       The United States is not even required to prove that

21  all members of the alleged conspiracy were named or that all

22  members of the conspiracy are even known.  What the

23  United States has to prove beyond a reasonable doubt is that

24  two or more persons in some way in the matter arrived at some

25  type of agreement, mutual understanding, or meeting of the

 1    minds to try to accomplish a common and unlawful objective.

 2         You can consider, as with everything, direct and

 3    circumstantial evidence in deciding whether the United States

 4    has proved beyond a reasonable doubt that an agreement or

 5    mutual understanding existed.

 6         You may find the existence of a conspiracy based on

 7    reasonable inferences that you draw from actions and

 8    statements of the alleged members of the conspiracy, from the

 9    circumstances surrounding the scheme, and from evidence of

10    related facts and circumstances which prove, in your judgment,

11    that the activities that participants in a criminal venture

12    couldn't have been carried out except as the result of a

13    preconceived agreement, scheme, or understanding together.

14         Let's move on.

15         So the next piece is that, if you find that a criminal

16    agreement or a partnership or a conspiracy existed, then in

17    order to find the defendant guilty of conspiracy, you also

18    have to find that the United States proved beyond a reasonable

19    doubt that the defendant knowingly and intentionally joined

20    that agreement, joined that conspiracy during its existence.

21         The United States must prove that the defendant knew

22    the goals or objectives of the agreement or conspiracy and

23    voluntarily joined it during its existence intending to

24    achieve the common goals or objectives and to work together

25    with the other alleged co-conspirators towards those goals or

1    objectives.

2         The United States doesn't have to prove that the

3    defendant knew everything about the conspiracy or that he knew

4    everyone involved in it, or that he was a member from the

5    beginning.  The United States also does not have to prove the

6    defendant played a major role or a substantial part in the

7    conspiracy.

8         You may consider both direct evidence and

9    circumstantial evidence in deciding whether the defendant

10   joined the conspiracy, knew of its criminal objectives, and

11   intended to further those objectives.

12        Evidence which shows that the defendant only knew about

13   the conspiracy, only kept bad company by associating with

14   members of the conspiracy or was only present when the

15   conspiracy was discussed or a crime was committed, that's not

16   sufficient to prove that the defendant was a member of the

17   conspiracy, even if the defendant approves of what was

18   happening or didn't object to it.

19        Likewise, evidence showing the defendant may have done

20   something that happened to help the conspiracy does not

21   necessarily prove that he joined the conspiracy.  You may,

22   however, consider all of the evidence, including this

23   evidence, in deciding whether the United States proved beyond

24   a reasonable doubt that the defendant joined the conspiracy.

25        We're still inside of Count 1, okay, which is the

 1    conspiracy.  This count, Count 1, charges that the defendant

 2    and the other alleged co-conspirators were all members of one

 3    single conspiracy to commit health care fraud or wire fraud.

 4         Count 5 of the indictment charges that defendant and

 5    the other alleged co-conspirators were all members of one

 6    single conspiracy to violate the Anti-Kickback Statute.

 7         The defendant has argued that the conspiracy alleged in

 8    Count 1 in the indictment was really, if anything, two or more

 9    separate conspiracies.  He has also argued that the conspiracy

10    alleged in Count 5 of the indictment was really again, if

11    anything, two or more separate conspiracies.  Whether a single

12    conspiracy or multiple conspiracies exist, that is a question

13    for you-all to decide.  That's a question of fact.

14         In order to find the defendant guilty of the Count 1

15    conspiracy or the Count 5 conspiracy, both of which were

16    charged in the indictment, you have to find that the

17    United States proved beyond a reasonable doubt that the

18    defendant was a member of that conspiracy.

19         If the United States failed to prove that the defendant

20    was a member of the conspiracy charged in Count 1 or the

21    conspiracy charged in Count 5, then you have to find the

22    defendant not guilty of Count 1 or Count 5, even if you find

23    that there are multiple conspiracies and the defendant was a

24    member of a separate conspiracy other than the one that is

25    charged in the indictment.

1          But proof that the defendant was a member of some other

2    conspiracy would not prevent you from also finding him guilty

3    of the conspiracy charged in Count 1 or Count 5, if you find

4    the United States proved beyond a reasonable doubt that he was

5    a member of that conspiracy, the one that was charged.

6          In deciding whether there was one single conspiracy or

7    more than one conspiracy, you should concentrate on the nature

8    of the agreement that's proved by the evidence as you see it.

9          To prove a single conspiracy, the United States has to

10   prove beyond a reasonable doubt that each of the alleged

11   members or conspirators agreed to participate in what he knew

12   or what he should have known was a single group activity

13   directed toward a common objective.  The United States must

14   prove that there was a single agreement on an overall

15   objective.

16         Multiple conspiracies are separate agreements operating

17   independent of each other, but a finding of a master

18   conspiracy that includes other sub-schemes does not constitute

19   a finding of multiple unrelated conspiracies.

20         A single conspiracy may exist when there is a

21   continuing core agreement that attracts different members at

22   different times and which involves different subgroups

23   committing acts in furtherance of an overall objective.

24         In determining whether a series of events constitutes a

25   single conspiracy or separate and unrelated conspiracies, you

1    should consider whether there was a common goal among the

2    alleged co-conspirators; whether there existed common or

3    similar methods; whether and to what extent alleged

4    participants overlapped in their various dealings; whether and

5    to what extent the activities of the alleged co-conspirators

6    were related interdependent; how helpful each alleged

7    co-conspirator's contributions were or were not to the goals

8    of the others; and whether the scheme contemplated a

9    continuing objective that would not be achieved without the

10   ongoing cooperation of the conspirators.

11        A single conspiracy may exist even if all the members

12   did not know each other, or never sat down together, or did

13   not know what roles all the other members would play.  A

14   single conspiracy may exist even if different members joined

15   at different times or the membership of the conspiracy changed

16   over time.

17        Similarly, there may be a single conspiracy even though

18   there were different sub-groups operating in different places

19   or many acts or transactions committed over a long period of

20   time.

21        You can consider these things in deciding there was one

22   single conspiracy or more than one conspiracy, but they are

23   not necessarily controlling.  What is controlling is whether

24   the United States has proved beyond a reasonable doubt that

25   there was one overall agreement on a common objective as to a

1   given count.

2       I want to talk to you about -- we're still talking

3   about conspiracy.  I want to talk to you about the mental

4   states associated with a conspiracy.

5       In order to find the defendant guilty of conspiracy,

6   you have to find that the United States proved beyond a

7   reasonable doubt that the defendant joined the conspiracy

8   knowing of its objective and intending to help further or

9   achieve that objective.

10      That is the United States must prove one, two, and

11  three.

12      One, that the defendant knew of the objective or goal

13  of the conspiracy.

14      Two, that the defendant joined the conspiracy intending

15  to help further or achieve that goal; and

16      Three, that the defendant and at least one other

17  alleged conspirator shared a unity of purpose toward that

18  objective or goal.

19      You can consider both direct evidence and

20  circumstantial evidence as we discussed, including the

21  defendant's words or conduct or any other facts and

22  circumstances that you deem relevant from the evidence in

23  deciding whether defendant had the required knowledge and

24  intent.  For example, evidence that the defendant derived some

25  benefit from the conspiracy or had some stake in the

1    achievement of the conspiracy's objectives might tend to show

2    that he had the required intent or purpose that the

3    conspiracy's objectives be achieved.

4         Now, the United States -- we just talked about the

5    conspiracy's objectives being achieved, but note:  The

6    United States is not required to prove that any of the members

7    of a conspiracy were successful in achieving any or all of the

8    objectives of the conspiracy.

9         You can find the defendant guilty of conspiracy if you

10   find that the United States proved beyond a reasonable doubt

11   the elements I have explained, even if you find that the

12   United States did not prove that any of the conspirators

13   actually committed any other offense against the

14   United States.

15        Conspiracy is a criminal offense that is separate from

16   the offenses that were the objects of the conspiracy.

17   Conspiracy can be complete, it can be finished, it can be

18   committed without the commission of those other offenses.

19        Now, evidence has been admitted here that certain

20   people who are alleged to be co-conspirators of the defendant

21   did or said certain things.  The acts or statements of any

22   member of a conspiracy are treated as the acts or statements

23   of all members of the conspiracy if these acts or statements

24   were performed or spoken during the existence of that

25   conspiracy and to further its objectives.

1        Therefore, you can consider as evidence against the

2    defendant any acts done or statements made by any members of

3    the conspiracy during the existence of and to further the

4    objective of the conspiracy.

5        You may consider those acts and statements, even if

6    they were done and made outside the defendant's presence and

7    without his knowledge.  As with all the evidence presented in

8    this case, it is for you to decide whether you believe this

9    evidence and how much weight to give it.

10        The next thing is the length of time for which there is

11    a conspiracy.  A conspiracy ends when the objectives of a

12    conspiracy have been achieved or when all members of the

13    conspiracy have walked away from it, they have withdrawn from

14    it.

15        However, a conspiracy may be a continuing conspiracy.

16    If it is, it lasted until there is some affirmative showing

17    that it has ended or that all of its members have withdrawn.

18        A conspiracy may be a continuing one if the agreement

19    includes an understanding that the conspiracy will continue

20    over time, and also a conspiracy may have a continuing purpose

21    or objective and therefore can be a continuing conspiracy.

22        I want to just share with you something about

23    unanimity.  This is the kind of thing that's probably a little

24    easier to say on the page, but I'll say it to you out loud.

25        Count 1 of the indictment, it charges the defendant

1    with a conspiracy to commit wire fraud or health care fraud

2    and it alleges two separate schemes or plans to obtain money

3    or property by means of several different false or fraudulent

4    pretenses, representations, or promises.

5           Now, the United States is not required to prove all of

6    the schemes or plans to defraud or all of the false or

7    fraudulent pretenses, representations, or promises that are

8    alleged.

9           However, you all have to agree with each of the other

10   jurors that the same scheme or plan and the same means of

11   false or fraudulent pretenses, representations, or promises

12   alleged in Count 1 was in fact employed by Mr. Naviwala.

13          The jury need not unanimously agree on each scheme or

14   plan, but in order to convict, has to unanimously agree upon

15   at least one such scheme or plan as a scheme or plan that was

16   knowingly used by the defendant.

17          Similarly, the United States is not required to prove

18   all of the means or methods alleged in Count 1 of the

19   indictment.  Each juror must agree with each of the other

20   jurors, however, that the same means or methods alleged in

21   Count 1 of the indictment was in fact engaged in or employed

22   by the defendant in committing the crime charged in Count 1 of

23   the indictment.

24          The jury doesn't have to unanimously agree on each mean

25   or method, but in order to convict, you must unanimously agree

1    upon at least one such means or methods as the one engaged in

2    by the defendant.

3          Unless the United States has proven the same means or

4    methods to each of you beyond a reasonable doubt, you have to

5    acquit the defendant of the crime charged in Count 1.

6          Unless each of you agrees that the United States has

7    proved the same scheme or plan to defraud beyond a reasonable

8    doubt, you have to find the defendant not guilty of the

9    conspiracy count charged in Count 1 of the indictment.

10         All of that is especially relevant because that

11   conspiracy in Count 1, as you've heard, it has two alleged

12   objectives.  One is health care fraud and one is wire fraud.

13         Now we move on to health care fraud.  This is about

14   Counts 2 and 3 and 4.  Count 1 was the conspiracy we talked

15   about, one of the alleged objects of that conspiracy was

16   health care fraud.  Now I'm gonna talk about Count 2 and

17   Count 3 and 4, health care fraud itself.

18         Those three counts charge the defendant with violations

19   of federal law which is health care fraud in three different

20   counts.

21         In order to find the defendant guilty of this offense,

22   the offense of health care fraud, you have to find that the

23   United States proved the following three elements beyond a

24   reasonable doubt as to a given count.

25         First, the defendant knowingly devised or participated

1   in a scheme to defraud or to obtain by means of false or

2   fraudulent pretenses or representations or promises any of the

3   money or property owned by or under the custody or control of

4   the victim entity in connection with the delivery of or

5   payment for healthcare benefits, items, or services.  That's

6   the first element.

7        The second element is the defendant acted willfully and

8   with the intent to defraud.

9        I defined those terms for you before.

10       Third, that the victim was a public or private plan or

11  contract, affecting commerce, under which medical benefits,

12  medical items, or medical services, were provided to any

13  individual.

14       Now, a quick definition of what a health care benefit

15  program is.  I'm going to read to you from the statute.

16       It's:  Any public or private plan or contract,

17  affecting commerce, under which any medical benefit, item, or

18  service, is provided to any individual, and includes any

19  individual or entity who is providing a medical benefit, item,

20  or service, for which payment may be made under the plan or

21  contract.

22       A little backtracking, but it's helpful to have here

23  again.  The United States must prove beyond a reasonable doubt

24  that the defendant acted willfully and with the intent to

25  defraud a health care benefit program.

1          I've already told you before what it means to act

2     willfully, and to act with intent to defraud, I've told you

3     about that before also.  It means to act knowingly and with

4     the intention or the purpose to deceive or cheat.

5          In considering whether the defendant acted with an

6     intent to defraud, you can consider, among other things,

7     whether he acted with a desire or purpose to bring about some

8     gain or benefit to himself or someone else at the expense of

9     the health care benefit program or with the desire or purpose

10    to cause some loss to the health care benefit program.

11         Next thing you heard me mention as part of these

12    instructions is affecting interstate commerce.  So the

13    United States has to prove beyond a reasonable doubt that the

14    health benefit plan or contract affected or could have

15    affected interstate commerce.

16         Affecting interstate commerce, it means any action

17    which in any way interferes with or changes or alters the

18    movement or transportation or flow of goods, merchandise,

19    money, or other property in commerce, between or among

20    different states.  And the effect can be minimal.

21         To prove health care fraud, the United States has to

22    prove beyond a reasonable doubt that the defendant knowingly

23    and willfully made a misrepresentation, or knowingly and

24    willfully caused someone else to make a misrepresentation in

25    connection with the delivery of or payment for health care

1    benefits, health care items, or health care services.

2        A little piece here I'm going to ask the parties to

3    take note of because it seems like it may be a little mistake

4    but we'll come back to that.

5        Next.  Counts Two through Four of the superseding

6    indictment allege that the claims to Medicare were false

7    because they were not medically necessary.

8        Count 1 alleges that one of the reasons that the claims

9    were false was because, as I said, they were not medically

10   necessary.

11       That got a little jumbled.

12       Counts 2 through 4 say that the claims to Medicare were

13   false because they were not medically necessary.

14       Count 1 -- that's the conspiracy count -- it alleges

15   that one of the reasons that the claims were false was the

16   same thing: again, not medically necessary.

17       In order for you to find that a claim was false because

18   it was not medically necessary, you have to find that the

19   United States proved beyond a reasonable doubt that a claim

20   that the prescription was medically necessary was false.  To

21   prove that the claim was false, the United States must prove

22   that the prescription was not medically necessary.  I'm sorry.

23   The United States must prove that the prescription was not

24   medically necessary.  That term was not defined by any

25   Medicare regulation.

1        I am instructing you that making a false statement and

2   the mental states associated with making a false statement,

3   they're separate things.  The element of falsity and the

4   element of mental state are not the same thing.

5        Therefore, the United States must prove that the claim

6   of medical necessity was false, and also that the claim was

7   made willfully and with an intent to defraud, as I have

8   defined those terms.

9        Now we're going to jump back.  We just talked about

10  health care fraud.  That is Counts 2 and 3 and 4.  Remember,

11  it's also an object allegedly of the Count 1 conspiracy.  The

12  other alleged object of the Count 1 conspiracy is wire fraud.

13  I'm going to talk about that now.

14       One of the objects, as I just mentioned, of the Count 1

15  conspiracy is that defendant conspired to commit wire fraud,

16  again a violation of federal law.

17       In order to find the defendant guilty of this offense,

18  you have to find that the United States proved each of the

19  following three elements beyond a reasonable doubt:

20       First, the defendant knowingly devised a scheme to

21  defraud or to obtain money or property by materially false or

22  fraudulent pretenses, representations, or promises, or

23  willfully participated in such a scheme with knowledge of its

24  fraudulent nature;

25       Second, that the defendant acted with the intent to

1   defraud;

2        Third, that in advancing, furthering, or carrying out

3   the scheme, the defendant transmitted any writing, signal, or

4   sound by means of a wire, radio, or television communication

5   in interstate commerce, or caused the transmission of any

6   writing, signal, or sound of some kind by means of a wire,

7   radio, or television communication in interstate commerce.

8        We'll talk about each of those little pieces.

9        The first element of wire fraud is that the defendant

10  knowingly devised or willfully participated in a scheme to

11  defraud the victims of money or property by materially false

12  or fraudulent pretenses, representations, or promises.

13       A scheme is just a plan for accomplishing an object.

14       Fraud.  Fraud is a general term which embraces all of

15  the various means by which one person can gain an advantage

16  over another by false representations, by suppression of the

17  truth, or by deliberate disregard for the truth.

18       Putting them together, a scheme to defraud is any plan,

19  device, or course of action to deprive another person of money

20  or property by means of false or fraudulent pretenses,

21  representations, or promises, reasonably calculated to deceive

22  people of average prudence.

23       In this case, the indictment alleges that the scheme to

24  defraud was carried out by making false or fraudulent

25  statements, false or fraudulent representations, or false and

1    fraudulent claims.  The representations which the Government

2    charges were made as part of a scheme to defraud, those are

3    set out in the indictment.

4         The United States is not required to prove every

5    misrepresentation charged in the indictment.  It is sufficient

6    if the United States proves beyond a reasonable doubt that one

7    or more of the alleged material misrepresentations were made

8    in furtherance of the alleged scheme to defraud.

9         But you cannot convict the defendant of wire fraud

10   unless all of you agree as to at least one of the material

11   representations.

12        A statement, representation, claim, or document is

13   false if it is untrue when made, and if the person making the

14   statement or representation or claim or document or causing it

15   to be made knew it was untrue at the time it was made.  A

16   representation or statement is fraudulent if it was falsely

17   made with intention to deceive.

18        In addition, deceitful statements of half truths or the

19   concealment of material facts or the expression of an opinion

20   not honestly entertained may constitute false or fraudulent

21   statements.  The arrangement of the words or the circumstances

22   in which they are used may convey false or deceptive

23   appearance.  The deception may not be premised upon spoken or

24   written words alone.  If there is deception, the manner in

25   which it is accomplished is immaterial.

1          The false or fraudulent representation or failure to

2     disclose something has to relate to a material fact or matter.

3          A material fact is one which would reasonably be

4     expected to be of concern to a reasonable and prudent person

5     in relying upon their representation or statement in making a

6     decision.

7          A misrepresentation is not material unless it goes to

8     the essence of the parties' bargain.

9          This means that if you find that a particular statement

10    of fact was false, you must determine whether that statement

11    was one that a reasonable person might have considered

12    important in making his or her decision, and whether it went

13    to the very essence of the parties' bargain.  The same

14    principle applies to fraudulent half-truths or omissions of

15    material facts.

16         In order to establish a scheme to defraud, the

17    United States has to also prove that the alleged scheme

18    contemplated depriving another person of money or property.

19    But the United States is not required to prove the defendant

20    originated that scheme to defraud.

21         Furthermore, it is not necessary that the United States

22    prove the defendant actually realized any gain from the scheme

23    or that any intended victim actually suffered any loss.  But

24    the United States has to show that the intent of the scheme

25    was to defraud and to deceive a victim out of money or

 1   property.

 2        If you find that the United States has proved beyond a

 3   reasonable doubt that the scheme to defraud charged in the

 4   indictment did exist and the defendant knowingly devised or

 5   participated in the scheme charged in the indictment, you

 6   should then consider the next and second element.

 7        Here is what that second element is.  Remember, there

 8   is Count 1 of the conspiracy and this is the second objective,

 9   that's wire fraud.  Here is the second element of wire fraud.

10   You can tell that's a little easier to see in writing.

11        The second element the United States must prove beyond

12   a reasonable doubt is that the defendant acted with a specific

13   intent to defraud.

14        To act with an intent to defraud means to act knowingly

15   and with the intention or the purpose to deceive or to cheat.

16        In considering whether the defendant acted with an

17   intent to defraud, you may consider, among other things,

18   whether the defendant acted with desire or purpose to bring

19   about some gain or benefit to himself or someone else or with

20   a desire or purpose to cause some loss to someone.

21        Now the third element of wire fraud.  The third element

22   the United States must prove beyond a reasonable doubt is that

23   in advancing, furthering, or carrying out the scheme, the

24   defendant transmitted -- and here is a list of things -- a

25   writing or signal or sound by means of a wire, radio, or

1    television communication in interstate commerce, or caused the

2    transmission of a writing, signal, or sound of some kind by

3    means of a wire, radio, or television communication in

4    interstate commerce.

5         That phrase that's built into what I just said,

6    "transmits by means of wire, radio, or television

7    communication in interstate commerce" means to send from one

8    state to another by means of telegraph or telephone lines or

9    by means of radio or television.

10        The phrase includes a telephone conversation by a

11   person in one state with a person in another state, or

12   electronic signals sent from one state to another, such as by

13   fax or by a financial wire.  The use of the Internet to send a

14   message, like an e-mail, or to communicate with a website,

15   that can also constitute a wire transmission in interstate

16   commerce.

17        The United States is not required to prove that the

18   defendant actually used a wire communication in interstate

19   commerce or that the defendant even intended anything be

20   transmitted in interstate commerce by means of a wire, radio,

21   or television communication to further, to advance, or to

22   carry out the scheme or plan to defraud.

23        But the United States must prove beyond a reasonable

24   doubt that a transmission by a wire, radio, or television

25   communication facility in interstate commerce was, in fact,

1  used in some manner to further or to advance or to carry out

2  the scheme to defraud.

3      The United States must also prove either that the

4  defendant used wire, radio, or television communication in

5  interstate commerce, or the defendant knew that use of the

6  wire, radio, or television communication in interstate

7  commerce would follow in the ordinary course of business

8  events, or that the defendant should reasonably have

9  anticipated that wire, radio, or television communication in

10 interstate commerce would be used.

11     It's not necessary that the information transmitted by

12 these means was itself false or fraudulent or contained any

13 false or fraudulent pretense, representation, or promise, or

14 contained any request for money or thing of value.

15     But the United States must prove beyond a reasonable

16 doubt the use of the wire, radio, or television communication

17 in interstate commerce further or advanced or indeed carried

18 out in some way the scheme.

19     So we have talked a little bit about the word

20 "materiality."  The United States must prove beyond a

21 reasonable doubt that the misrepresentation question was

22 material.  A fact or a matter is material if it has a natural

23 tendency to influence or be capable of influencing the

24 decision of the decision-maker to whom that misrepresentation

25 was addressed.

1          In this case here, the relevant decision-makers are

2   Medicare and TRICARE and CHAMPVA, which together I'm going to

3   refer to as much as I can as Medicare.

4          In determining whether a fact is or is not material to

5   Medicare, you should consider whether the decision-maker --

6   Medicare -- would have made the same decision if it would have

7   known that fact.  If the decision-maker here, Medicare, would

8   have made the same decision if it knew a particular fact, that

9   is evidence that the fact is not material.

10          If the decision-maker regularly makes similar decisions

11   despite actual knowledge that certain factual statements were

12   made to it, that is evidence that the statements are not

13   material.

14          We are now going to talk about Count 5, which is a

15   conspiracy to violate the Anti-Kickback Statute.

16          Count 5 of the superseding indictment charges that from

17   in or around February of 2017, through in or around April

18   2019, in the District of New Jersey -- again, that's just the

19   same as the State of New Jersey -- and elsewhere, the

20   defendant knowingly and intentionally conspired and agreed

21   with others to commit offenses against the United States.

22          I'm just gonna read to you A and B from the indictment.

23          A:  To knowingly and willfully solicit and receive

24   remuneration, directly or indirectly, overtly and covertly, in

25   cash and in kind, that is kickbacks and bribes in return for

*United States District Court*
*District of New Jersey*

1  referring an individual to a person for the furnishing and

2  arranging for the furnishing of any item and service, for

3  which payment may be made, in whole or in part, under a

4  federal health care program, namely Medicare.

5  And B:  To knowingly and willfully offer and pay

6  remuneration, directly and indirectly, covertly and overtly,

7  in cash and in kind, that is, kickbacks and bribes to any

8  person to induce such person to refer an individual to a

9  person for the furnishing and arranging for the furnishing of

10  any item and service which payment may be made, in whole or in

11  part, under a federal health care program, namely Medicare.

12  That is just from the indictment.

13  Count 5 also charges that to further the objectives of

14  the conspiracy, at least one member of the conspiracy

15  committed or caused the commission of at least one overt act

16  as alleged in the superseding indictment.

17  As I have already instructed you, it is a federal crime

18  for two or more persons to conspire or agree to commit any

19  offense against the United States, even if they never actually

20  achieve their objective.  As I said before, conspiracy is

21  fundamentally a kind of criminal partnership.

22  In order for you to find the defendant guilty of

23  conspiracy to commit any offense against the United States,

24  even if he never actually achieves his objective, you have to

25  find that the United States proved beyond a reasonable doubt

1    the following four elements:

2          Here they go.

3          First, two or more people agreed to commit an offense

4    against the United States and in this case of Count 5 to

5    violate the Anti-Kickback Statute.  I'm going to explain to

6    you the elements of that Anti-Kickback Statute soon.

7          The second of the elements, that the defendant was a

8    party to or a member of that agreement.

9          Third, that the defendant joined in that agreement or

10   conspiracy knowing of its object to commit an offense against

11   the United States, and intending to join together with at

12   least one other conspirator to achieve that objective.  That

13   is, that the defendant and at least one other alleged

14   conspirator shared a unity of purpose and the intent to

15   achieve a common goal or objective to commit an offense

16   against the United States.

17         Fourth, at some time during the existence of the

18   agreement or conspiracy, at least one of the members of the

19   conspiracy performed an overt act in order to further the

20   objective of the agreement.

21         I'm going to explain these to you in more detail in a

22   moment.

23         Now, I've already told you, though, about three

24   elements of this crime of conspiracy -- the existence of an

25   agreement, membership in the agreement, and the mental states

1    of the people involved in the conspiracy -- when I instructed

2    you on the elements of the conspiracy that was in Count 1,

3    that was the conspiracy to commit health care fraud and wire

4    fraud.  Those same instructions on those topics are applicable

5    to the first three elements of Count 5.

6         Now, with regard to the fourth element of the Count 5

7    conspiracy, that is about the commission of overt acts, the

8    United States has to prove beyond a reasonable doubt that

9    during the existence of the conspiracy, at least one member of

10   the conspiracy performed at least one of the overt acts

11   described in the superseding indictment for the purpose of

12   furthering or helping to achieve the object injunctive of the

13   conspiracy.

14        The superseding indictment alleges certain overt acts

15   pertaining to Count 5.

16        The Government does not have to prove that all of these

17   acts were committed or that any of these acts were themselves

18   illegal.  Also, the United States does not have to prove the

19   defendant personally committed himself any of the overt acts.

20        The United States has to prove beyond a reasonable

21   doubt that at least one member of the conspiracy committed at

22   least one of the overt acts alleged in the indictment and

23   committed it during the time the conspiracy existed for the

24   purpose of furthering or helping to achieve the objective of

25   the conspiracy, and you have to unanimously agree on the overt

 1   act that was committed.

 2        As I have already instructed you, to find the defendant

 3   guilty of conspiracy to commit an offense against the

 4   United States, the first element of the offense requires you

 5   to find that two or more people agreed to commit an offense

 6   against the United States.  And with respect to the Count 5

 7   conspiracy that the United States alleges, the allegation is

 8   the defendant committed an offense against the United States

 9   by violating the Anti-Kickback Statute.

10        That's the object of the Count 5 conspiracy so I'm

11   going to tell you a little bit about the elements of that

12   Anti-Kickback Statute offense.

13        Now, as I said, one of the objects of this -- the

14   object of the Count 5 conspiracy is a violation of the

15   Anti-Kickback Statute by soliciting or receiving kickbacks in

16   connection with the federal health care program payments.

17   That underlying crime of soliciting or receiving kickbacks in

18   connection with federal health care program payments has the

19   following five elements:

20        First, that the defendant solicited or received a

21   kickback or a bribe.

22        Second, that the remuneration was solicited or received

23   for the purpose of inducing the purchase of an item or

24   service.

25        Third, that the item was one for which payment was or

1    might be made, in whole or in part, under a federal health

2    care program.

3          Fourth, that the defendant acted knowingly and

4    willfully -- you've heard those terms -- when soliciting or

5    receiving the remuneration.

6          And fifth, that the remuneration was provided to a

7    decision-maker who could influence healthcare decisions on

8    behalf of patients.

9          Remuneration may be solicited or received directly or

10   indirectly, overtly or covertly, in the open or secretly.

11   Remuneration may be cash or in kind remuneration.

12         The other object of the conspiracy to commit an offense

13   against the United States is a violation of the Anti-Kickback

14   Statute by paying kickbacks in connection with federal health

15   care program payments.  The crime of paying kickbacks in

16   connection with federal health care program payments has the

17   following four elements:

18         First, the defendant paid or offered to pay to a

19   decision-maker who made medical decisions on behalf of

20   payments any remuneration, including any kickback, bribe, or

21   rebate.

22         Second, that the remuneration was paid or offered to a

23   decision-maker for the purpose of inducing the furnishing or

24   arranging for the furnishing of any item or service.

25         Third, that the item or service was one for which

1   payment was or might be made, in whole or in part, under a

2   federal health care program.

3        And, fourth, that the defendant acted knowingly and

4   willfully when paying or offering to pay the remuneration.

5        Now, that's Count 5.  That's the conspiracy.

6        Now I want to talk about Counts 6 through 8.  Those

7   charge the defendant with committing violations of the

8   Anti-Kickback Statute itself.

9        The crime of soliciting or receiving kickbacks in

10  connection with federal health care program payments is the

11  following five elements.

12       First, the defendant solicited or received a kickback

13  or bribe.

14       Second, that the remuneration was solicited or received

15  for the purpose of inducing the purchase of an item or

16  service.

17       Third, the item was one for which payment was or might

18  be made, in whole or in part, under a federal health care

19  program.

20       Fourth, that the defendant acted knowingly and

21  willfully when soliciting or receiving the remuneration; and

22       Fifth, that the remuneration was provided to a

23  decision-maker who could influence healthcare decisions on

24  behalf of patients.

25       As before, remuneration can be solicited or received,

1  directly or indirectly, overtly or covertly, and remuneration

2  can be in cash or in kind.

3       I'm gonna walk through the various elements of what we

4  have just talked about.

5       The first element is the United States has to prove

6  beyond a reasonable doubt that the defendant knowingly and

7  willfully paid or received remuneration.

8       I already told you about the definitions of knowingly

9  and willfully when I instructed you before on mental states at

10  the top and those same definitions are applicable here.

11       Remuneration means something of value in whatever form.

12  Remuneration can be paid in cash or kind such as through

13  giving property.  Remuneration includes the payment of a

14  kickback or bribe.

15       Remuneration can be offered, paid, solicited, or

16  received overtly and openly or covertly and secretly.

17  Remuneration may be offered to pay directly to the recipient

18  or offered to be paid indirectly through another.

19       Now, in Count 5 through 8 I used that term "to induce."

20  I want to tell you what that means.  You'll see it when you

21  look back at the page.

22       To induce as that term is used in the instructions for

23  Counts 5, 6, 7, and 8, that means to attempt to gain influence

24  over the reason or judgment of a person improperly or

25  corruptly.

1          The United States must prove beyond a reasonable doubt

2     that a remuneration, a kickback, or bribe, as that term is

3     defined in these instructions, was paid improperly or

4     corruptly or explicitly as a quid pro quo in return for a

5     decision by a decision-maker.

6          In order to sustain its burden of proof for the crime

7     charged in Counts 5, 6, 7, and 8 of the indictment, the

8     United States must prove beyond a reasonable doubt that the

9     primary or material purpose of the remuneration, kickback, or

10    bribe, was the improper or corrupt inducement, not that this

11    was for some incidental or minor purpose.

12         It is not unlawful to hope or expect or believe that

13    purchases would result from the payment of remuneration to a

14    customer that was designed for other purposes.  The

15    expectation of profit or creation of a favorable business

16    relationship does not violate the statute charged in the

17    indictment.

18         We're on to the third element of the Anti-Kickback

19    Statute.  That's that the items or services for which

20    remuneration was paid or received were paid for, in whole or

21    in part, by a federal health care program.

22         The term "federal health care program," that means any

23    plan or program that provides health benefits, whether

24    directly or indirectly, through insurance or otherwise, which

25    is funded directly, in whole or in part, by the United States

1    government.

2         A violation of the Anti-Kickback Statute does not

3    require proof that money or funds used to pay the kickback or

4    remuneration came from federal funds or that the United States

5    lost any money as a result of the alleged misconduct.

6    Similarly, it is not necessary to show the illegal payments

7    increased costs to the Government.

8         Okay.  Now, under the Medicare statute in effect at the

9    time of the alleged events, an item was required to be

10   medically necessary to be reimbursable by Medicare.  Medicare

11   regulations did not define the term "medical necessity."

12        During the trial, you'll recall there was some

13   testimony about Medicare's audit rules, civil penalties, and

14   other guidelines.  A violation of those rules, civil

15   penalties, and other guidelines, is not in and of itself a

16   crime and it does not necessarily mean that a crime has been

17   committed.

18        A defendant cannot be convicted of a crime -- cannot be

19   convicted of a crime merely for breaching these types of audit

20   rules, civil penalties, or other guidelines.

21        In deciding whether the United States has met its

22   burden of proof regarding the elements of the charged crimes,

23   you have to decide if the United States has proved that the

24   defendant had certain states of mind at the time of the

25   charged crimes.

1      We have been talking about that throughout, things like

2  knowingly and willfully.

3      Often, the state of mind with which a person acts at a

4  given time simply can't be proved directly because you can't

5  read another person's mind and tell what that person is

6  thinking.

7      But the defendant's respective states of mind can be

8  proved indirectly from the surrounding circumstances.  Thus,

9  to determine a state of mind such as what he intended or knew

10  at a particular moment, you can consider evidence about what

11  he said or did or failed to do, how the defendant acted and

12  all the other facts and circumstances shown by the evidence

13  that may prove what was in his mind at the time.

14      It is entirely up to you to decide what that evidence

15  presented during this trial proves, or fails to prove, about

16  his state of mind.

17      You can also consider the natural and probable results

18  or consequences of any acts that the defendant normally did

19  and whether it's reasonable to conclude that the defendant

20  intended those results or consequences.  You can find, but

21  you're not required to find, that the defendant knew and

22  intended the natural and probable consequences or results of

23  acts he knowingly did.

24      This means that if you find an ordinary person in the

25  defendant's situation would have naturally realized that

1    certain consequences would result from his actions, then you

2    may find, but, again, you're not required to find, that the

3    defendant did know and did intend that those consequences

4    would result from his actions.

5         That is entirely up to you to decide as the finders of

6    facts.  You are the jurors in the case and you are the finders

7    of facts.

8         Now, not the conspiracy counts but the non-conspiracy

9    counts which lawyers call substantive counts, those are

10   Counts 2, 3, and 4, and Counts 6, 7, and 8.  Those also charge

11   aiding and abetting in addition to the substantive charges of

12   health care fraud and violation -- I'm sorry -- charge aiding

13   and abetting in addition to the substantive charges of health

14   care fraud and violations of the Anti-Kickback Statute.

15        A person can be guilty of an offense because he

16   personally committed the offenses himself or because he aided

17   and abetted another person in committing the offense.

18        A person who has aided and abetted another person in

19   committing an offense is often called an accomplice.  The

20   person whom the accomplice aids and abets, that person is

21   called the principal.

22        In order to find a defendant guilty of health care

23   fraud or a violation of the Anti-Kickback Statute because he

24   aided and abetted another in committing those offenses, you

25   have to find that the United States proved beyond a reasonable

1    doubt each of four requirements:

2          First, that another person committed the offense

3    charged by committing each of the elements of that offense, as

4    I have explained those elements to you in these instructions.

5    That person need not have been charged with or found guilty of

6    the offense, however, as long as you find the United States

7    proved beyond a reasonable doubt that he committed the

8    offense.

9          Second, that the defendant knew that the offense

10   charged was going to be committed or was being committed by

11   the other person;

12         Third, that the defendant knowingly did some act for

13   the purpose of aiding, assisting, soliciting, facilitating, or

14   encouraging that person in committing the specific offense

15   charged and with the intent that the other person commit that

16   specific offense; and

17         Fourth, that the defendant performed at least one act

18   in furtherance of the offense charged.

19         In deciding whether the defendant had the required

20   knowledge and intent to satisfy the requirements of aiding and

21   abetting, you have to consider both -- you may consider --

22   excuse me -- both direct and circumstantial evidence,

23   including the defendant's words and actions and other facts

24   and circumstances.

25         However, evidence that the defendant merely associated

1   with other persons involved in a criminal venture or was

2   merely present or was merely a knowing spectator during the

3   commission of an offense is not enough to find the defendant

4   guilty as an aider and abbetor.

5        If the evidence shows that the defendant knew the

6   offense was being committed or was about to be committed but

7   does not also show beyond a reasonable doubt that it was the

8   defendant's intent and purpose to aid, assist, encourage,

9   facilitate, or otherwise associate himself with the offense,

10  you must not find the defendant guilty of that offense as an

11  aider and abettor.

12       The United States must prove beyond a reasonable doubt

13  that the defendant in some way participated in the offense

14  committed by the other person as something the defendant

15  wished to bring about and to make succeed.

16       To show that the defendant performed an act in

17  furtherance of the offense charged, to satisfy the fourth

18  requirement of aiding and abetting, the United States needs to

19  show some affirmative participation by the defendant which at

20  least encouraged another person to commit the offense.  That

21  is, you have to find that the defendant's act or acts did in

22  some way aid, assist, facilitate, encourage that other person

23  to commit the offense.

24       The defendant's act or acts need not further aid,

25  facilitate every part or phase or element of the offense

1    charged.  It is enough if the defendant's act or acts further

2    aid, assist, facilitate, or encourage only one or some part or

3    parts or phases or elements of the offense.  Also, the

4    defendant's acts need not themselves be against the law.

5         Now, sticking with Count 2, 3, and 4, not the

6    conspiracy counts, and also Counts 6, 7, and 8, again not the

7    conspiracy counts, those are the ones that are the substantive

8    allegations.

9         As to these, the United States may prove a defendant

10   guilty of these offenses by proving that he personally

11   committed them.  The United States may also prove the

12   defendant guilty of these offenses based on the legal rule

13   that each member of a conspiracy is responsible for crimes and

14   other acts committed by the other members, as long as those

15   crimes and acts were committed to help further or to help

16   achieve the objective of the conspiracy and were reasonably

17   foreseeable to the defendant as a necessary or natural

18   consequence of the agreement.

19        In other words, under certain circumstances, the act of

20   one conspirator may be treated as the act of all.  This means

21   that all the conspirators may be convicted of a crime

22   committed by any one or more of them, even though they did not

23   all personally participate in that crime themselves.

24        In order for you to find the defendant guilty of health

25   care fraud or violating the Anti-Kickback Statute based on

1    this legal rule, you must find that the United States proved

2    beyond a reasonable doubt each of the following four

3    requirements:

4          First, the defendant was a member of one or both of the

5    conspiracies charged in the superseding indictment.

6          Second, while the defendant was still a member of the

7    conspiracy or conspiracies, one or more of the other members

8    of the conspiracy or conspiracies committed the offenses

9    charged in Counts 2 through 4 or Counts 6 through 8 by

10   committing each of the elements of the offenses, as I've

11   explained them to you here.  However, the other member of the

12   conspiracy or conspiracies need not have been found guilty of

13   or even charged with the offenses, as long as you find that

14   the United States proved beyond a reasonable doubt that the

15   other member committed the offenses.

16         Third, the other member of the conspiracy or

17   conspiracies committed these offenses within the scope of the

18   unlawful agreement and to help further or achieve the

19   objectives of the conspiracy or conspiracies; and

20         Fourth, these offenses were reasonably foreseeable to

21   or reasonably anticipated by the defendant as a necessary or

22   natural consequence of the unlawful agreement.

23         The United States does not have to prove that the

24   defendant specifically agreed or knew that these offenses

25   would be committed.  However, the United States must prove

1    that the offenses were reasonably foreseeable to the

2    defendant, as a member of the conspiracy or conspiracies, and

3    within the scope of the agreement as he understood it.

4         You can't draw any inference -- favorable, unfavorable,

5    no inference -- toward the United States or the defendant on

6    trial from the fact that certain persons are not named as

7    defendants in the indictment or are not here.  The fact that

8    these persons are not on trial has to play no part in your

9    deliberations.

10        It should be of no concern to you, and you shouldn't

11   speculate as to the reason why somebody may or may not be here

12   on trial.  That person's absence shouldn't influence your

13   verdict with respect to the defendant on trial here.  You have

14   to base your verdict as to the defendant solely on the

15   evidence against him.

16        During trial, there was testimony that lawyers,

17   sometimes with assistance from others, have interviewed some

18   witnesses who testified in order to prepare them for trial.

19   No adverse inference should be drawn from that.  Indeed, both

20   parties -- both parties -- had a right, a duty, and obligation

21   to conduct those interviews and prepare this case fully as

22   thoroughly as they could.  They might have been derelict in

23   the performance of their duties if they did not question the

24   witnesses as the investigation progressed and during their

25   preparation for this trial.

1          A couple times the United States and the defendant have

2    agreed that the facts set forth in a stipulation are true.

3    You should, therefore, treat these facts as having been

4    proved.  You are not required to do so since you are the sole

5    judge of the facts.

6          You will note that the superseding indictment charges

7    that the offenses were committed on or about a certain date.

8    The United States does not have to prove with certainty the

9    exact date of the alleged offenses.  It is sufficient if the

10   United States proves beyond a reasonable doubt that the

11   offenses charged were committed on a date reasonably near

12   those dates alleged.

13         Now, you're gonna see that the word "and" is used

14   between certain charging words in the indictment.  For

15   example, Count 1 of the indictment says that the object of the

16   conspiracy was for the defendant to commit health care fraud

17   and to commit wire fraud.  Count 5, similarly, it says the

18   object of the conspiracy was for the defendant to knowingly

19   and willfully solicit and receive remuneration and to

20   knowingly and willfully offer and pay remuneration.

21         But even though the word "and" appears in the

22   superseding indictment in this way, the United States does not

23   have to prove that the defendant did both things.  It's enough

24   for the United States to prove that the defendant did one of

25   the things charged in a particular count.

 1          In other words, you should treat the word "and" as it

 2   appears in the indictment as if it is the word "or."  Treat

 3   "and" as if it is "or."

 4          For example, in Count 1, it is enough for the

 5   United States to prove either that the defendant did conspire

 6   to commit health care fraud or that he committed wire fraud.

 7   Similarly, it is enough for the United States to prove either

 8   that the defendant conspired to knowingly, willfully solicit

 9   and receive remuneration, or that he knowingly and willfully

10   offered and paid remuneration.

11          An important exception to this rule is the portion of

12   counts that charge that the defendant acted with certain

13   mental states like knowingly and intentionally.  In those

14   instances, knowingly and intentionally, you have to find that

15   each of the required elements exist in order to find the

16   defendant guilty on that particular count.

17          So when it comes to mental states "and" means "and"; it

18   doesn't mean "or."

19          Now, the United States presented certain charts and

20   summaries in order to help explain information that was

21   admitted as evidence in this case.  The charts and summaries

22   are not themselves evidence or proof of any facts.  It's the

23   underlying evidence that you have to consider.  If the charts

24   and summaries do not correctly reflect the evidence in the

25   case, you should disregard them and determine the facts from

1    the underlying evidence.

2         In deciding what the facts are, you have to decide what

3    testimony you believe and what testimony you do not believe.

4    You are the sole judges of the credibility of the witnesses.

5         Credibility refers to whether a witness is worthy of

6    belief.  Was the witness truthful?  Was the witness's

7    testimony accurate?  You may believe everything a witness says

8    or only a part of it or none of it.

9         You can decide whether to believe a witness based on

10   his or her behavior and manner of testifying, the explanations

11   and information the witness gave, and all the other evidence

12   in the case, just as you would in any important matter when

13   you're trying to decide if a person is truthful,

14   straightforward, and accurate in their recollection.

15        In deciding questions of credibility, you use your

16   common sense, your good judgment, your experience, and your

17   assessment of all the evidence in the case.

18        In deciding who to believe, what to believe, here are

19   some factors you might want to potentially consider:

20        The opportunity and ability the witness had to see or

21   hear and know the things about which they're testifying.

22        The quality of the witness's knowledge, understanding,

23   and memory.

24        The witness's behavior, appearance, manner while they

25   were testifying.

1        Whether the witness has an interest in the outcome of

2   the case or any motive or bias or prejudice.

3        Any relation the witness may have with a party in the

4   case and any effect the verdict or proceedings may have on the

5   witness.

6        Whether the witness said or wrote anything before trial

7   that was different than the witness's testimony in court.

8        Whether the witness's testimony was consistent or

9   inconsistent with other evidence that you believe.

10       And any other factors that bear on whether the witness

11  should be believed in your judgment.

12       Inconsistencies or discrepancies in a witness's

13  testimony or between the testimony of different witnesses may

14  or may not cause you to disbelieve a witness's testimony.  Two

15  or more people witnessing an event can simply see it or hear

16  it a bit differently.

17       Mistaken recollection, like failure to recall, that's a

18  common human experience.  In weighing the effect of an

19  inconsistency, you should also consider whether it was about a

20  matter of real importance or an insignificant detail.

21       You should also consider whether the inconsistency was

22  innocent or intentional.  You are not required to accept

23  testimony even if the testimony was not contradicted and the

24  witness was not impeached.

25       You may decide that the witness is not worthy of belief

1   because of the witness's bearing and demeanor, or because the

2   inherent improbability of the testimony, or for any other

3   reason that is sufficient in your judgment.

4        After making your own judgment about the believability

5   of the witness, you can then attach to that witness's

6   testimony the importance or the weight that you think it

7   deserves.

8        The weight of the evidence to prove a fact does not

9   necessarily depend on the number of witnesses who testified or

10  the quality *[sic]* of evidence that was presented.  What is

11  more important than numbers or quantity is how believable the

12  witnesses were and how much you think their testimony

13  deserves.

14       Now, you've heard here the testimony of a law

15  enforcement officer, at least one.  The fact that a witness is

16  employed as a law enforcement officer does not mean that his

17  or her testimony -- and you have heard more than one -- does

18  not mean that his or her testimony necessarily deserves more

19  or less consideration or greater or lesser weight than that of

20  any other witness.

21       You have to decide, after reviewing all the evidence,

22  whether you believe the particular testimony of a law

23  enforcement witness and how much weight, if any, you think it

24  deserves.

25       You've heard evidence that certain individuals are

1    alleged co-conspirators and have entered into a plea

2    agreement.  In the case of Armani Adams and Shannon Haas and

3    David Laughlin and Nadia Levit and Kareem Memon and Kenneth

4    Pitter all are -- have a cooperating non-prosecution agreement

5    with the Government.

6        Their testimony was received in evidence and it can be

7    considered by you.  The United States is permitted to present

8    the testimony of someone who has reached a plea bargain or is

9    entering into a cooperating non-prosecution agreement with the

10   United States in exchange for his or her testimony.  You

11   should consider the testimony of such a witness with great

12   care and caution.

13       In evaluating the witness's testimony, you should

14   consider this factor along with the factors that I have

15   brought up just a moment ago.  Whether or not the witness's

16   testimony may have been influenced by the agreements he or she

17   entered into with the United States is for you to determine.

18   You may give the witness's testimony such weight as you think

19   it deserves.

20       You must not consider a witness's guilty plea or

21   cooperating non-prosecution agreement as evidence of the

22   defendant's guilt.  An individual's decision to plead guilty

23   or enter into a non-prosecution agreement is a personal

24   decision about his or her own guilt.

25       Such evidence is offered only for one or more of the

```
 1    following circumstances:
 2            To allow you to assess the credibility of the witness;
 3            to eliminate any concern that the defendant has been
 4    singled out for prosecution; and
 5            to explain how the witness came to possess detailed
 6    firsthand knowledge of the events about which they testified.
 7            You may consider the witness's guilty plea and
 8    non-prosecution agreement only for those purposes.
 9            There was some testimony I want to mention to you.  The
10    testimony of someone who abuses narcotics must be examined and
11    weighed by the jury with greater care than the testimony of
12    the witness who does not.  The jury must determine whether the
13    testimony of someone who abuses narcotics has been affected by
14    the drug use or the need for drugs.
15            You have heard the testimony of certain witnesses.  You
16    have also heard that before this trial some of them made
17    statements that may be different from their testimony made
18    here.
19            It's up to you to determine whether those statements
20    were made and whether they were different from the witness's
21    testimony here.
22            These are statements that were brought to your
23    attention to help you decide whether to believe the witness's
24    testimony here at trial.  You can't use that as proof of the
25    truth of what the witness may have said in earlier statements.
```

1  You can only use it as one way of evaluating the witness's

2  testimony here from the witness box.

3       You heard evidence that certain witnesses previously

4  were convicted of crimes punishable by more than one year in

5  jail.  You can consider this evidence, along with other

6  pertinent evidence in deciding whether or not to believe these

7  witnesses and how much weight to give their testimony.

8       If you believe that a witness knowingly testified

9  falsely concerning any important matter, you may distrust the

10  witness's testimony concerning other matters.  You can reject

11  all of the testimony or you can accept such parts of the

12  testimony that you believe are true and give it as much weight

13  as you think it deserves.

14       As to the defendant's testimony, you should examine and

15  evaluate it just as you would the testimony of any witness.

16       Finally, the superseding indictment alleges that some

17  act in furtherance of each of the offenses occurred here in

18  the District of New Jersey, which means the State of

19  New Jersey.  There's no requirement that all aspects of each

20  of the offenses charged or that the entire conspiracy took

21  place here in the District of New Jersey.  But for you to

22  return a guilty verdict, the Government must convince you that

23  for each count, some meaningful act in furtherance of the

24  crimes charged took place here in the District of New Jersey;

25  that is, as to the conspiracies in Counts 1 and 5.

1          In addition to that, as to Counts 2, 3, and 4, the

2    meaningful act in furtherance of those counts must have been

3    causing the delivery of DME into New Jersey.  Durable medical

4    equipment.

5          As to Counts 6, 7, and 8, the meaningful act in

6    furtherance of those counts must have been either causing the

7    delivery of DME into New Jersey or receiving a payment into

8    New Jersey or the signing of a doctor's order in New Jersey.

9          Unlike the elements of the charged offenses that I have

10   described so far, this set of facts as to the connection to

11   New Jersey, as I have just described to you, only has to be

12   proved by a preponderance of the evidence.  This means the

13   United States only has to convince you that it's more likely

14   than not that these acts took place here.

15         Remember that the United States must prove all of the

16   elements of the crimes charged beyond a reasonable doubt.

17         Here is where I'm planning to stop.  The time is 3:17.

18   We can either get started with the first summation.  We'll

19   have to stop at some point and pick it up back on Thursday

20   morning, or you could take a bathroom break and we can come

21   back in, or we can call it a day.

22         I want to ask the jury how they want to proceed.

23         Do you want to get started with the summation now, do

24   you want to take a break, or do you want to end the day and

25   pick it up on Thursday morning?  I'm going to ask you for a

 1    show of hands.

 2          Who wants to just get started right now?

 3          We have a bunch of people who want to do that.

 4          Anybody want to just call it right now?  I have a

 5    couple people who want to call it.  I think there's a

 6    little bit of out-voting.

 7          Of the people who want to call it, do you need a

 8    bathroom break now?  Does anyone else in the courtroom need a

 9    bathroom break?

10          Okay.  We're gonna take a bathroom break and we will

11    come back.  It's now 3:18.  We will come back and be ready to

12    start at 3:30.  We will begin the summation, and then we'll

13    call it at exactly four o'clock.

14          Let's all rise and we'll get back on at 3:30.

15          (The jury exits the courtroom at 3:18 p.m.)

16              (Whereupon, the following proceedings were held

17               outside the presence of the jury:)

18          THE COURT:  The door is shut.  The jury has left.

19    Let's all please be seated briefly.

20          Any issues with respect to the jury instructions as

21    delivered that's been brought to my attention from the

22    United States?

23          MR. WEBMAN:  No, Your Honor.

24          MS. SOLANO:  No, Your Honor.  I note that what you

25    noted, the sentence about implicit process, so the Government

 1   and I both read -- it comes from the *Jones* case, and I re-read

 2   the *Jones* case and we have no objection to it not being read.

 3          THE COURT:  That's what I figured.  I felt that as

 4   it was happening and decided not to.  Nothing else?

 5          MS. SOLANO:  No, Your Honor.

 6          THE COURT:  So we will come back and be ready to start

 7   at 3:30.  Thank you all.

 8              (Recess taken.)

 9          THE COURTROOM DEPUTY:  All rise.

10              (Whereupon, the following proceedings were held

11               outside the presence of the jury:)

12          MR. WEBMAN:  As Your Honor was reading, I think in

13   addition to the one point that we talked about before, there

14   were one or two other places where Your Honor made changes on

15   the fly.

16          There was the one stray reference to controlled

17   substances obviously, and then there were a few other things

18   like referring to the defendant as "the defendant" rather than

19   Mr. Naviwala which was in there, and referring to the

20   Government as "The United States."  I think in many places you

21   referred to the superseding indictment as just the indictment.

22          Would you like me to re-file with those things fixed or

23   just send them back to the jury as is?

24          THE COURT:  You should send it back to the jury with

25   the removal of the things we talked about, which is to say the

1  legal citations both below the footnotes and the heading in

2  one particular place.

3      You should change the headings that say request no. 1,

4  2, 3, to instruction 1, 2, 3, and otherwise those are the

5  things we discussed.  Nothing else should be changed from what

6  the parties agreed to.

7      There is one exception.  The one exception is the

8  controlled substance thing has to come out.  Everyone knows

9  that's a mistake and that is obviously just a potentially odd

10  wildcard.  I assume the defendant sees everything exactly as I

11  just said it.

12      MS. SOLANO:  Of course, Your Honor.

13      THE COURT:  Let's get the jury out.  I think they're

14  ready.

15      THE DEPUTY CLERK:  All rise.

16          (Jury enters the courtroom at 3:34 p.m.)

17          (Whereupon, the following proceedings were held in

18          the presence of the jury:)

19      THE COURT:  Members of the jury, we're back.  Please

20  have a seat.

21      We're on to the next stage of the trial which is

22  the summations from the lawyers, and it's over to the

23  United States for the beginning of its summation.

24      I'm gonna cut Mr. Specht -- I'm going to cut him off

25  unceremoniously at 3:59 so we can get everyone home at

1    four o'clock.

2          Just a reminder, no court tomorrow, no court Wednesday.

3    We'll be back here with Mr. Specht resuming on Thursday

4    morning at 9:00.

5                       CLOSING ARGUMENT

6          MR. SPECHT:  Thank you, Your Honor.

7          If I could request that the screen also be made visible

8    to the jury.

9          This case is about greed and deception.  The defendant

10   used multiple companies, The Prudent Group, Elite Healthcare

11   Solutions, and Parra Health, to commit crimes.

12         The defendant and his co-conspirators treated signing

13   prescriptions like commodities to be sold at volume; signed

14   prescriptions for braces people didn't need, people didn't

15   want.

16         The defendant has admitted to committing crimes.  FBI

17   Special Agent Katie Latrenta explained that the defendant was

18   charged with a crime, got a lawyer, voluntarily met with the

19   FBI, admitted to violating the law.

20         And here in this courtroom the defendant took the

21   stand, and when he was confronted with documentary evidence,

22   he had no choice but to admit committing crimes, no choice but

23   to admit treating the prescriptions like commodities to get

24   him kickbacks.

25         Medicare and other health insurance is a trust-based

1  system.  It has to be.  There are so many transactions

2  processed every day.  The defendant abused that trust to make

3  more than $10 million.

4       The goal was clear: to fraudulently get money from

5  health insurance by health care fraud, hide the fraud so it

6  could continue.

7       Why hide their conduct?  The defendant and his

8  co-conspirators knew it was illegal.  The defendant and his

9  co-conspirators hid their conduct when they signed sham

10 contracts, created sham invoices, used and paid telemedicine

11 doctors to sign prescriptions, even when the doctor didn't

12 know the patient; hadn't spoken to the patient, couldn't

13 determine if the patient needed a brace; when they edited

14 recordings of phone calls sent to telemedicine doctors.

15      And when the scheme started to unravel, the defendant

16 spoke to John Fusco, one of his owners on paper.  What did the

17 defendant say?  "Don't rat me out."

18      You sat in this courtroom for several weeks.  You have

19 seen e-mails, text messages, contracts, invoices.  You have

20 listened to audio recordings of patients and telemarketers,

21 and you've heard testimony from people who participated in the

22 fraud, and you've seen the beneficiaries.

23      You saw Diane DiPalma and the braces that she received

24 at her house in New Jersey.  She talked about them here in

25 this courtroom.

CLOSING ARGUMENT - BY MR. SPECHT                    *2394*

1        Today, and on Thursday, we'll talk about how all of the

2   evidence fits together; how it shows beyond a reasonable doubt

3   the defendant is guilty of each and every crime that he is

4   charged with.

5        Before we get into the details, let's talk for a moment

6   about the big picture.  The evidence that you have seen, the

7   evidence that you have heard, it shows that health insurance

8   pays a lot of money.  That includes paying a lot of money for

9   things like orthotic braces, back braces, knee braces.

10       The defendant and his partners understood that health

11  insurance only paid for braces in certain circumstances where

12  it was appropriate, and the defendant and his partners got

13  lists of patient information and had telemarketers convince

14  the patients they wanted a brace.  Again, you heard multiple

15  of those phone calls during this trial.

16       And then the defendant and his partners at The Prudent

17  Group or at Elite Healthcare Solutions edited some of the

18  recordings of the telemarketer calls, sent those edited phone

19  calls to telemedicine doctors who were paid to write a

20  prescription for one or three or five or nine braces for a

21  patient.

22       The defendant didn't go into a patient's real doctor.

23  The defendant went to doctors associated with telemedicine

24  companies like Ken Pitter's Telemedex, David Laughlin's

25  RediDoc, where the doctors could be fooled by the phone calls

CLOSING ARGUMENT - BY MR. SPECHT

1    that were edited, where the doctors were just expected to sign

2    a prescription, where the doctors didn't have to even speak to

3    a patient, didn't even have to listen to that recorded phone

4    call.

5         Shannon Haas herself, who was one of those doctors,

6    explained how she just clicked through the patient file to

7    sign a prescription for a patient.  And then the defendant

8    arranged for those prescriptions to get billed to health

9    insurance through DME companies.

10        He controlled at least one DME company.  You have heard

11   about Parra Health.  And the defendant kept some of the very

12   best prescriptions for his company Parra Health to bill.

13        The best prescriptions being ones for the most

14   expensive braces, like back braces, or ones that avoided

15   strict, private insurance companies.

16        And other prescriptions, the ones that didn't get

17   billed to Parra Health, the defendant sold them.  Sold them to

18   Armani Adams, sold them to Ken Pitter, sold them to

19   Nadia Levit; and then Adams, Pitter, or Levit, could use their

20   DME companies to bill health insurance.

21        You've seen the e-mails where the defendant sells

22   prescriptions.  You've seen the wires where he gets paid.  The

23   defendant knew those DME companies would bill Medicare and

24   other health insurance for braces based on those prescriptions

25   that he sold.  That was the whole plan.  That was how he made

CLOSING ARGUMENT - BY MR. SPECHT

1    money.

2        For his role in the scheme, the defendant was charged

3    in an eight-count indictment.  The eight counts fall into

4    basically four categories.

5        First category:  Conspiracy to commit health care fraud

6    and wire fraud.  The defendant agreed with other people to lie

7    to get money from health insurance, including Medicare.

8        Second category: health care fraud related to three

9    specific patients:  Diane DiPalma, Joanne Frantantoni, and

10   Frank Pringle.  The defendant called health insurance to pay

11   for braces for these three patients, all of who lived in

12   New Jersey, even though these braces weren't necessary.

13       Third category:  Conspiracy to violate the

14   Anti-Kickback Statute.  The defendant agreed to sell

15   prescriptions to Ken Pitter or Armani Adams or Nadia Levit in

16   exchange for money.

17       And the fourth category:  Illegal kickbacks related to

18   three specific payments.  The defendant caused Armani Adams to

19   pay him three separate payments of $200,000 each in exchange

20   for selling patient information.

21       Let's talk for a moment about the defendant's

22   testimony.  As the Judge explained, the defendant has no

23   burden in this case, has the right not to testify; but here in

24   this case, the defendant chose to testify and his testimony,

25   his credibility are to be weighed like you weigh the testimony

1   and credibility of other witnesses.

2        Your job is to assess how his credibility stacks up by

3   studying his demeanor, evaluating how his testimony fits in

4   with the testimony of other witnesses and with the documents.

5        Here, the defendant took the stand, admitted to his

6   role in an illegal kickback scheme, which relates to the

7   counts charged in Counts 5, 6, 7, and 8.

8        The defendant sold prescriptions like they were

9   commodities.  But the defendant has also tried to erase

10  himself from the narrative as to the fraud scheme charged in

11  Counts 1, 2, 3, and 4.

12       He testified that there were other people running the

13  show; that he thought the telemedicine doctors were doing

14  legitimate doctor-patient consultations.

15       Consider the defendant's testimony against that of his

16  criminal partners -- Ken Pitter, Armani Adams, David Laughlin,

17  Kareem Memon, Nadia Levit -- witnesses who testified about

18  their role in the conspiracy, about knowing they were

19  violating the law, persisting because they made a lot of

20  money.

21       These people came to court and they testified to

22  committing crimes with the defendant, and they explained that

23  they got a cooperation agreement with the Government that

24  requires them to testify honestly.  They told you if they

25  aren't honest, they could lose their cooperation agreement,

CLOSING ARGUMENT - BY MR. SPECHT                    **2398**

1    could get in trouble.

2          These witnesses all agreed on one thing: the defendant

3    committed crimes with each of them.  But the defendant would

4    have you believe that these men and women are lying, each of

5    them.  That he is the one telling the truth.

6          The defendant, the person who is on trial here who has

7    by far the most to lose, use your common sense.  That just

8    doesn't add up, doesn't make sense.  It is the defendant, and

9    not all those other people, who took the stand and lied.

10          The testimony of all those other witnesses is

11    corroborated by e-mails and by text messages, including those

12    from the defendant himself, showing that he's managing people

13    in this scheme; he is making demands of telemedicine

14    companies; he's setting up fake owners; he's earning millions

15    of dollars.

16          Ask yourself:  Why go through such efforts to use fake

17    owners, to use fake invoices?  It's because the defendant knew

18    he was committing crimes because he is guilty of those crimes.

19          It is the United States' burden to prove each and every

20    element of the charges presented to you beyond a reasonable

21    doubt, and we welcome that burden, which is the same standard

22    applied in every criminal case across the country.

23          You have heard evidence in this case, and we won't be

24    able to review it all.  Over the next few minutes, and again

25    on Thursday, I am going to walk through the evidence as to

CLOSING ARGUMENT - BY MR. SPECHT

1   each and every count to demonstrate there is only one verdict

2   consistent with the evidence in this case, consistent with

3   your common sense, consistent with the defendant's own

4   statements, and that is a verdict of guilty on all counts.

5          Of course, the only person who can tell you what the

6   law is is the Judge.  If anything I say deviates from anything

7   that the Judge has said, of course it's what the Judge says

8   that matters.

9          Let's talk about Count 1.  Count 1 charges the

10  defendant with conspiracy, so does Count 5, and we'll talk

11  about that a little bit more later.  A conspiracy is just two

12  or more people who agree to do something unlawful.

13         As the Judge has instructed, the United States doesn't

14  have to prove a written or a formal agreement.  You can find a

15  conspiracy existed based even on circumstantial evidence that

16  there is a mutual understanding between two or more people.

17         The United States does not have to prove all members of

18  the conspiracy directly met or even knew each other.  The

19  important thing is the common and the unlawful goal.

20         So, for example, you can conclude that the defendant

21  didn't meet Dr. Shannon Haas, the telemedicine doctor who

22  testified, but the defendant knew telemedicine doctors like

23  Dr. Haas existed and were part of the conspiracy.  The

24  defendant and Dr. Haas and others shared the same goal:

25  getting money from insurance.

CLOSING ARGUMENT - BY MR. SPECHT

1      As to Count 1, the illegal conduct is health care fraud

2   and wire fraud, and the United States has to show that the

3   defendant entered into an agreement with one other person as

4   to healthcare fraud and wire fraud.  But the evidence has

5   shown that the defendant entered into an agreement with

6   multiple people to commit health care fraud and to commit wire

7   fraud as part of their shared goal to get money.

8      There has been substantial evidence of a criminal

9   partnership and a relationship in this case between the

10  defendant and others to commit health care fraud and wire

11  fraud.  The defendant sent patient information to David

12  Laughlin at RediDoc and Ken Pitter at Telemedex to get

13  prescriptions patients didn't need.

14     The defendant sold prescriptions to DME companies,

15  including Nadia Levit's DME companies here in New Jersey, all

16  while knowing what the DME companies promised not to bill

17  Medicare for prescriptions acquired through kickbacks.

18     The defendant worked with his business partner,

19  Kareem Memon, to get those leads, to get telemedicine doctors

20  to sign prescriptions, and to sell prescriptions.  Testimony

21  tells that story.  And the testimony is corroborated by

22  invoices, by contracts, by e-mails and text messages.

23     Health care fraud and wire fraud require that the

24  defendant participated in a scheme to defraud, that he

25  intended to defraud.  A primary difference between the two

1  statutes is that, for health care fraud, the victim needs to

2  be a health insurer; and for wire fraud, the defendant needs

3  to send or cause someone to send an interstate communication

4  or a wire.

5       Those last two points aren't reasonably in dispute.  As

6  to the health care fraud, the victim of the defendant's crime

7  was a health insurer.  Actually, multiple health insurers.

8       You have seen the checks from Medicare.  You have seen

9  checks from TRICARE.  You have seen the list of patients that

10 specified their insurance carrier.

11      As to the wire fraud, you've seen wire reports showing

12 that Armani Adams and his company sent wire payments to the

13 defendant's companies.  Robert Amenta, a witness from the

14 Federal Reserve Board, testified that each of those wires,

15 like every wire in the Federal Reserve Fedwire system, travels

16 in interstate commerce.

17      Those are elements that have been met.

18      We'll focus for now on the defendant's intent to

19 defraud.  You have heard testimony from several witnesses that

20 they agreed with the defendant to commit fraud, meaning they

21 were all focused on the same goal of getting money by

22 submitting claims to insurance for orthopedic brace

23 prescriptions without regard to medical necessity.

24      First and foremost, the defendant signed Medicare

25 documents.  His signature appeared on multiple Medicare forms

CLOSING ARGUMENT - BY MR. SPECHT

 1   going back to 2017.  He agreed to "not knowingly cause to be

 2   presented a false or fraudulent claim for payment by

 3   Medicare," and he acknowledged Medicare's payments were

 4   conditioned on compliance with, among other things, the

 5   federal Anti-Kickback Statute.

 6        Despite these requirements, the defendant schemed to

 7   defraud Medicare out of money, and that scheme can be seen in

 8   false statements.

 9        For example, here is a Parra Health organizational

10   chart submitted to Medicare that lists the defendant as an

11   office manager, but he's not an office manager.  He is just

12   listed as an office manager to conceal his role from Medicare.

13        The defendant admitted that during his testimony:

14           (Reading:)

15           And it says that you're an office manager but

16        you said that you controlled the business and you

17        really -- you and Kareem were the ones that were

18        running things; right?

19           Yes.

20           But that's not reflected on this organization

21        chart; right?

22           That's correct.

23        The defendant's intent to defraud can also be seen by

24   his payments to the telemedicine doctors to rubber-stamp

25   fraudulent prescriptions without talking to patients.

1    How did the defendant use telemedicine doctors in the

2  fraud?  Well, for one thing he sent the telemedicine doctors'

3  orders with the doctors' notes already filled out and the

4  specific braces pre-selected.

5    Here you see the defendant submitting patient

6  information about Sadie Wilson to RediDoc.  RediDoc is the

7  telemedicine company David Laughlin testified about.

8    What does the defendant send to RediDoc?  A prefilled

9  prescription for an ankle brace.  The defendant is sending the

10  doctor the type of brace, specific product code, even the shoe

11  size.

12    Shouldn't it be the other way around, the doctor and

13  not a telemarketer selecting a patient's brace type?

14    The materials that are sent to RediDoc include

15  objective notes from a treating physician, a doctor's order

16  from a treating physician, but there is no treating physician.

17  There is no physician at all.  This information is going to

18  the doctor.

19    You may also recall the audio file associated with this

20  patient.

21    (Audio played.)

22    MR. SPECHT:  This telemarketer doesn't even get Sadie

23  Wilson on the phone.  The telemarketer gets Sadie Wilson's

24  granddaughter.  That's the audio file that the defendant sends

25  to RediDoc for a prescription with a pre-written doctor's

 1   order from a treating physician that says that the benefit of

 2   the brace has been explained to Sadie, a claim not supported

 3   by the audio file.

 4        David Laughlin, the COO of RediDoc testified about

 5   these documents.  (Reading:)

 6           Was this text written by a doctor?

 7           No.

 8           Did a doctor send this to RediDoc?

 9           No.

10           Who sent this to RediDoc?

11           A marketer.

12           And do you know who the marketer is for this

13        particular one?

14           Raheel.

15           Is this form based on a template?

16           Yes.

17        The defendant is sending pre-filled prescriptions to

18   RediDoc hoping that a doctor just rubber-stamps the

19   prescription.  Of course, as you've seen, doctors do exactly

20   that.

21        Again from the testimony of David Laughlin.  (Reading:)

22           What percentage of RediDoc consultations

23        resulted in a signed prescription from a doctor?

24           Over 99 percent.

25           What percentage of RediDoc consultations

1           resulted in a signed prescription without the

2           doctor speaking to the patient?

3               Equivalent.  Over 99 percent.

4               Did the defendant ever complain when a doctor

5           didn't sign a prescription?

6               Yes.

7           This is why the defendant worked with RediDoc.  RediDoc

8    doctors just signed prescriptions ASAP.  How could they sign

9    so quickly?  They didn't talk to the patient.  And to be sure,

10   RediDoc had a system that prompted doctors to check boxes

11   saying that they did certain things, but the doctors didn't do

12   that.

13          Again, David Laughlin.  (Reading:)

14              But did you understand whether they in fact did

15          the things that they checked the box for?

16              Did I, in fact, know that they did?  I knew

17          that they didn't.

18              Based on the volume and the turnaround time of

19          prescriptions getting signed, could the doctors

20          have always taken all those steps?

21              It's mathematically impossible and everyone

22          knew that.

23          This testimony from David Laughlin, it's corroborated,

24   for example, by the testimony of Shannon Haas, a doctor who

25   worked for RediDoc, who signed thousands of prescriptions.

1          According to Dr. Shannon Haas.  (Reading:)

2              When you signed the orders, did you speak to

3          the patients before you signed them?  Again, I'm

4          just talking about RediDoc.

5              No, ma'am.

6              Did you have a doctor-patient relationship with

7          the RediDoc patients?

8              No, ma'am.

9              Why do you say that?

10             Because I didn't see them, evaluate them, speak

11         with them.

12             Can you please explain in a few sentences what

13         you did to violate the law.

14             In signing the orders, I made false statements.

15             How would you know which brace to prescribe?

16             They would be pre-populated.

17         RediDoc doctors just described the braces, people like

18    the defendant picked.  That was their job.  The defendant paid

19    for telemedicine, the defendant called the shots.

20         THE COURT:  Mr. Specht, I'm going to stop you right

21    there.  It's 3:59.  We're with gonna pick it up Thursday

22    morning at nine o'clock with Mr. Specht's continuation of his

23    address.

24         All rise for the jury.

25             (Jury leaves the courtroom at 4:00 p.m.).

1           (Whereupon, the following proceedings were held

2              outside the presence of the jury:)

3        THE COURT:  The jury has departed, the door is closed.

4    Let's sit down, please, very quickly.

5        One other thing.  Mr. Webman, while we were discussing

6    before Mr. Specht began, I think also the *Jones* line should be

7    removed because the parties have agreed that that shouldn't

8    have been in there.

9        Okay by the United States?

10       MR. WEBMAN:  That's what we'll do, Your Honor.

11       THE COURT:  Ms. Solano, for the defendant.

12       MS. SOLANO:  Is that okay or do I have something -- an

13   application?

14       THE COURT:  Is that okay?

15       MS. SOLANO:  That's okay, yes.

16       THE COURT:  It sounds like you have an application.

17       MS. SOLANO:  Yes, Your Honor.  I believe that the

18   Government made the mis -- made the representation this

19   morning that it would not use the term "treating physician."

20       I heard it at least three times, and in light of that,

21   we renew our application that a limiting instruction or a

22   curative instruction, rather, be provided specific to treating

23   physician.

24       That was the subject of Quindoza's testimony.  I was

25   concerned about it.  They opened on it and then Mr. Specht,

1    notwithstanding the representation, said it at least three

2    times already.

3            THE COURT:  Mr. Specht.

4            MR. SPECHT:  Your Honor, I think here the Government's

5    reading from an exhibit.  We're not referencing a regulation

6    or a statute.  To the extent we're referring to something

7    that's admitted into evidence, I don't believe that creates

8    the issue underlying the defense concern.

9            THE COURT:  I'm not sure you were reading from the

10   exhibit.

11           MR. SPECHT:  If I may, I think there's a slide where it

12   says doctor's order from a treating physician.  There wasn't

13   someone in that capacity.  If that was misleading, I apologize

14   for that.  The goal here --

15           THE COURT:  Can you pop back to the slide for a second?

16   Is that doable?

17               (Brief pause.)

18           THE COURT:  This is the slide that's Government

19   Exhibit 2216d.

20           Is that what we're looking at?  Is this the right one?

21           MR. SPECHT:  Yes, Your Honor.  I think there's the

22   two --

23           THE COURT:  I saw that.  I think there was an

24   additional reference.

25           MR. SPECHT:  I think in talking about this I may have

```
 1   said that there wasn't a treating physician, just to mirror
 2   the language that's there that was sent to RediDoc.
 3         THE COURT:  I'm not sure why that implicates the
 4   concern.  Look, here is the problem -- Mr. Specht, I think the
 5   difficulty is this:  Whether it implicates the concern or not,
 6   Ms. Solano is right that there was an unencumbered
 7   representation made today about not using that phrase.
 8         And so at least as a formal matter this steps on the
 9   toe of that representation and puts everyone in a complicated
10   spot.
11         Aside from formalism, the difficulty, Ms. Solano, in
12   terms of any kind of application or a limiting instruction or
13   anything of the kind is that Mr. Specht has this right.  This
14   is admitted into evidence.  There's no suggestion here that
15   treating physician is key to some term in the Medicare rules
16   and regs or any kind of policy statement or anything of the
17   kind.
18         The purpose for which this is being put before the jury
19   is exactly what we spoke about earlier today, which is the
20   United States is not trying to strengthen or yeast up its case
21   by pointing to regs, even though it may have been able to make
22   its case stronger by doing that.
23         Instead, it's simply arguing from a lie, in it's
24   telling, and it's arguing from a lie by saying this says the
25   sky was blue and the sky is not blue.  This says there was a
```

1    treating physician.  There was no treating physician.

2         It's not relevant that the word "treating" was used.

3    It's simply to show that the negation is what the evidence in

4    the United States' telling shows.

5         So while I agree that as a formal matter the

6    United States did not hew to the representation it made this

7    morning, as a substantive matter, we're not even remotely in

8    the zone that relates to the various limiting instructions

9    that we discussed this morning and that were the subject of

10   the limiting instruction I gave.

11        Is there another reference, Ms. Solano, that you want

12   to bring to my attention?

13        MS. SOLANO:  I'm trying to find it, but I'm having

14   technical difficulties.  Can I have the evening to look at it

15   and then --

16        THE COURT:  Of course --

17        MS. SOLANO:  -- if there is something I think needs to

18   be addressed, I'll raise it first thing.

19        THE COURT:  Of course.

20        Anything else?

21        MS. SOLANO:  Not from the defense, Your Honor.

22        THE COURT:  From the United States?

23        MS. LOU:  No, Your Honor.

24        THE COURT:  We will see each other ready to start

25   nine o'clock on Thursday morning.  Thank you all.

1          (Which were all the proceedings held in the

2           above-entitled matter on said date.)

3                        *   *   *   *   *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

2

3       I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court

4    Reporter of the United States District Court for the District

5    of New Jersey, do hereby certify that the foregoing

6    proceedings are a true and accurate transcript from the

7    record of proceedings in the above-entitled matter.

8

9

10              */S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

11              Official U.S. District Court Reporter ~

12                   District of New Jersey

13

14              DATED this February 24, 2025

15

16

17

18

19

20

21

22

23

24

25